# ADMINISTRATIVE RECORD

# EXHIBIT 171



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20020

January 13, 2005

FAC No. SDG-237529

<u>By Federal Express Courier</u>
Shereef H. Akeel, Esq.
Akeel & Valentine, PLC
Suite 430
401 S. Old Woodward
Birmingham, MI 48009

     Re:  Islamic American Relief Agency (IARA-USA)

Dear Mr. Akeel:

     As part of the administrative reconsideration process initiated by IARA-USA through your letters of November 12, 2004, and November 30, 2004, the Office of Foreign Assets Control ("OFAC") has located in its files the enclosed twelve pieces of correspondence between IARA-USA and OFAC. OFAC will review this correspondence as part of the reconsideration process. As stated in our letter of January 10, 2005, any submission by you as part of this administrative reconsideration process should be made no later than February 7, 2005, in order to allow OFAC an opportunity to fully evaluate that information prior to making a reconsideration determination.

     As part of the ongoing administrative reconsideration process with IARA-USA, OFAC will also incorporate into its record all pleadings and exhibits that IARA-USA has filed in the case of *Islamic American Relief Agency v. Unidentified FBI Agents et al.*, No. 04-2264 (D.D.C.).

     Any submissions made in response to this letter or as part of the administrative reconsideration process should be directed to Robert W. Werner, Director, Office of Foreign Assets Control, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Annex, Washington, D.C. 20220. A copy of your submission also should be provided to Timothy Ott, Office of Chief Counsel (Foreign Assets Control), U.S. Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Annex, Washington, D.C. 20220.

IARA-2419

If you have any questions regarding this matter, please contact Mr. Ott at (202) 622-2410.

Sincerely,

Robert W. Werner
Director
Office of Foreign Assets Control

Enclosures

2

 **ISLAMIC AFRICAN RELIEF AGENCY** *(IARA-USA)*

P.O. Box 7084 ◆ Columbia, MO 65205 -USA ◆ Phone: (573) 443-0166 ◆ Fax: (573) 443-5975 ◆ E-mail: iarausa@mail.coin.missouri.edu

'98  JAN 20  P 3 :04

To: Office of Foreign Assets Control
    Licensing Division
    U.S. Department of the Treasury
    1500 Pennsylvania Avenue, N. W.
    Washington, D.C.   20220

RE: Request for License to process payments to Sudan.

Dear / Sir, Madam

Please consider this letter as an application for obtaining license to process payments to Sudan to fund our relief activities in Sudan. Enclosed you will find a brief summary about our projects and activities in Sudan.
The following is the information you requested for the license:

| | |
|---|---|
| 1- The name and address of the remitter: | Islamic African Relief Agency<br>201 E. Cherry ST. Suite # D<br>Columbia, MO. 65203 |
| 2- The name of the remitting bank: | Nations Bank – Columbia Mo. |
| 3- The name of the beneficiary bank: | City Bank – Khartoum Branch |
| 4- The name of the beneficiary: | Islamic African Relief Agency |
| 5- Beneficiary address: | P.O. BOX  3372<br>Khartoum Sudan |

Thank you for your time on this matter. If you have any question please contact me at (573) 443-0166.

Sincerely

Mubarak Hamed
Executive Director
IARA-USA

IARA-2421

# ISLAMIC AFRICAN RELIEF AGENCY (IARA-USA)

P.O. Box 7084 ♦ Columbia, MO 65205 -USA ♦ Phone: (573) 443-0166 ♦ Fax: (573) 443-5975 ♦ E-mail: iarausa@mail.coin.missouri.edu

The Islamic African Relief Agency, United States Affiliate (IARA--USA), is an American not for profit international organization dedicated to empowering disadvantaged peoples everywhere. IARA--USA provides emergency relief and participatory development programs based on principles of human dignity, self-reliance, and social justice, regardless of cast, creed, color or nationality, to those in need.

The IARA--USA office was registered in the state of Missouri in the United States in 1985. A copy of our registration and our tax identification and registration papers are included for your consideration. Our state identification number is #13910809. Our federal id number is #43-1439368.

Since 1993, IARA—USA has also been a member of Interaction. Interaction is a professional organization of not for profit agencies dedicated to working together to provide for the impoverished people everywhere, regardless of race, creed, or religion.

Also in 1993, IARA—USA registered with the United States Agency for International Development (USAID). At the present time, IARA—USA is implementing a child survival project in the region of Timbuktu, Mali as a result of an entry-level grant from USAID. A follow up proposal was recently submitted and is expected to be awarded for funding for the next four years.

Until now, IARA--USA has worked primarily through partnerships with registered not for profit humanitarian organizations in countries of need. No funds have ever been and never will be transferred to individuals or to governmental authorities. Each partnership has been controlled by a contract known as a Letter of Agreement. This contractual agreement clearly specifies the rights and responsibilities of the two organizations including how the funds are to be used and accounted.

Recently, the Board of Directors decided that IARA might best operate by establishing its own office in each of the countries in which it works. As a result, IARA—USA is in the process of establishing and registering its own office in each. These will be operated and run by qualified local people to oversee the projects and operations funded by IARA—USA. All monies will then go directly to our office there and then be distributed to the projects instead of going through a partner office.

Through its partnerships and with an annual budget of nearly $2 million US, IARA--USA has helped to build orphanages, schools, feeding and nutritional centers, hospitals and medical clinics as well as helping to support well water, agriculture, and income generating projects that encourage self-reliance and independence of a community.

IARA-2422

Currently, our partner in Sudan is the Islamic African Relief Agency, Sudan. This relationship has been long standing and beneficial to the many poor, the disabled, and displaced peoples of Sudan as well as refugees from neighboring countries.

A major component of IARA--USA's work is its child sponsorship program that provides for many needy children in seventeen countries. In Sudan, IARA supports more than 400 children in need of support mostly in the outlying regions of Khartoum (including Gaabl Awlera, Al-Thawra, Al-Kalakla Alwehda, Khartoum North, Gouz Al Saaleem-Kosti, Al-Nofalab Gezra Slay, At barra of Nile State, Al-Sahafa, Al Nouba Al Hassaneb, Gaabaal Awlia-Zaitoun, Al Hg Yousef) as well as in Omdurman, Kassala, Gederef, Port Sudan, Juba, and other regions as well. Most of the current sponsorships are in the Khartoum area because of the reporting requirement is difficult to fulfill for the children in the other regions.

In all regions, individuals qualified for support include poor children whose fathers are deceased or missing, the disabled, and the displaced. In developing countries, mothers are frequently unable to earn enough to provide for their children's needs so single parent families are included.

The screening process to determine the individuals eligible for sponsorship include an application, the presentation of the death certificate for the father, and a demonstrated need. The sponsorship is a one to one assignment where each sponsor is assigned a particular child to support for an amount of $30 monthly, $90 quarterly or $360 yearly. The sponsorship program is one of IARA's most successful projects.

IARA--USA also has extensive efforts in health care delivery in a variety of geographical locations of Sudan including displaced persons camps and a hospital and clinics. Beneficiaries include civil war victims, refugees from neighboring countries including Eritrea, Chad, Uganda, and Zaire, and the poor. These facilities operate to provide preventative and emergency health and nutrition programs to the malnourished, the poor and the displaced. The program centers help to provide mother and child care, to monitor child growth, and to provide immunizations and supplementary food for those in need. Some of the polyclinics also house income-generating programs and community educational services. Once established, the clinics and hospital will operate on a cost recovery system. The hospital is located centrally in Khartoum and the polyclinics in the peripheral areas and simple clinics in the more rural areas. This system is designed to establish needed medical services in areas where there is none and each clinic refers cases as necessary to the polyclinics and hospital. These clinics offer services for less cost than can be found elsewhere.

IARA—USA also helps to provide services for the displaced persons and refugee camps in Sudan. In these camps, many organizations work together to provide for the needs of the people there. Some provide educational services, some medical facilities, some water, etc. IARA—USA most often helps in these camps by establishing safe water wells, providing emergency food relief, and setting up medical clinics to safeguard the lives and health of the people, especially for the mothers and children. The refugees and the displaced also benefit from the

IARA-2423

seasonal projects implemented by IARA.

Seasonal projects include the Iftar Siam program, the distribution of Zakat-ul-Fitr, and the Audhia projects. These projects are charitable programs that honor the Islamic holidays of Ramadan, the celebration or `Eid-ul-Fitr (at the end of Ramadan) and the celebration or `Eid-ul-Adha (at the end of the pilgrimage time).

The Islamic religion dictates that every Muslim pay alms that are known as Zakat-ul-Fitr, this year an estimated $8 per person in the USA, by the end of the month of Ramadan to help provide for the hungry and needy. These funds are used to provide for the needs of the displaced and the children in the sponsorship program and is distributed in the form of foodstuffs.

The Iftar Siam program is an assistance to poor families during the month of Ramadan when all Muslims are to fast from dawn to sunset. For the poor, this month can be difficult when they may not get enough to eat. The Iftar Siam program helps to provide nutritious food for the poor on which to break their fast at sunset of each day.

The Audhia program is a celebration of Abraham's willingness to sacrifice his son. To commemorate this, Muslims around the world sacrifice a lamb, goat, cow or camel and then, according to Islamic law, donate at least one third of the meat for charity, one third for their extended family, neighbors, and friends, and one third for their own families. Many Muslims like to provide for those in need overseas as well. For many of the poor around the world, this may be the only meat they eat in the year. IARA's program helps to make this possible. For the Audhia program, IARA keeps careful account of the number and kind of animals for sacrifice and then the staff of our partner offices organize the sacrifice and the distribution of the meat. This most often happens in the displaced persons camps and among the children of the sponsorship program.

Another project in Sudan includes the digging of safe water wells, both shallow and deep, in areas of need. Some wells are in the displaced persons camps and some in other communities. Most recently, IARA began working in the regions of Kurdofan and Darfor Sudan for this effort. This is a participatory development project with the villagers of the regions.

IARA—USA also donates in-kind donations. These are primarily medical equipment and medical supplies that go directly to the hospital and clinics for use. Some clothing is also shipped and this is distributed within the displaced persons camps as well.

IARA--USA also operates the Wad AlHillayoh Project in Gederef, Sudan. This is a project to provide needed educational services to those in need. Some in-kind donations are distributed and used at this site. Beneficiaries include the poor and those registered in the sponsorship program.

IARA-2424



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

FAC No. SU-160731

JAN 3 0 1998

Dear Mr. Mubarak:

You have requested that the Islamic African Relief Agency (IARA-USA) be issued a license/registration number to process payments to Sudan to fund activities there.

After careful consultation and close coordination with the U.S. Department of State, it has been determined that the issuance of a license or registration number to the Islamic African Relief Agency would not be consistent with current U.S. policy regarding Sudan. Your application, therefore, must be denied at this time.

If you have any further questions, please contact Compliance Officer Lorraine B. Lawlor at 202/622-2490.

Sincerely,

Dennis Wood
Chief, Compliance Programs Division
Office of Foreign Assets Control

Mubarak Hamed
Executive Director
Islamic African Relief Agency (IARA-USA)
P.O. Box 7084
Columbia, MO 65205

IARA-2425

## ISLAMIC AFRICAN RELIEF AGENCY (IARA-USA)

P.O. Box 7084  ◆  Columbia, MO 65205  USA  ◆  Phone: (573) 443-0166  ◆  Fax: (573) 443-5975  ◆  E-mail: iarausa@mail.coin.missouri.edu

August 4, 1998

Mr. Richard Newcomb
Director, Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Dear Mr. Newcomb:

As an established American not for profit humanitarian relief and development agency, the board of directors, officers, and staff of the Islamic African Relief Agency, USA (IARA—USA) would like to petition your office to reconsider granting a license and registration number for our agency to provide much needed humanitarian relief services in Sudan. We are an American agency abiding by the rules of governance of American law and protecting American interests. In the past, our work there has been extensive for a small organization like ours, and it is important to our private donors that we continue our efforts to help the poor, the displaced and the war victims throughout Sudan.

It is our hopes that we can once again contribute to the cause of helping those in need in Sudan, regardless of politics, race, creed, nationality, or religion. While IARA—USA has "Islamic" in its name, in its provision of services, our office does not discriminate. Such discrimination would go against our agency's fundamental beliefs that all people in need should be served.

As you know, the situation is escalating in Sudan. More and more people are suffering from hunger, dehydration and increasing numbers are becoming displaced. From our understanding, the situation in the Bhr El Ghazal and other states is worsening. The population is already beyond the previous estimates and such numbers indicate a likelihood of even greater influxes in the future. The morbidity and mortality rate is significantly increasing. In addition to this, there are very poor water and sanitary services in the area and this is expected to worsen with the rainy season which in turn, will have an adverse effect on the morbidity and mortality rate in the region.

It is imperative for the humanitarian community to take further action now. With such frightening indicators, it is increasingly important that the relief and development community utilize every resource to help meet the needs of the people. IARA—USA would like to be one of those resources. With the permission of your office, IARA would

IARA-2426

like to form a coalition with one or more other American non for profit humanitarian agencies to provide relief in the crisis areas of Sudan.

It is our hopes that you will hear our plea and that of others who have contacted you on our behalf. IARA—USA is truly dedicated to providing relief and development services to those in need without bias. The situation in Sudan is worsening daily, we want to help and are prepared to do so with the permission of your office. Please consider our pleas on the behalf of those in need in Sudan.

Thank you for your time and consideration.

Sincerely,

Mubarak A. Hamed
Executive Director

IARA-2427

DAVID E. BONIOR
MICHIGAN

H-307, THE CAPITOL
WASHINGTON, DC 20515-6538
(202) 225-3130

**One Hundred Fifth Congress
U.S. House of Representatives
Office of the Democratic Whip**



August 3, 1998

Mr. Richard Newcomb
Director, Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

Dear Mr. Newcomb:

I am writing to urge you to consider granting a license and registration number to allow the Islamic African Relief Agency (IARA-USA) to provide humanitarian relief in Sudan.

The sanctions law allows OFAC to register non-governmental organizations seeking to provide humanitarian assistance in Sudan. With the famine worsening in Sudan, it is more important than ever to permit appropriate assistance of a humanitarian nature through legitimate, internationally-recognized non-governmental organizations (NGOs) in order to relieve the suffering.

IARA-USA is a member of Interaction, the well-known network of NGOs which provide humanitarian assistance, and has received grants from USAID for its work elsewhere in Africa. IARA-USA's goals in Sudan include providing support for effective programs to aid poor children, deliver health services to refugees, and provide water and emergency food relief.

I have been informed that OFAC earlier this year decided not to issue a license or registration to IARA-USA, but the humanitarian situation in Sudan now is much more grave. IARA-USA appears to meet all the qualifications for an appropriate NGO, and I hope you will give their application every consideration within the scope of the sanctions law.

Thank you for taking my views in this matter into consideration.

Sincerely,

David E. Bonior
Democratic Whip

DEB/snp

IARA-2428

573-443-5975    p.2



# ISLAMIC AFRICAN RELIEF AGENCY (IARA-USA)

P.O. Box 7084 ◆ Columbia, MO 65205 -USA ◆ Phone: (573) 443-0166 ◆ Fax: (573) 443-5975 ◆ E-mail: iarausa@mail.com.missouri.edu

August 11, 1998

Mr. Richard Newcomb
Director, Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Dear Mr. Newcomb:

Thank you for reconsidering the license and registration of our agency, the Islamic African Relief Agency, USA (IARA-USA). Although the positive decision is not yet been made, we feel confident that it will be.

At this time, IARA-USA would like to let you know that we have worked toward a new partnership in the region of Sudan. We have completed a cooperative agreement with Medical Care Development Incorporated (MCDI) who will be the primary organization there in Sudan and we, if allowed to implement our relief program, will be the sub-recipient and operating under their auspices. As you may know, MCDI's record and reputation for providing quality programs throughout the world is exceptional. We feel that this partnership will help build our capacity as well as provide quality programs to those in need.

Also at this time, IARA-USA would like to condemn the recent tragedies in Nairobi and Dar es Salaam. Such atrocities make our work so much more difficult and yet, that much more necessary. Terrorism is an unnecessary and unacceptable atrocity for innocent victims in an unknown war. We stand behind all efforts to help eliminate this scourge from the world and to bring the murderers to justice.

Thank you for your time and consideration.

Sincerely,

Mubarak A. Hamed
Executive Director

IARA-2429



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

FAC No. SU-164827

OCT 3 0 1998

Dear Mr. Mubarak:

You have again requested that the Islamic African Relief Agency (IARA-USA) be issued a license/registration number to process payments to Sudan to fund activities there.

After careful reconsideration of your application and close consultation and coordination with the U.S. Department of State, it has been determined that the issuance of a license or registration number to the Islamic African Relief Agency is not consistent with current U.S. foreign policy interest. Therefore, your application must be denied at this time.

If you have any further questions, please contact James Seward of my Compliance staff at 202/622-2490.

Sincerely,

Dennis Wood
Chief, Compliance Programs Division
Office of Foreign Assets Control

Mubarak Hamed
Executive Director
Islamic African Relief Agency (IARA-USA)
P.O. Box 7084
Columbia, MO 65205

IARA-2430

FROM : IARA-USA                    FAX NO. :                    Jan. 02 2004 09:27AM  P3

 **ISLAMIC AMERICAN RELIEF AGENCY (IARA-USA)**

P.O. Box 7084 • Columbia, MO 65205—USA • Phone: (573) 443-0166 • Fax: (573) 443-5975 • E-mail: iara@iara-usa.org
• Website: www.iara-usa.org

December 31st, 2003

Attn: Licensing Division
Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Subject: Request for License to carry out Humanitarian Relief in Iran For Earthquake
Victims in Iran

Dear/Sir, Madam
Please consider this letter as an application for obtaining authorization to carry out
humanitarian aid in Iran for earthquake victims.

Islamic American Relief Agency (IARA-USA) is a non-for-profit relief and development
agency. IARA-USA was registered in the state of Missouri in the United States in 1985.
Our state identification number is #13910809. Our federal id number is #43-1439368.

IARA-USA is planning to participate in the humanitarian assistance to the people of Iran
following Friday's devastating earthquake in Bam. IARA-USA is going to collect in-kind donation
and used clothes from the local communities for earthquake victims. IARA-USA is going to ship
the collected humanitarian goods to the Iranian Red Crescent.

Thank you for your time on this matter. If you have any question please contact me at
(573) 424 0318 or email at iarahamed@aol.com.

Sincerely,

Mubarak Hamed, Ph.D.
Executive Director
201 E. Cherry Street Ste#D
Columbia, MO 65203
Fax #573-443-5975.

IARA-2431

 **ISLAMIC AMERICAN RELIEF AGENCY (IARA-USA)**

P.O. Box 7084 ♦ Columbia, MO 85205—USA ♦ Phone: (573) 443-0186 ♦ Fax: (573) 443-5975 ♦ E-mail: iara@iara-usa.org
♦ Website: www.iara-usa.org

December 31st , 2003

Attn: Licensing Division
Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Subject: Request for License to carry out Humanitarian Relief in Iran For Earthquake
Victims in Iran

Dear/Sir, Madam
Please consider this letter as an application for obtaining authorization to carry out
humanitarian aid in Iran for earthquake victims.

Islamic American Relief Agency (IARA-USA) is a non-for-profit relief and development
agency. IARA-USA was registered in the state of Missouri in the United States in 1985.
Our state identification number is #13910809. Our federal id number is #43-1439368.

IARA-USA is planning to participate in the humanitarian assistance to the people of Iran
following Friday's devastating earthquake in Bam. IARA-USA is going to raise $250,000.00 for
purchasing tents, blankets and winter clothes for earthquake victims. IARA-USA is going to
purchase the humanitarian goods from the global market. The humanitarian goods are going to
be delivered to the Iranian Red Crescent.

Thank you for your time on this matter. If you have any question please contact me at
(573) 424 0318 or email at iarahamed@aol.com.

Sincerely,

Mubarak Hamed, Ph.D.
Executive Director
201 E. Cherry Street Ste#D
Columbia, MO 65203
Fax #573-443-5975.

IARA-2432



# ISLAMIC AMERICAN RELIEF AGENCY (IARA-USA)

P.O. Box 7084 • Columbia, MO 65205—USA • Phone: (573) 443-0166 • Fax: (573) 443-5975 • E-mail: iara@iara-usa.org
• Website: www.iara-usa.org

January 16, 2004

Attn: Licensing Division
Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Subject: Request for License to carry out Humanitarian Relief in Iraq

Dear/Sir, Madam
Please consider this letter as an application for obtaining authorization to carry out humanitarian aid in Iraq.

Islamic American Relief Agency (IARA-USA) is a non-for-profit relief and development agency. IARA-USA was registered in the state of Missouri in the United States in 1985. Our state identification number is #13910809. Our federal id number is #43-1439368.

IARA-USA is planning to participate in the humanitarian assistance to the people of Iraq by the following items:
1. To finish the construction of the second and third floors of the north side of a new orphanage in Al-salikh, Baghdad. The orphanage is managed by the Islamic Relief Agency (ISRA -Middle East). The total amount is going to be $200,000.
2. To support at least 500 orphans through the existing orphanages in Iraq. Each orphan is going to be supported by $1a day.
3. To send in-kind donations.
4. To provide emergency relief.

All the our relief is going to be delivered through our regional partner.

Thank you for your time on this matter. If you have any question please contact me at (573) 424 0318 or email at iarahamed@aol.com.

Sincerely,

Mubarak Hamed, Ph.D.
Executive Director
201 E. Cherry Street Ste#D
Columbia, MO 65203
Fax #573-443-5975.

IARA-2433



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

**17 FEB 2004**

Case No. IQ-2454

Mubarak Hamed, Ph.D.
Executive Director
Islamic American Relief Agency
201 E. Cherry Street, Ste. #D
Columbia, MO 65203

Dear Doctor Hamed:

This letter responds to your January 16, 2004 application to the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") for authorization to carry out humanitarian relief in Iraq. Please be advised, OFAC is responsible for administering sanctions against Iraq.

The sanctions against Iraq are set forth in the Iraqi Sanctions Regulations, 31 C.F.R. Part 575 (the "Regulations"). After the United Nations Security Council lifted multilateral sanctions against Iraq on May 22, 2003, OFAC amended the Regulations, effective May 23, 2003, to add a general license (the "GL"). Regulations § 575.533. The GL authorizes U.S. persons to engage in all transactions previously prohibited by the Regulations, except as provided in paragraph (b) of the GL. Regulations § 575.533(a).

Please note that paragraph (b) of the GL requires that the exportation from the United States or, if subject to U.S. jurisdiction, the exportation or reexportation from a third country to Iraq of any goods or technology (including technical data or other information) controlled by the U. S. Department of Commerce under the Export Administration Regulations for exportation to Iraq must be separately authorized by OFAC. Regulations § 575.533(b)(2).

The Department of Commerce is responsible for determining whether particular goods or technology are classified as being controlled for exportation to Iraq. Under the circumstances described in your letter, you should consult the Department of Commerce as to the export status of the goods or technology identified in your letter. Any questions you may have as to whether and how a specific item is classified as controlled for export to Iraq should be addressed to the Department of Commerce/Bureau of Industry and Security at 202/482-4811.

For additional information about the Regulations or the GL, you may refer to our website: www.treas.gov/ofac. Should you wish to speak with a representative of OFAC, you may call our office at 202/622-2480.

Sincerely,

David W. Mills
Chief of Licensing
Office of Foreign Assets Control

IARA-2434



## ISLAMIC AMERICAN RELIEF AGENCY (IARA-USA)

P.O. Box 7084 • Columbia, MO 65205—USA • Phone: (573) 443-0166 • Fax: (573) 443-5975 • E-mail: iara@iara-usa.org
• Website: www.iara-usa.org

June 14, 2004

Attn: Licensing Division
Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Dear Sir/Madam:

Subject: Request for License to Conduct Humanitarian Relief for War Victims in Darfur Region,
Sudan

The Islamic American Relief Agency (IARA-USA) is applying for authorization to provide humanitarian aid for war victims in Darfur region in Sudan.

IARA-USA is a not-for-profit relief and development agency, registered in the state of Missouri, United States in 1985. IARA-USA's Missouri state identification number is #13910809 and its federal identification number is #43-1439368.

IARA-USA will want to work in affected area/s to provide humanitarian assistance to the people, especially the more than one million displaced people in the Darfur region. This effort is a response to the UN High Commissioner for Refugees, Mr. Ruud Lubbers' appeal to the international community that "people fleeing conflict in Sudan's war—ravaged Darfur region are facing a disaster unless peace is restored to the area where more than one million people have been displaced in recent months."

IARA-USA is going to raise about $250,000.00 for purchasing of tents, blankets, medicine and used clothes for the victims. IARA-USA is going to purchase the humanitarian goods from the global market.

Thank you for your time on this matter. If you have any question please contact me at the above contact information, my cell phone at (573) 424 0318 or email at iarahamed@aol.com or iara@iarausa.org.

Sincerely,

Mubarak Hamed, Ph.D.
Executive Director

IARA-2435

 ## ISLAMIC AMERICAN RELIEF AGENCY (IARA-USA)

P.O. Box 7084 • Columbia, MO 65205—USA • Phone: (573) 443-0166 • Fax: (573) 443-5975 • E-mail: iara@iara-usa.org
• Website: www.iara-usa.org

June 14, 2004

Attn: Licensing Division
Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Dear Sir/Madam:

### Subject: Request for License to Conduct Assessment of Needs to support US-Led Peace Pact in Southern Sudan

The Islamic American Relief Agency (IARA-USA) is applying for authorization to carry out needs assessment to support US-Led peace pact between the government of Sudan and Sudan People's Liberation Movement (SPLM).

IARA-USA is a not-for-profit relief and development agency, registered in the state of Missouri, United States in 1985. IARA-USA's Missouri state identification number is #13910809 and its federal identification number is #43-1439368.

IARA-USA is planning to explore the possibility of conducting needs assessment to support the peace treaty by sending a peace delegation. The needs assessment may lead IARA to develop projects that might deal with health, nutrition, education, including vocational training, and other relief efforts.

*The tentative budget to conduct the needs assessment is put at $50,000.*

Thank you for your time on this matter. If you have any question please contact me at the above contact information, my cell phone at (573) 424 0318 or email at iarahamed@aol.com or iara@iara-usa.org.

Sincerely,

Mubarak Hamed, Ph.D.
Executive Director

IARA-2436



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

SEP 2 2 2004

FAC No. SU-226353

Mubarak Hamed
Executive Director
IARA-USA
P.O. Box 7084
Columbia, MO  65205

Dear Dr. Hamed:

You have requested that the Islamic American Relief Agency (IARA-USA) be issued a registration number to authorize its activities in Sudan, including the transfer of funds to and from Sudan.

After careful consideration of your application and close consultation and coordination with the U.S. Department of State, it has been determined that the issuance of a registration number to the Islamic American Relief Agency (IARA-USA) is not consistent with current U.S. foreign policy and U.S. Government interests.  Therefore, your application must be denied at this time.

If you have any further questions, please contact Alice Rojas of my Compliance staff at 202/622-2490.

Sincerely,

Dennis Wood
Chief, Compliance Programs Division
Office of Foreign Assets Control

IARA-2437

# ADMINISTRATIVE RECORD

# EXHIBIT 172

**AKEEL & VALENTINE, PLC**
**401 S. Old Woodward**
**Suite 430**
**Birmingham, Michigan 48009**

**Shereef H. Akeel, P.C.**
**Glenn L. Valentine, P.C.**

**Tel:  (248) 594-9595**
**Fax:  (248) 594-4477**

January 25, 2005

Robert W. Werner, Director
Office of Foreign Assets Control
U. S. Department of Treasury
1500 Pennsylvania Avenue NW
Washington, D.C.  20220

Via facsimile and first class mail
(202) 622-1911

RE:    Islamic American Relief Agency (IARA - USA)
        License No.  SDGT-403

Dear Mr. Werner:

Thank you for your letter dated January 13, 2005.  In response, please find enclosed Plaintiff's Response to Defendants Opposition to Plaintiff's Motion for Preliminary Injunction which was filed last week.

Please also be advised that a hearing in the above matter has been scheduled for Friday, January 28, 2005 at 3:00 p.m. before the Honorable Reggie B. Walton.

If you have any questions, please feel free to call.

Very truly yours,

AKEEL & VALENTINE, PLC

Shereef H. Akeel

SHA/dlb
Enclosure
cc:    Timothy Ott, Office of Chief Counsel, Foreign Asset Control, U.S. Department of Treasury,
        1500 Pennsylvania Avenue, N.W. Annex, Washington, D.C. 20220
        Andrea Gacki, U.S. Department of Justice, Civil Division, 20 Massechusets Avenue, N.W.,
        Room 7308, P.O. Box 883, Washington, D.C. 2044
*Note: Faxed without exhibits*
\\Secretary\c\MyFiles\G - L\iara-usa\Werner.ltr.2wpd.wpd

IARA-2438

## Oppositions and Replies

1:04-cv-02264-RBW ISLAMIC AMERICAN RELIEF AGENCY v. ASHCROFT et al

### U.S. District Court

### District of Columbia

Notice of Electronic Filing

The following transaction was received from Akeel, Shereef entered on 1/19/2005 at 9:03 PM EDT and filed on 1/19/2005

**Case Name:**       ISLAMIC AMERICAN RELIEF AGENCY v. ASHCROFT et al
**Case Number:**     1:04-cv-2264
**Filer:**           ISLAMIC AMERICAN RELIEF AGENCY
**Document Number:** 11

**Docket Text:**
REPLY to opposition to motion re [3] *Preliminary Injunction* filed by ISLAMIC AMERICAN RELIEF AGENCY. (Attachments: # (1) Exhibit License Requests# (2) Exhibit Requests to resume USAID# (3) Exhibit UN document# (4) Exhibit Affidavit of El-Beshir# (5) Exhibit AIDS plea# (6) Exhibit UN Status Report# (7) Exhibit InterAction List# (8) Exhibit Proofs of Service)(Akeel, Shereef)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**\\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Reply to Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-0]
[9c542383257469237df663cacf717d9685c2920031f94a71ed168e03324e64f26b732
22676a4ec3246416769590597237818a4d90dd83b6b36c7f55cb0a68d4d]]
**Document description:**Exhibit License Requests
**Original filename:**\\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Exhibit A Reply to Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-1]
[ad73290eaa21f0991e3a92b70a59896cf86610d6fe54d0837f030a1337aed0fb955e0
2ed332b5cb4a288248a62c4a4204cca5e32d178d963825a204e63b10ade]]
**Document description:**Exhibit Requests to resume USAID
**Original filename:**\\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Exhibit B reply to Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-2]
[6696f19e4598f6f0c2ed158b8ce1f590071f7c0b4c37f771917572dbb3e3751d8ef6d
11d23e9a4f0bdc68e3a6c0c7972576d4180ed36c48de369414f45e8d93e]]
**Document description:**Exhibit UN document
**Original filename:**\\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Exhibit C Reply to Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-3]

IARA-2439

[54c20c816b7aa709e36310ed780b187b56295fd6fe25761f591c217acd4977c5d9e93
8a2b3042ef4bac97278d289a9daf437aac1f5dbb3bd819e286d6266f68f]]
**Document description:** Exhibit Affidavit of El-Beshir
**Original filename:** \\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Exhibit D Reply to
Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-4]
[20f2deb4361e98f7df1d091d724a8fdd380b480a0df33276f7f3c4eb4e4088f97a157
43a18662a3dbb5b1d1d934d834c6d199b8a10fda83b5185a93bf83ffc41]]
**Document description:** Exhibit AIDS plea
**Original filename:** \\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Exhibit E Reply to
Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-5]
[163128583163f043751ea89b0b72f8dfc4718714003df3db4807ac4619303affa12a1
e4866722d81757f0ed07daad0a6d3e2942c54000e668169bd738b4fa18c]]
**Document description:** Exhibit UN Status Report
**Original filename:** \\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Exhibit F Reply to
Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-6]
[1fe9fb862eb53ce1a076bdc8b49a9984c60926a6662d02657ecde9b89a24e8f9d9045
481a768d6ddf75a7d78b6c27c8272b9cbd886d16eaad2bebfdaeb83ee17]]
**Document description:** Exhibit InterAction List
**Original filename:** \\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Exhibit G Reply to
Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-7]
[24b0b183caec5ccdf8007912bc3d249e9e2d9e03c7880db3babaaf2cea65cb968aaf0
98b130bbb72afda5b2ed09354b7105947b4f59d26b540f2779020ad84c9]]
**Document description:** Exhibit Proofs of Service
**Original filename:** \\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Exhibit H Reply to
Opposition.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/19/2005] [FileNumber=650728-8]
[68ad61028a8253a6499d6b2541e049c6e6858e41ccffecf6aeecc269d180ee4dc1d67
6076510056c54a1dfd23010b9fc4c46881217675693a4e58b213d36e35a]]

**1:04-cv-2264 Notice will be electronically mailed to:**

Shereef Akeel    shereef@akeelvalentine.com,

Andrea Marie Gacki    andrea.gacki@usdoj.gov,

Carlton Greene    carlton.greene@usdoj.gov,

John Kenneth Zwerling    jz@zwerlingkemler.com,

**1:04-cv-2264 Notice will be delivered by other means to:**

IARA-2440

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISLAMIC AMERICAN RELIEF AGENCY
(IARA-USA),
201 East Cherry Street, Suite D
Columbia, MO 65203

      Plaintiff

vs.                                                        Case No.  1.04CV02264
                                                           Hon. Judge Reggie B. Walton

UNIDENTIFIED FBI AGENTS, PAUL SCHLUP, AND
OTHER UNIDENTIFIED DEPARTMENT OF TREASURY PERSONNEL,
in their individual and official capacities, JOHN SNOW, in his individual
and official capacity as Secretary of the Department of Treasury,
JOHN ASHCROFT, in his individual and official capacity as
Attorney General of the United States, and United States
Department of Justice,

      Defendants

_____/

JOHN KENNETH ZWERLING (#147637)          MICHAEL LEE HERTZBERG (#357319)
Attorneys for Plaintiff                  Attorneys for Plaintiff
108 North Alfred Street                  740 Broadway, Fifth Floor
Alexandria, VA 22314                     New York, NY 10003
703) 684-8000                            (212) 982-9870

SHEREEF H. AKEEL (P54345)                Carlton E. Greene
Attorneys for Plaintiff                  Andrea Gacki
401 S. Old Woodward Avenue               Attorneys for Defendants
Suite 430                                U. S. Department of Justice
Birmingham, MI 48009                     Civil Division
(248) 594-9595                           20 Massachusetts Avenue, N.W.
                                         Room 7308
                                         P. O. Box 883
                                         Washington, D. C.  20044

_____/


**RESPONSE TO DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

IARA-2441

**TABLE OF CONTENTS**

Page

Introduction........................................................................................................ 2

Reply to Factual Background............................................................................. 6

Plaintiff has Satisfied the Elements for Entry of a Preliminary Injunction.......................... 8

OFAC Exceeded Its Authority Under IEEPA...................................................... 16

This Court has Jurisdiction Regarding FBI's actions......................................... 16

Defendants Violated Plaintiff's Constitutional Rights........................................ 17

Defendants Violated Plaintiffs Fourth Amendment Rights................................. 18

Defendants' Have Violated Plaintiffs Fifth Amendment Rights......................... 19

Freedom of Association...................................................................................... 20

Bivens and 42 USC 1985 Claims........................................................................ 21

Public Interest is in Favor of Injunctive Relief.................................................. 21

Relief Requested................................................................................................. 22

i

IARA-2442

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                         Page

*Aero Continente, S.A. v Newcomb*
    No. 04-01168 (D.D.C. July 16, 2004), aff'd, No 04-53265
    (D.C. Cir. Aug. 2, 2004)............................................................................5

*Citizens to Preserve Overton Park vs Volte,*
    401 U.S. 402,416 (1971)........................................................................ 9

*Dorfman v Boozer,*
    414F.2d 1168,113 (D.C. Cir. 1969).......................................................... 12

*Global Relief Found. v O'Neill,*  207 F. Supp. 2d 779 (N.D. Ill. 2002), *aff'd,*
    315 F.3d 749 (7th Cir.), *cert denied,* 540 U.S. 1003 (2003)...............................5

*Holy Land for Relief and Dev. v Ashcroft*
    219 F. Supp 2d 57 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003),
    cert. denied 540 U.S. 1218 (2004)..........................................................passim

*Motor Vehicle Manufactures Association vs State Farm Mutual Automobile*
    *Insurance Company*, 463 U.S. 29, 43 (1983)....................................................10

Soldal v Cook County
    506 US 56 (1992)...............................................................................19

United States ex rel. Rahman v Oncology Associate
    198 F.3d 489 (4th Cir. 1999)..................................................................19


<u>STATUTES</u>


28 USC 1391 (e)......................................................................................17
15 USC 1701...........................................................................................18

<u>FEDERAL RULES CRIMINAL PROCEDURES</u>

Rule 41...............................................................................................7,17
Rule 64................................................................................................19

ii

IARA-2443

**Introduction**

Plaintiff has no intention to undermine the President's authority to combat terrorism. Plaintiff is in strong support of the President's efforts and the use of his powers. However, in this action, in carrying out the powers delegated by the President, defendants have grossly abused the powers they are entrusted with and have engaged in a fishing expedition to create facts where none exist to support the allegation that plaintiff has supported terrorism.

Through their own admissions and recent submission of documents, defendants have not produced any evidence, whatsoever, that a single penny from plaintiff went to fund any wrongful act. They have not produced any document allegedly evidencing that plaintiff supports terrorism. Nor did defendants provide any proof, whatsoever, that plaintiff engaged in any wrongful act. Of equal significance, the record is totally absent and void of evidence that the African entity exerted any influence or control on this American charity.

Instead, relying on historical relationships developed 10-20 years ago **before** IARA in Sudan was designated a terrorist organization with its officials, web sites of other organizations, together with Washington Post, Newsweek, Associated Press, New York Times articles and Google searches, defendants have somehow concluded that plaintiff IARA-USA is supporting terrorism, and is simply another name (AKA) for the Sudanese entity known as Islamic African Relief Agency. This cannot be farther from the truth and contrary to defendants own submitted documents. Indeed, this presumption underscores the very concern raised by the staff members to the September 11 commission panel concerning speculation based on historical relationships, with no evidence of any wrongdoing.

2

IARA-2444

Defendants own documents speak for themselves in showing that the two organizations were entirely separate and independent. On paper, there is not one document that states plaintiff, IARA-USA is an AKA of the African entity. In examining the course of conduct, based on the documents, thus far presented, there is not one correspondence, one financial transaction, or one activity exchanged between plaintiff and the African entity. There are no common employees, directors or officers. There is not one report, tax return, financial document or bank record that would show any connection between plaintiff and the African entity. Even assuming a connection, which has not been established, there is no evidence, whatsoever, that can be reasonably construed to establish that plaintiff supported terrorism.

On January 13, 2005, after this instant motion was filed, defendants furnished several license requests previously made by plaintiff (**Exhibit A**), including one made by then Congressman, Democratic Whip, David E. Bonier, to allow plaintiff to provide humanitarian aid  to Sudan to combat the very worsening crisis of famine and displacement. Each request was denied, but strongly demonstrates plaintiff's course of conduct in following the letter of the law in efforts to obtain permission to transact charitable activities in Sudan and provide humanitarian relief to that country. Most importantly, the requests demonstrate the total independence of IARA-USA from any organization in Africa, including the African based Sudanese entity, Islamic African Relief Agency, which was recently deemed a terrorist organization. After all, if the entities were one and the same, why would plaintiff been requesting permission to furnish relief in efforts to assist the African entity in Sudan.

For nearly 5 years, plaintiff urged and pleaded with defendants to have its USAID agreements resumed and to be allowed to provide humanitarian efforts to one of the poorest and

3

IARA-2445

famine stricken countries in African, Sudan. (**Exhibit B**) Never once did defendants advise plaintiff of any specific concerns, including alleged possible links to Islamic African Relief Agency.

Unfortunately, defendants have also misapplied the terms "partner" and "affiliate" to the plaintiff and the African organization. Those terms have completely separate meanings within NGOs - essentially NGOs working together on given projects. By taking defendants' application of the words "partner" and "affiliate" to their logical conclusion, without a scintilla of evidence that plaintiff allegedly supported terrorism, reputable non-for- profit organizations and NGO's such as International Council of Voluntary Agencies (ICVA) InterAction, UNICEF, CORE, and even the United Nations would require that their assets be frozen, since they all were partners, members or had a working relationship at some time during the past 20 years with the African entity before it was designated as a terrorist organization.

For example, see Exhibit 3 of Werner Declaration at IAR277 of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, for members of ICVA and, **Exhibit C** reflecting a United Nations document expressly stating that it "maintains close relations with thousands of NGOs" and have "mutually beneficial working relationship." Further, the United Nations granted the African entity, Islamic African Relief Agency, a "Special Consultative Status" with the Economic and Social Council (ECOSOC) of the United Nations.

Further, with respect to the name similarity, **Exhibit D** is the affidavit of a former Sudanese student, referenced in defendants' brief, explaining the origin of plaintiff's name. Mr. Mohammed Ahmed El-Beshir arrived in late 1982 and saw little effort in providing humanitarian relief to the Continent of Africa. Approximately, after three years in the United States, Mohammed consulted an attorney, an Eric Vickers, to set up the organization. At that time, since Mohammed was familiar

4

IARA-2446

with the African entity's name since it operated in Sudan, he agreed with Mr. Vickers to use the same name[1]. At all times, plaintiff was separate and independently run. That was the extent of how the name was derived. There was no intent or master plan to set up a branch office of the African Entity, as defendants seem to suggest. In fact, in even reviewing the subsequent annual tax returns filed by IARA-USA (paragraph 80 of each of the 1999-2003 tax returns, and attached as Exhibit H of Plaintiff's Motion for a Preliminary Injunction to Unblock Assets) , it always indicated is not related to any other organization.

This court has treaded these waters before and set the parameters for due process as further explained in plaintiff's previously filed brief. Defendants reliance on *Holy Land for Relief and Dev. v Ashcroft,* 219 F. Supp 2d 57 (D.D.C. 2002), *aff'd,* 333 F.3d 156 (D.C. Cir. 2003), *cert. denied* 540 U.S. 1218 (2004), *Global Relief Found. v O'Neill,* 207 F. Supp. 2d 779 (N.D. Ill. 2002), *aff'd,* 315 F.3d 749 (7th Cir.), *cert denied,* 540 U.S. 1003 (2003) and *Aero Continente, S.A. v Newcomb,* No. 04-01168 (D.D.C. July 16, 2004), aff'd, No 04-53265 (D.C. Cir. Aug. 2, 2004) is inapplicable. These cases, involved entities that were designated as terrorists. In this case, a completely separate and unrelated entity from plaintiff was involved.. Further, defendants action is entirely in violation of a previous order made by another Judge in this district, the Honorable Gladys Kessler in Holy Land, supra, where she ruled that a designated entity such as Holy Land could provide articles intended for humanitarian aid to non-blocked entities. In this plaintiff's articles intended for humanitarian aid was also blocked.

Contrary to defendants incredible statements that the different agencies were working separate from one another, this was a well coordinated effort between the Department of Treasury

---

[1]Mr. Vickers was an original officer of plaintiff.

5

IARA-2447

and Department of Justice. It was not a coincidence that the Federal Bureau of Investigation (FBI), Internal Revenue Service (IRS), Office of Foreign Asset Control (OFAC), and the Immigrations, Customs & Enforcement (ICE) all descended upon plaintiff at same date in same location with vast local media coverage to destroy the 20 year old reputation of plaintiff. Board members or employees of plaintiff (teachers, state employee, Phds) were then embarrassed at their jobs and homes by being interrogated by teams of two, one from Department of Treasury and other from FBI. Plaintiff, to date, was never provided a warrant or an inventory of the items sized as required under Federal Rules of Civil Procedure Rule 41 (d).

Simply put, defendants are misapplying the President's power that was delegated to them They don't have a scintilla of evidence supporting the notion that plaintiff supported or assisted terrorism. While defendants continue to engage in the futile effort to create facts based on speculation and far fetched assumptions, plaintiff continues to receive pleas from AIDS stricken African children crying for help. (**Exhibit E**). In efforts to save these children, plaintiff is open to address any concerns defendants have and would consider working under some type of reasonable monitoring program to ensure humanitarian relief reaches its intended designation.

### Reply to Factual Background

Defendants' list in their brief "alleged" aliases for Islamic African Relief Agency. (Pg 11 of Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction). This is utterly misleading and merits further explanation. First as already stated, the Islamic American Relief Agency is completely separate from the African entity. It is not an AKA of the African entity. Further, the name in the list " Al-WAKALA AL-ISLAMIYA AL-AFRIKIA L'IL IGHATHA" is the phonetic name of Islamic African Relief Agency in Arabic. This is not an English name.

6

IARA-2448

Further, based on literature furnished by defendants titled "Partner's Offices" (Werner Declaration Exhibit 3 IAR 260-262) , with the exception of Canada, all of the entities allegedly related to the African entity outside of Africa went by the name Islamic Relief Agency (ISRA). The U.S. office listed for IARA does not list the Columbia address, where plaintiff is located. The other name listed as an alleged alias AL-WAKALA AL-ISLAMIYA L'LL-IGHATHA is the phonetic name in Arabic for ISRA.

Defendants next stated on page 12 of their brief, and in their Attachment 1 titled Werner Declaration on page 10, that it was by sheer coincidence that on the same date OFAC blocked plaintiff's assets, the Federal Bureau of Investigation (FBI) was conducting its own search "as part of a separate criminal matter", and agents from Immigration, Customs & Enforcement (ICE) and Internal Revenue Service of the Department of Treasury were interviewing employees. Again, as stated before, this alleged coincidental joint action may be an effort to separate the actions of the agencies in efforts to transfer venue. This was a joint concerted effort initiated by defendants in this district. See Exhibit 2 of Werner Declaration (IAR13-15) of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, which includes an OFAC notice that states, "in consultation with the Secretary of State, the Secretary of Homeland Security, and the Attorney General", plaintiff's assets were blocked and the non party African entity with its 5 officials deemed as supporting terrorism[2].

Defendants next state that they received requests from plaintiff to have its property removed and to have a license for payment of attorney fees. The removal request was made to avoid

---

[2]It is also important to point out that, during the raid, defendants violated Rule 41 (d) of the Federal Rules of Criminal Procedures by failing to provide plaintiff a Return showing the property confiscated.

7

IARA-2449

incurring additional rent, and in efforts to mitigate damages. A licence for representing the organization has been granted but not for payment of attorney fees from the blocked funds. Plaintiff has applied for such a license and its application is pending.

On page 14, defendants state that OFAC has responded in writing to IARA-USA's request for reconsideration. OFAC has responded, but only after suit was filed and two months after the request was originally made by plaintiff. Plaintiff received, via federal express, the purported unclassified evidence against plaintiff. However, in their response, defendants' provide no explanation, whatsoever, of what concerns OFAC may have to suggest that plaintiff violated any law. To date, including Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, plaintiff has not been provided with any purported data or evidence that it engaged in any wrongful conduct. Plaintiff is essentially left, at this time, with attempting to prove a negative.

**Plaintiff has Satisfied the Elements for Entry of a Preliminary Injunction**

For the reasons already stated above and its previously filed brief, plaintiff has demonstrated a substantial likelihood that it will prevail on the merits, and that it has never supported terrorism, entitling plaintiff to injunctive relief. In their opposition, defendant places heavy reliance on *Holy Land Found* v *Ashcroft*, 333 F.3d 156 (2003) to support its actions under APA. Their reliance is misplaced.

For its argument under APA on page 19, defendants citing *Holy Land Found.* state, "Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference. While this may be true, defendants have failed to provide a shred of evidence to even suggest that plaintiff was engaged in or supported terrorism or any type of wrongful act to be entitled to such deference.

8

IARA-2450

Further, in *Holy Land Found.*, the plaintiff, itself, was designated as an SDGT. In this case, plaintiff was not but rather an unrelated entity in Africa. Moreover, in *Holy Land Found.* there is purported terrorism related evidence the Treasury Department relied in making its determination to designate HLF as an SDGT. This included (1) HLF allegedly having financial connections to Hamas (2) HLF leaders allegedly meeting with Hamas leaders (3) HLF allegedly funding Hamas controlled charities (4) HLF allegedly providing financial support to orphans and families of Hamas martyrs and prisioners, (5) HLF's Jerusalem office allegedly acted on behalf of Hamas, and (6) that HLF allegedly operated as fundraiser for Hamas in the United States and that Hamas officials allgedly provided HLF with funds. The court concluded that there was "ample evidence in the a massive administrative record" to designate HLF as an SDGT. *Id.* at 162. In this case, based on the documents presented, the record it totally devoid of any alleged terrorism related evidence. There is no question, that plaintiff has a strong likelihood to prevail on the merits in this case, entitling it to injunctive relief.

Defendants appear to suggest that as long as there is some document supporting an alleged past historical affiliation between plaintiff and the African entity which can be found in the Administrative Record that the Agency has chosen to present, the Court must surrender to the Agency's expertise. APA review although generally differential, does not require the judicial deference that the government contemplates. The Court must conduct a "searching and careful" review of informal Agency fact finding. *Citizens to Preserve Overton Park vs Volte*, 401 U.S. 402, 416 (1971).

To survive review under the "arbitrary and capricious" standard, the Agency "must examine the relevant data and articulate a satisfactory explanation for its actions including a 'rational

9

IARA-2451

connection between the facts found and the choice made.'" *Motor Vehicle Manufactures Association vs State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983). In reviewing the Agency's explanation for its decision, the reviewing Court "must "consider whether the decision was based on a consideration on the relevant factor then whether there has been a clear error of judgment"." Id.   As the Supreme Court has summarized the "arbitrary and capricious" standards.

> Normally, an Agency rule would be arbitrary and capricious if the Agency has relied on the factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the Agency, or is so implausible that it could not be ascribed to a difference in view or the product of Agency expertise. Id.

In this case, there is no question that plaintiff's property was blocked in an arbitrary and capricious matter.  Defendants cannot possibly articulate a rational connection from the evidence presented that plaintiff supported terrorism or even engaged in any wrongful act. Nothing in the record presented suggests any wrongful acts.

On page 16 of Defendants' brief defendants state "the fundamental issue is in this case is whether OFAC's designation of IARA-USA as an SDGT violated the Administrative Procedure Act." This statement underscores defendants' abuse of the presidential powers delegated to them. Contrary to defendants' statement, OFAC never designated IARA-USA as an SDGT.  Instead, OFAC designated a completely separate entity based in Sudan, Islamic African Relief Agency, as an SDGT, in addition to its officials.

Further, Attachment 1 titled Werner Declaration of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, provides the following enumerated reasons why plaintiff's property was blocked:

10

3. The Department of Treasury OFAC's Office are primarily responsible for administrating U.S. economic sanction programs. These programs are primarily directed against foreign states and nationals, including sponsors of global terrorism and foreign narcotics traffickers, to implement U.S. foreign policy and national security goals. Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential wartime and peace time national emergency powers. OFAC also acts under authority granted by specific legislation to impose controls on transactions and to freeze or "block," certain foreign property and interest with in property within the United States or in possession or control of U.S. persons. (page 3)

7. The President delegates the task of determining who meets the standards of an agency in the Executive Branch, usually the Department of Treasury. Those who are determined to fit these standards are "designated" and subject to the Executive order's economic sanctions. . . .

21. On October 13, 2004, OFAC issued an order blocking the funds, accounts and business records of the Islamic African Relief Agency and its aliases, branches, and affiliates as located worldwide, which included plaintiff Islamic American Relief Agency. ("IARA-USA"). . . . In making its determination, OFAC evaluated the various criteria set forth in E.O. 13224, with a primary focus on subsection 1(c) and 1(d)(i). Subsection (c) permits blocking where persons were determined "to be owned or controlled by, or to act for or on behalf of" persons within the scope of the order. Subsection 1(d)(i) is a basis for blocking where persons are determined to "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of" the terrorist and terrorist activities falling within the scope of the order. . . .

22. OFAC considered both classified and unclassified information in reaching its decisions to issue the blocking order. The unclassified information in the Administrative Record to date has been provided to the Court with Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction. . . . OFAC and its legal counsel are working to obtain the necessary clearances for each piece of intelligence from each relevant agency in order to provide the Court with the classified Administrative Record as expeditiously as possible . . .

23. Among the information relating to IARA-USA. the fact that OFAC's communication with IARA-USA demonstrates IARA-USA's connection to the Islamic African Relief Agency headquartered in Sudan. In 1998, IARA-USA made repeated requests to be issued an OFAC registration number pursuant to the Sudanese Sanction Regulations, 31 C.F.R. 538. 521, to conduct humanitarian operations as a non-governmental organization in Sudan. For example, on January 20, 1998, Mubarak Hamed, executive director of IARA-USA, requested a license to process payments to the beneficiary "Islamic African Relief Agency," located in

11

IARA-2453

Khartoum, Sudan in an attachment to that letter, IARA-USA explains: "Currently our partner in Sudan is the Islamic African Relief Agency, Sudan. This relationship has been long standing and beneficial to the many poor, the disabled, and displaced peoples of Sudan as well as refugees of neighboring countries." . . .

24. Information available to OFAC in the unclassified Administrative Record, as well as information developed by OFAC to date in response to IARA-USA's request for reconsideration . . . demonstrates the close historical ties between IARA-USA and the Islamic African Relief Agency of Sudan. IARA-USA was originally founded in 1985 as a branch of the Islamic Relief Agency by "foreign students attending the University of Missouri at Columbia, Missouri" who were "native and citizens of the nations of Sudan in Africa." . . . For years after its formation, IARA-USA held itself out as a branch of the Islamic African Relief Agency. . . In 1999, the U.S. Agency For International Development ("USAID") terminated all assistance to the "Islamic African Relief Agency (IARA)" identifying the charity as having its headquarters in Columbia, Missouri," because "continuation of assistance to IARA under USAID agreements would not be in the national interest of the United States."
. . .

25. Information available to OFAC in the unclassified Administrative Record, as well as information developed to date in response to IARA-USA's request for reconsideration . . . demonstrates that even after IARA-USA changed its name to the "Islamic American Relief Agency" in 2000, IARA-USA's affiliation with Islamic African Relief Agency in Sudan continued. Overseas offices of the Islamic African Relief Agency have continued to identify the Columbia, Missouri charity as a branch of the Islamic African Relief Agency. . . IARA-USA itself has identified as "partner offices" other overseas branches of the Islamic African Relief Agency.

As can been seen above, including, the enumerated reasons, the records referenced by defendants are totally void of any evidence, whatsoever, that plaintiff supported terrorism. Also, the reasons stated above by Mr. Werner clearly demonstrate and highlight the absence of evidence that plaintiff supports terrorism or even engaged in any wrongful conduct. Clearly, in the instant action, plaintiff demonstrates that an "overwhelming" case is present in its favor on the merits and equities of the controversy.[3], entitling it to injunctive relief.

Further, in reviewing paragraphs 21 - 25 of Werner's Declaration above and in reviewing

---

[3]*Dorfman v Boozer,* 414F.2d 1168,113 (D.C. Cir. 1969)

12

IARA-2454

the unclassified documents, there is no evidence whatsoever to suggest that IARA-USA "assist in, sponsor, or provide financial, material or technological support for, or financial or other services to or in support of" the terrorists and terrorist activity falling within the scope of this order. It simply is lacking. There is no evidence that IARA-USA is "owned or controlled" on behalf of any entity

Defendants have made reference to an undated Bosnia Call (Exhibit 3, Tab A exhibit 48) of Defendants' Opposition to Motion for Preliminary Injunction, an exhibit titled Partner's Offices (Exhibit 3, Tab B exhibit 49 and exhibit 50) and a purported web-site for Independent Scandinavian Relief Agency ("ISRA") to support the notion of IARA-USA's continued affiliation with Islamic African Relief Agency. Even assuming that is true, the references noted above and made in paragraph 25 of Mr. Robert Werner's Declaration provide no basis, whatsoever, to establish that plaintiff in any manner supported terrorism.

Defendants also sought a thirteen-year old IARA-USA Report dated 1992 suggesting an affiliation with Islamic African Relief Agency. Again, this description of an affiliation in working on projects together does not demonstrate in any manner that Plaintiff supported or condoned any type of wrongful act.

Moreover, and as stated, before the African entity was designated as a terrorist organization, various NGOs, around the world in addition to the United Nations, dealt with the Islamic African Relief Agency. In fact, the African Agency had Special Consultative Status with the Economic Social Counsel of the United Nations. (**Exhibit C**). **Exhibit F** is a status report published by United Nations Children Funds (UNICEF) as recent as 2004 demonstrating that it worked with various NGOs, including the African entity to set up health facilities in Sudan. Clearly this does not mean that the United Nations is a terrorist organization because it worked in consultation with the

13

African entity before it was designated as a terrorist organization. With respect to plaintiff, it was

listed as a member of InterAction[4], based in Washington DC, with various other well known NGOs

members including CARE, United Way International , YMCA of the USA, and Project Hope.

(**Exhibit G**). Clearly, because plaintiff is listed on a web site with other organizations, its does not

mean that they are one and the same. Likewise, IARA-USA's, listing on a web pages of other

organization, should not be held to a different standard.    In further reviewing the reasons why

IARA-USA's assets were blocked, criticism is made by Mr. Werner of the efforts made by Mr.

Mubarak Hamed, the Executive Director of IARA-USA, (which was supported by Congressmen

David Bonior) to obtain a license to provide humanitarian relief in Sudan. Mr. Werner makes

specific reference to the verbiage use of "partner" and the fact both entities benefitted the poor, the

disabled and displaced people in Sudan. As previously stated, many NGOs cooperated in various

projects, especially in Sudan for humanitarian causes. Of more significance, this does not

demonstrate that plaintiff, in any way, condoned or supported terrorism in any fashion.

On page 17, defendants attempts to set a low criteria threshold for OFAC to meet to explain

its action in blocking plaintiff's property. Simply,

> that OFAC can identify for the Court unclassified evidence already in the Administrative
> Record - as well as unclassified evidence currently being developed through the
> administrative process of reconsideration initiated by IARA-USA - in support of the
> agency's reasonable determination that IARA-USA is indeed an office of or otherwise
> affiliated with the Islamic African Relief Agency, designated as an SDGT for its support to

---

[4] On its website, Interaction.org, it states:

InterAction is the largest alliance of U.S.-based international development and humanitarian nongovernmental organizations. With more than 160 members operating in every developing country, we work to overcome poverty, exclusion and suffering by advancing social justice and basic dignity for all.InterAction is greater than the sum of its parts, a force multiplier that gives each member the collective power of all members to speak and act on issues of common concern. InterAction convenes and coordinates its members so in unison, they can influence policy and debate on issues affecting tens of millions of people worldwide and improve their own practices.

14

terrorism.

This is simply the wrong criteria. Again, to take defendants' question to its logical conclusion, that means any entity that had any affiliation with Islamic African Relief Agency, including the United Nations, would require its assets frozen. The proper question should be whether OFAC can identify for the Court unclassified evidence already an Administrative Record - as well as unclassified evidence currently being developed through Administrative Process of reconsideration, initiated by IARA-USA - in support of the Agency's determination that IARA-USA is indeed assisting, sponsoring, providing financial, material or technological support for financial or other services to or in support of such acts of terrorism. Clearly, based on the evidence provided the answer is no.

First of all, based on the statements above, it appears that defendants are attempting to develop evidence or create more reasons to further support their denial rather than give plaintiff its due reconsideration. More significantly, clearly, based on the documents that have been furnished to date by defendants, plaintiff can demonstrate a substantial likelihood of success on the merits that it has never in any manner condoned or supported any wrongful acts including terrorism.

Defendants state on page 25 that "there is no evidence that Plaintiff IARA-USA has severed its ties with Islamic African Relief Agency." This statement is simply distorted.

For at least 20 years before the African entity was declared a terrorist organization, no organization in the world that was working with Islamic African Relief Agency on a cooperative project had any knowledge that would lead them to sever ties with Islamic African Relief Agency. This includes the United Nations. Now that the African entity has been deemed a terrorist organization, it is imperative for NGOs, including Plaintiff, to discontinue any type of working

15

IARA-2457

relationship with Islamic African Relief Agency. Plaintiff never knew what activity may have caused a concern. As the Court may recall, five years ago, USAID terminated its relationship with IARA-USA, despite USAID making a finding that there was no legal basis to terminate the agreement. However, the termination was ordered by the Secretary of State. At that time, Plaintiff IARA-USA filed a plea inquiring as to the reason for the termination. (**Exhibit B**) IARA-USA never received a response from defendants or any governmental official of the reasons for the termination.

Moreover, as stated before, plaintiff repeatedly applied for licenses to lawfully provide humanitarian relief to the African entity. This effort was also supported by then Democratic Whip, Congressman David Bonier. During this five-year period defendants never indicated to plaintiff that it should sever any alleged working relationship with Islamic African Relief Agency.

## OFAC Exceeded Its Authority Under IEEPA

Plaintiff is not questioning the President's powers. Plaintiff is questioning the application of the President's powers by the defendants. Defendants disagree with Judge Kessler's finding that a designated entity could provide articles intended for humanitarian aid. (page 30) Plaintiff relies on its previously filed Memorandum. Further, there is no question that based on Judge Kessler's ruling, defendants violated IEEPA. Plaintiff should able to provide articles intended for humanitarian aid (ie. Used text book, clothing and/or blankets) to non-blocked entities based on Judge Kessler's ruling.

## This Court has Jurisdiction Regarding FBI's Actions

Defendants maintain that this court has no jurisdiction over FBI's actions by attempting to distinguish the FBI's actions from the actions of at least six different agencies that descended upon plaintiff's premises on the same day. This is simply untrue.

16

IARA-2458

Procedurally, this issue is not proper at this time before the court. This instant motion simply addresses the issue of unblocking the property.

Turning to the merits of defendants' argument, pursuant to 28 USC 1391 (e), where a defendant is an officer or employee of the United States, suit may be brought where defendant in the action resides and where "a substantial part of the events or omissions giving rise to the claim occurred". As stated, there was a joint concerted effort initiated by defendants, including the ultimate head of the FBI, in this district. See Exhibit 2 of Werner Declaration (IAR13-15) of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, which includes an OFAC notice that states, "in consultation with the Secretary of State, the Secretary of Homeland Security, and the **Attorney General**", plaintiff's assets were blocked and the non party African entity with its 5 officials deemed as supporting terrorism.

There is no question that the Department of Justice based in this district, including the ultimate head of the FBI, the Attorney General (where he also resides in his official capacity), played a substantial part in blocking and interfering with plaintiff's property. Also, personal service has been effectuated on all defendants (**Exhibit H**). Venue is proper before this court.

Further, as stated before, plaintiff was never furnished a Warrant or a Return pursuant to Fed. R. Crim. P. R 41 (d). Plaintiff has no clue what property was confiscated, what monies were taken. Once that information is known, including the reasons for the confiscation, plaintiff can seek a return of the property in the district where the property was removed if the property still remains there, as defendants suggest.

### Defendants Violated Plaintiff's Constitutional Rights

Defendants, practically, argue that they are totally immune from the First, Fourth and

17

IARA-2459

Fifth Amendment implications to block and seize a citizens assets so long their actions is cloaked under IEEPA, regardless of any finding of wrongdoing. This is clearly an untenable position and a very dangerous attempt to circumvent the constitutional safeguards.

The intent of IEEPA is to arm the President to block funds of an entity which may be considered " an unusual and extraordinary threat,"which has its sources in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States...15 USC 1701 (a).

Again, based on administrative record presented by defendants, there is no evidence whatsoever to trigger IEEPA. There is no evidence that plaintiff derives "its sources in whole or substantial part outside of the United States. There is no evidence that plaintiff represents "an unusual and extraordinary threat" to "the national security, foreign policy, or economy of the United States. By blocking, and confiscating plaintiffs assets, without regard to any evidence that it supports terrorism sets a very dangerous precedent, which the Fourth and Fifth Amendment is designed to protect against. Plaintiff is not in any manner asking this Court to intervene in matters of foreign policy to impede the President's ability to combat terrorism. However, based on our systems of check and balances, plaintiff is rather requesting that defendants apply IEEPA as it was intended to, and not at the expense of the framework of the constitution.

### Defendants' Have Violated Plaintiff's Fourth Amendment Claims

As for plaintiff's Fourth Amendment claim, defendants argue that its action did not constitute searches or seizures under the Fourth Amendment and that neither a warrant nor probable cause was required. This is simply untrue. Plaintiff relies on its previously filed Memorandum in Support of

18

IARA-2460

Plaintiff's Motion for Preliminary Injunction to Unblock Assets.

Additionally, there is no question that when OFAC changed the locks on IARA-USA's office on October 13, 2004, that act implicated the Fourth Amendment.[5]  OFAC's actions interfered with plaintiff's possessory interest of its property.  The premises was locked and plaintiff has been prevented access to its property.  Meaningful interference with the owner's possessory interests in property constitutes a seizure. *Soldal v Cook County*, 506 US 56, 63 (1992).

Further, as already stated, plaintiff is not questioning the President's powers under IEEPA or TWEA to regulate financial transactions in the foreign policy and national security arena. Plaintiff rather questions the application of these powers by defendants.  Again, the evidence is void and lacking, based on the documents presented by defendants, to merit any blocking of plaintiffs assets pursuant to IEEP and TWEA.  Simply put, the powers bestowed by IEEPA and TWEA were misapplied.  Defendants' actions were arbitrary and capricious for the reasons already stated above implicating the Fourth Amendment.  In instances where IEEPA is not triggered, restraint of fund transfers have been held to constitute seizure. *United States v Daccarett*, 6 F3d 37, 49 (2d Cir. 1993) (restraint of electronic funds pending forfeiture trial constitutes Fourth Amendment seizure) *United States ex rel. Rahman v Oncology Associates*, 198 F3d 489, 500 (4th Cir. 1999) (court analogizes seizure under Fed. R. Civ. P. 64 to Fourth Amendment and holds that court order "direct[ing] that assets be frozen pending further order" constitutes a seizure.

## Defendants' Have Violated Plaintiffs Fifth Amendment Rights

Plaintiff relies on its previously submitted brief.  And as already stated, defendants are

---

[5]Defendants implies that plaintiff has contested the removal of its property at plaintiff counsel's request based on a letter issued on November 18, 2004 requesting removal of the property to save rent.  Plaintiff never raised that issue.

19

IARA-2461

not immune from Fifth Amendment implications.  Defendants cannot use IEEPA as a shield

from Constitution claims, especially, when defendants are not properly carrying out the

legislative intent of the act to combat terrorism.  Defendants, also, cannot use IEEPA as a sword

to trample plaintiffs' constitutional rights with no regard to any evidence that plaintiff allegedly

supported terrorism, as already discussed.

Moreover, in footnote 22 Defendants state:

"Plaintiff suggested that the government had "a legitimate, particularized concerns that IARA-USA would transfer its funds if given pre-designation notice," it should have used it power to "block during the pendency of an investigation" under 50 U.S.C. §1702(a)(1)(B).  In reality, the effect of proceeding in that manner would have made little practical difference to Plaintiff's due process argument.  Under Plaintiff's scenario, OFAC would have blocked IARA-USA's assets during the pendency of an investigation, also without notice or opportunity to be heard, and later the agency would have engaged IARA-USA while conducting the investigation.  Here, OFAC blocked IARA-USA's assets without notice or opportunity to be heard, but the agency is also in the process of engaging IARA-USA in evaluating Plaintiff's request for reconsideration.

There is a big practical difference which is contrary to what Defendants suggest.  When

Plaintiff's assets are blocked but it has not, yet, been designated as a terrorist organization, its

reputation and standing in the community still remains sound.  Further, by providing an opportunity

to explain or address any of the governments' concern, the property could be unblocked and the

entity would remain a viable concern.  However, by immediately designating another separate

organization as a terrorist organization and boot-strapping without any opportunity is provided, the

organization is practically destroyed since  its reputation in the community is ruined.  There is a

huge "practical difference" to Plaintiff's due process argument.

### Freedom of Association

Plaintiff relies on its previously submitted brief.  And as already stated, defendants are

20

IARA-2462

not immune from First Amendment implications.

Additionally, defendants state: "IARA-USA implies that it has a First Amendment right to provide financial support to a foreign terrorist organization as long as it does not have a specific intent to further the organization's unlawful ends." As previously stated, IARA-USA to date has no knowledge whatsoever that the African entity supported or engaged terrorism. Further, since IARA-USA's license requests were denied to provide funds to the African entity, IARA-USA was unable to provide relief to Sudan as requested by plaintiff.

## Bivens and 42 USC 1985 Claims

Defendants have raised questions regarding the viability of plaintiff's Bivens and 42 USC 1985 claims. These matters would be more property addressed in a dispositive motion. Further, plaintiff is seeking equitable relief only in this motion, and both the Bivens and the 42 USC 1985 claims involve money damages, issues not currently raised in this instant motion.

## Public Interest is in Favor of Injunctive Relief

There is no question that the continuing blocking of IARA-USA's assets will cause irreparable harm. To close down an organization that has been in existence for twenty (20) years combating famine to impoverished nations is simply unjustifiable. Plaintiff has been a partner to the United States, not its enemy. Defendants' actions set a dangerous precedent to the public. To allow defendants to close down a humanitarian organizations based on speculation and assumption with no shred of evidence whatsoever that the organization supports terrorism can have devastating consequences to the public. Human being will suffer all around the world including those children in Kenya previously referenced. Executive Order #13,224 was never intended to close down innocent organizations free of any wrong doing. As stated by the staff

21

IARA-2463

members to the September 11th Commission.  It is "hard to justify" shutting down an

organization without any evidence that the organization engaged in any wrongful act.

WHEREFORE, for the reasons discussed above, defendants have provided no evidence

whatsoever to support their wrongful actions, or to support their assertion that IARA-USA in any

manner or supported terrorism. The denial of IARA-USA's Application for Preliminary

Injunction will cause irreparable harm.  Being an organization that for over twenty years has

engaged in combating famine and providing aid to the needy, there is simply no justification to

shut down plaintiff with no evidence whatsoever to support the allegation that it supported or

condoned terrorism.

Respectfully submitted,

Akeel & Valentine, PLC

By/S/ Shereef Akeel

SHEREEF H. AKEEL (P54345)
Admitted Pro Hac Vice
Attorneys for Plaintiff
401 S. Old Woodward Avenue
Suite 430
Birmingham, MI 48009
Dated: January 19, 2005            (248) 594-9595

\\Secretary\C\MyFiles\G - L\iara-usa\04_CV_02264 Reply to Opposition.wpd

22

IARA-2464

# ADMINISTRATIVE RECORD

# EXHIBIT 173

AKEEL & VALENTINE, PLC
ATTORNEYS AND COUNSELORS
401 S. OLD WOODWARD
SUITE 430
BIRMINGHAM, MICHIGAN 48009-6613

SHEREEF H. AKEEL, P.C.
GLENN L. VALENTINE, P.C.

February 2, 2005

TEL: 248-594-9595
FAX: 248-594-4477

Robert W. Werner, Director
Office of Foreign Assets Control
U. S. Department of Treasury
1500 Pennsylvania Avenue NW
Washington, D.C.  20220

Via facsimile and first class mail
(202) 622-1911

RE:    Islamic American Relief Agency (IARA - USA)
       FAC No. SDG-237388

Dear Mr. Werner:

This letter is a further response to your correspondence dated January 10, 2005.  In your letter, you advised that we should provide you with any material to OFAC by February 7, 2005 to allow the Agency an opportunity to fully evaluate all information during your reconsideration process.

Please be advised that we are planning to reply by February 7, 2005 with the hope and objective of addressing any possible concerns you may have.

Thank you for your attention to this matter.

Very truly yours,

Shereef H. Akeel

SHA/
cc:    Timothy Ott, Office of Chief Counsel
       Foreign Asset Control
       U.S. Department of Treasury
       1500 Pennsylvania Avenue, N.W. Annex
       Washington, D.C. 20220

       Ms. Andrea Gacki
       U.S. Department of Justice, Civil Division
       20 Massachusetts Avenue, N.W., Room 7308
       P.O. Box 883
       Washington, D.C. 2044

C:\MyFiles\G - L\iara-usa\Werner 003.wpd

IARA-2465

# ADMINISTRATIVE RECORD

# EXHIBIT 174

AKEEL & VALENTINE, PLC
ATTORNEYS AND COUNSELORS
401 S. OLD WOODWARD
SUITE 430
BIRMINGHAM, MICHIGAN 48009-6613

SHEREEF H. AKEEL, P.C.
GLENN L. VALENTINE, P.C.

TEL: 248-594-9595
FAX: 248-594-4477

February 7, 2005

Robert W. Werner, Director
Office of Foreign Assets Control
U. S. Department of Treasury
1500 Pennsylvania Avenue NW
Washington, D.C. 20220

Via facsimile and first class mail
(202) 622-1911

    RE:    Islamic American Relief Agency (IARA - USA)
           FAC No. SDG-237388

Dear Mr. Werner:

This letter serves as a follow-up request to unblock IARA-USA's property. In the spirit of cooperation and to salvage the organization from the brink of extinction, while the matter is pending in Court, we offer an opportunity to resolve any of your concerns and have the matter resolved.

As you know, the organization has been sound for over 20 years, and we can all agree that there is no doubt that it has contributed to combating famine in the most devastated regions of the world. Members, employees, and personnel have come and gone, but the organization remained ever so vibrant to provide humanitarian relief and alleviate the suffering.

On January 10, 2005, you provided us, for review, certain material. This was the first time the organization learned of the suspicion surrounding the organization's purported affiliation with the Sudanese entity, Islamic African Relief Agency.

As you know, in early 2000, IARA-USA filed multiple pleas of inquiry as to the reasons why its USAID agreements were being terminated. At that time, and prior to the organization having its properties blocked on October 13, 2004, the organization never knew or had reason to know that the government had any concerns with the organization's purported affiliation with Islamic African Relief Agency.

In fact, as you know, license request after license request was filed, even with the assistance of then Congressman David Bonior, to provide relief in Sudan only to be denied. Again, no communication was received from the government that it had any concerns of any purported relationship.

IARA-2466

In your declaration dated January 25, 2005, you cite instances regarding brochures and web sites of other organizations to support you concerns that IARA-USA allegedly is one and the same with the Sudanese organization, and that IARA-USA is simply another name for the African agency. No other stronger words can be further provided in the negative but to say that the two entities have unequivocally been completely separate from one another. IARA-USA has no control over any other organization, nor does any other organization have any influence over it. This was constantly represented in the organization's tax returns since its inception. The fact that IARA-USA applied for one license after another for permission from our government to provide donations suggests that it continuously considered itself a separate entity from any other organization. Again, if the organization did not consider itself a separate and independent entity, it can be reasonably assumed that IARA-USA would not have attempted to seek a license to transfer monies from one of its pockets to the other.

We would ask for an opportunity to address any concern that the government has regarding any specific activities that IARA-USA has engaged in with any other organization. Based on the documents presented, we would respectfully submit to you that any activity IARA-USA has been involved in was solely dedicated and designed with the full intent to relieve human suffering.

When Holy Land Foundation was designated as a terrorist organization, part of the main reason was that it was believed that the Foundation still dealt with Hamas, an entity that was designated as a terrorist organization in the 1990's. This matter is strikingly different. It could be confidently stated that not a single charity or an NGO knew, or should have known that there was any suspicion surrounding the Sudanese organization in supporting terrorism. From UNICEF to even the United Nations, they all dealt with the Sudanese organization for the intent of relieving human suffering based on our research and findings of the brochures we incorporated in our recent court filings. We even learned that the United Nations had issued the Sudanese organization a "Special Consultative" status as an NGO. Not a single NGO, including, IARA-USA could possibly have known of any wrongdoing committed by the Sudanese entity.

Based on the documents presented in your letter dated January 10, 2005, and the documents presented by your attorneys in shedding light on the matters that have concerned the government, we suggest the following possible solutions.

In the event the organization's assets are unblocked, you, the government, and donors may rest assured that IARA-USA would implement the strictest measures to ensure that it does not participate, partake, or get involved, in any manner, in any humanitarian activity involving the Sudanese organization.

The organization would take an aggressive approach, including legal action, to remove any reference to the United States organization with any other organization deemed or found to support a terrorist organization. This would include, removing any reference in web sites or brochures.

The organization would be vigilant to ensure that all of its funds reach its intended humanitarian designation. This organization would even consider some sort of reasonable monitoring

program imposed by the government to ensure that donations reach its intended humanitarian destination. We would also consider any measures that the government may request the organization to implement, as part of IARA-USA's internal controls, to ensure that all monies collected reach its intended humanitarian designation.

Further, the organization is perpetual, ongoing, and greater than an individual. If requested, the organization would change its personnel.

If you have any evidence that directly supports the suspicion that IARA-USA allegedly funded terrorism, I would understand your position but would ask for the opportunity to explain any such purported evidence. Further, if your concerns are primarily based on past affiliated references, I would ask you to seriously consider the above suggested solutions.

Millions of people around the world are in dire need. With proper guidance and controls, this matter can be a win-win situation.

As you know, most of us are completely disconnected with the actual sufferings that take place around the world because of the great country we live in. However, we were personally contacted by orphans, Christians and Muslims, ages 11 to 15, from Nairobi, Kenya asking us personally to intervene on their behalf. This includes Rehma A. Sheikaha, age 11; Peter Mwangi Miugua, age 13; Adam Yusuf, age 15; Victor Stanley Mulindi, age 14; all of them pleading for "help", and asking me personally to assist them. (These letters can be found in Exhibit "C" of Plaintiff's Motion for Preliminary Injunction to Unblock Assets. We also received a direct plea from an orphan feeding program called Kicoshep School based in Kenya, which houses orphans afflicted by HIV-AIDS, and who are critically ill of HIV-related illnesses. They expressly advised us that they are "saddened to learn of the closure of IARA-USA", and that "This is going to affect the children adversely". Practically at this time, we are the only voice for children for you to hear.

While the matter is pending in Court, and you engage in further efforts to explore OFAC's suspicion, young children are being directly harmed. We truly believe that if you would consider the above progressive measures to alleviate your concerns, IARA-USA can reopen and continue alleviating human suffering. As a result, we would be able to continue to collect donations to sustain the lives of those in need.

Members of the organization, are deeply disheartened that the organization is unable to assist many in need at this time, especially, in the wake of the Tsunami disaster. These members have dedicated a major part of their lives helping others. In an area where the majority of inhabitants subscribe to the Muslim faith, IARA-USAs could have served in a vital role in collecting funds in the United States, especially from American Muslim donors, to assist the victims of this disaster. Further, as you may know, many orphans in that region have been kidnaped and are in dire need for food and shelter. Protecting orphans is IARA-USA's specialty and has been a vital resource for the United States to lend a hand in establishing feeding centers and orphanages. In fact, IARA-USA has a history of assisting victims from natural or man-made disasters. IARA-USA assisted victims from the recent Iran earthquake to the horrific terrorist attack of the US Embassy in Kenya.

IARA-2468

By unblocking the assets, we would be combating terrorism. At this time, the poor and weak are vulnerable to terrorists. By providing them an alternative for food and shelter, the underprivileged are less susceptible to be lured into terrorist organizations.

It is not too late to salvage this 20 year old American organization and allow it to resume its efforts in alleviating human suffering around the world. Please reconsider unblocking our client's assets given the proposals outlined above.

If you have any questions, comments or suggestions, please feel free to call. Thank you, and we look forward to hearing from you.

Very truly yours,

Shereef H. Akeel

SHA/

cc:    Timothy Ott, Office of Chief Counsel
       Foreign Asset Control
       U.S. Department of Treasury
       1500 Pennsylvania Avenue, N.W. Annex
       Washington, D.C. 20220

       Ms. Andrea Gacki
       U.S. Department of Justice, Civil Division
       20 Massachusetts Avenue, N.W., Room 7308
       P.O. Box 883
       Washington, D.C. 2044

C:\MyFiles\G - L\iara-usa\February 4.werner.wpd

IARA-2469

# ADMINISTRATIVE RECORD

# EXHIBIT 175

AKEEL & VALENTINE, PLC
ATTORNEYS AND COUNSELORS
401 S. OLD WOODWARD
SUITE 430
BIRMINGHAM, MICHIGAN 48009-6613

SHEREEF H. AKEEL, P.C.
GLENN L. VALENTINE, P.C.

February 17, 2005

TEL: 248-594-9595
FAX: 248-594-4477

Robert W. Werner, Director
Office of Foreign Assets Control
U. S. Department of Treasury
1500 Pennsylvania Avenue NW
Washington, D.C. 20220

RE:    Islamic American Relief Agency (IARA - USA)
       FAC No. SDG-237388

Dear Mr. Werner:

As you may know, your attorneys recently filed supplemental information with the Court on February 14, 2005. In reviewing the documents, we were provided with additional information for the first time for our review.

The information included additional unclassified documents. Please find enclosed our response to this additional information that we recently filed with the Court for your review.

If you have any further questions, please feel free to call; of course, with the consent of your attorneys.

Very truly yours,

Shereef H. Akeel

SHA/
Enclosures

cc:    Timothy Ott, Office of Chief Counsel
       Foreign Asset Control
       U.S. Department of Treasury
       1500 Pennsylvania Avenue, N.W. Annex
       Washington, D.C. 20220

       Ms. Andrea Gacki
       U.S. Department of Justice, Civil Division
       20 Massachusetts Avenue, N.W., Room 7308
       P.O. Box 883
       Washington, D.C. 20244

C:\MyFiles\G - L\iara-usa\Werner 005.wpd

IARA-2470

## Oppositions and Replies

1:04-cv-02264-RBW ISLAMIC AMERICAN RELIEF AGENCY v. ASHCROFT et al

### U.S. District Court

### District of Columbia

Notice of Electronic Filing

The following transaction was received from Akeel, Shereef entered on 2/16/2005 at 1:58 PM EDT and filed on 2/16/2005

**Case Name:**       ISLAMIC AMERICAN RELIEF AGENCY v. ASHCROFT et al
**Case Number:**     1:04-cv-2264
**Filer:**           ISLAMIC AMERICAN RELIEF AGENCY
**Document Number:** 26

**Docket Text:**
RESPONSE to *Defendants' Supplement to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction* filed by ISLAMIC AMERICAN RELIEF AGENCY. (Attachments: # (1) Exhibit Settlement Letter# (2) Exhibit Definitions)(Akeel, Shereef)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**\\Secretary\C\MyFiles\G - L\iara-usa\04_cv_2264 Response to Defendants' Supplement.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=2/16/2005] [FileNumber=676457-0]
[6b94e9a1bc31d934720feb138f8d83e60a0a37023d9d0462fb5ef8be0c042427c4719
8e8669b0b45b0522b7f9372876e32ecfff66e3f952482a22131477b5c94]]
**Document description:**Exhibit Settlement Letter
**Original filename:**\\Secretary\C\MyFiles\G - L\iara-usa\04_cv_2264 Exhibit A Response to Supplement .pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=2/16/2005] [FileNumber=676457-1]
[82c7773d5e98491e560d1bfae034244519bf34a9bf19706d161c8f4e1462055e4ed2c
29879cd970f1ac74376d22a0d78a869503db12b129910ce9c606e2b8f7f]]
**Document description:**Exhibit Definitions
**Original filename:**\\Secretary\C\MyFiles\G - L\iara-usa\Exhibit B Response to Supplement .pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=2/16/2005] [FileNumber=676457-2]
[206b0397459a13a99a73f0ed195ce874ba0c62a7d4862af8106c279e35cf18e6d7d31
12ee31f5f2907f693e07edd2165efa7ec7bc0780492f30c9724419be7d5]]

**1:04-cv-2264 Notice will be electronically mailed to:**

Shereef Akeel     shereef@akeelvalentine.com,

IARA-2471

District of Columbia live database

Andrea Marie Gacki    andrea.gacki@usdoj.gov,

Carlton Greene    carlton.greene@usdoj.gov,

**1:04-cv-2264 Notice will be delivered by other means to:**

IARA-2472

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISLAMIC AMERICAN RELIEF AGENCY
(IARA-USA),

        Plaintiff,

vs.

UNIDENTIFIED FBI AGENTS, PAUL SCHLUP, AND
OTHER UNIDENTIFIED DEPARTMENT OF TREASURY PERSONNEL,
in their individual and official capacities, JOHN SNOW, in his individual
and official capacity as Secretary of the Department of Treasury,
ALBERTO GONZALES, in his individual and official capacity as
Attorney General of the United States, and United States
Department of Justice,

        Defendants.

Civil Action No. 04-2264 (RBW)
Hon. Judge Reggie B. Walton

---

JOHN KENNETH ZWERLING (#147637)
Attorneys for Plaintiff
108 North Alfred Street
Alexandria, VA 22314
703) 684-8000

MICHAEL LEE HERTZBERG (#357319)
Attorneys for Plaintiff
740 Broadway, Fifth Floor
New York, NY 10003
(212) 982-9870

AKEEL & VALENTINE, PLC
BY: SHEREEF AKEEL (P54345)
Attorneys for Plaintiff
401 S. Old Woodward Avenue
Suite 430
Birmingham, MI 48009
(248) 594-9595

---

## RESPONSE TO DEFENDANTS' SUPPLEMENT TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

IARA-2473

## TABLE OF CONTENTS

**PAGE**

INDEX OF AUTHORITIES ii

INTRODUCTION 1

STANDARD TO APPLY 3

UPDATED APPLICABLE FACTS 3

ARGUMENT: 3

I.    Federal Law Mandates That Defendants Determine If The
      Alleged Evidence Can be Declassified. 4

II.   This Matter Should Not Be Resolved By Usage of Secret Evidence. 4

III.  Under The Mathews v Eldridge Test, The Use Of Secret Evidence
      Would Violate IARA-USA's Right To Due Process. 7

      A.    The "Private Interest". 8

      B.    The Risk Of Erroneous Deprivation And The Value
            Of Additional Procedures. 9

      C.    The Government's Interest. 11

      D.    Suggested Approach To Analyze The Classified
            Information. 14

            1.    Evidence Related To Plaintiff - IARA-USA 15

            2.    Evidence Related To The African Entity - IARA 18

            3.    Evidence Of Partnership Humanitarian Projects 19

            4.    Evidence Based On Declarations 19

CONCLUSION 20

i

IARA-2474

## INDEX OF AUTHORITIES

**CASES**                                                                    Page

<u>Abourezk</u> v <u>Reagan</u>, 785 F3d 1043 (CA D.C., 1986)                5, 12, 13, 15, 21

<u>Alderman</u> v <u>United States</u>, 394 US 165, 184 (1969)               11

<u>Alexiou</u> v <u>McGrath</u>, 101 F Supp 421, 424-25 (D.D.C. 1951)       7

<u>Al Najjar</u> v <u>Ashcroft</u>, 273 F3d 1330 (CA 11, 2001)             2, 6

<u>Al Najjar</u> v <u>Reno</u>, 97 F Supp 2d 1329 (S.D. FL, 2000)
(S.D. Fla. 2000)                                                             13

<u>American-Arab Anti-Discrimination Committee</u> v <u>Reno</u>, 70 F3d      4, 8, 10, 11, 20
1045, 1070 (CA 9, 1995)

<u>Bridges</u> v <u>Wixon</u>, 326 U.S. 135 (1945)                          9

<u>Elfrandt</u> v <u>Russell</u>, 384 US 11 (1966)                          17

<u>Fujrnair</u> v <u>Warden, Allenwood Federal Correctional Inst.</u>, 218 F3d
250, 255 (CA 3, 2000)                                                        16

<u>Gastelum-Quinones</u> v <u>Kennedy</u>, 374 U.S. 469, 472-73 (1963)       17

<u>Global Relief Foundation, Inc.</u> v <u>O'Neill</u>, 207 F Supp 2d
779, 793 (ND. ILL. 2002)                                                    16

<u>Goldberg</u> v <u>Kelly</u>, 397 U.S. 254, 264 (1970)                    9

<u>Haddam</u> v <u>Reno</u>, 54 F Supp 2d 588, 598 (E.D. Va., 1999)         5

<u>Healy</u> v <u>James</u>, 408 US 169, 1876 (1972)                        17

<u>Holy Land Foundation</u> v <u>Ashcroft</u>, 333 F3d 156, 162 (CA D.C., 2003)   3, 5, 16, 20

<u>In re: Washington Post Co.</u>, 807 F2d 383, 391-92 (CA 4, 1986)         14

<u>Kiareldeen</u> v <u>Reno</u>, 71 F Supp 2d 402, 413-14 (D. N.J., 1999)   7

<u>Kinoy</u> v <u>Mitchell</u>, 67 F.R.D. 1, 15 (S.D.N.Y., 1975)            7

IARA-2475

                                                                    Page

Mathews v Eldridge, 424 U.S. 319 (1976)                    8, 9, 12, 13, 15

Molerio v FBI, 749 F2d 815 (CA D.C, 1984)                              12

National Counsel of Resistance of Iran v Department of State,
251 F3d 192, 198 (CA D.C., 2001)                                       15

National Counsel of Resistance of Iran v Department of State,
373 F3d 152 (CA D.C., 2004)                                         18,19

New York Times Co. v United States, 403 U.S. 713 (1971) (per curiam)   13

Ng Fung Ho v White, 259 U.S. 276 (1922)                                 9

Ohio Bell Telephone Co. v Public Utilities Commission,
301 U.S. 292, 300-05 (1937)                                             7

Rafeedie v INS, 880 F2d 506, 524-25 (CA D.C., 1989)                 8, 12

Scales v United States, 367 U.S. 203, 222 (1961)                       17

States Marine Lines, Inc. v Federal Maritime Commission,
376 F2d 230, 238 (CA D.C., 1967)                                        5

United States v Atkins, 323 F2d 733, 743 (CA 5, 1963)                   7

United States v James Daniel Good Real Property, 510 U.S. 43,
54-55 (1993)                                                        8, 10

United States v Lee, 79 F Supp 2d 1280 (D. N.M., 1999),
aff'd mem., 308 F3d 228 (CA 10, 2000)                                  13

United States v Progressive, Inc., 486 F Supp 5 (D. Wis.),
dismissed as moot, 610 F2d 819 (CA 7, 1979)                           13

United States v Rafeedie, 795 F Supp 13, 18-20 (D.D.C. 1992)            7

United States v Reynolds, 345 U.S. 1, 8 (1953)                         12

United States v Taylor, 403 F Supp 747, 751053 (S.D.N.Y. 1975)          7

IARA-2476

Page

**Wisconsin** v **Constantineau**, 400 U.S. 433 (1971)                          9

OTHER AUTHORITIES

28 CFR 17.17                                                                   4

50 USC §17.02                                                                  6

iv

IARA-2477

## INTRODUCTION

Plaintiff is not the Sudanese organization. Plaintiff's counsel is not challenging the designation of the Sudanese organization as a terrorist organization, simply, because its not a client and counsel has no knowledge whatsoever of the African organization's activities or its personnel[1]. To the extent that Defendants are trying to claim that Plaintiff is the Sudanese organization, which it is not, Plaintiff challenges that belief and any designation that it is a terrorist organization.

With respect to Plaintiff, IARA-USA, Defendants have yet to produce a shred of evidence to implicate Plaintiff of any wrongdoing. Not one document produced that was labeled as "unclassified" evidence, including the recently submitted material, implicates Plaintiff in allegedly supporting terrorism. Now, through its submission of "classified" material on an ex parte basis under the guise that it is in the interest of "national security", Plaintiff is essentially left in the dark with no chance to either refute or explain any alleged secret evidence Defendants claim they have against Plaintiff. This is contrary to the fundamental tenets of due process, actually compromises national security and aids terrorism, as further explained below.

Before the Executive Branch can claim that its evidence is to remain "classified", it needs to engage in further steps, under federal law, to determine if the alleged evidence can be declassified so Plaintiff can have an opportunity to adequately reply. There is no indication that this was done. Further, only in the most extraordinary circumstances, which are not available in the case at bar, are Courts allowed to decide the merits of a dispute based on ex parte information. A federal court has decided that due process would be violated if a dispute is resolved in reliance on classified information and that mere alleged "associations" with a known terrorist organization were not

---

[1]

This is a striking contrast from other cases the government has relied on to block Plaintiff. In all other cases, the entity that challenged the designation was the entity that was at court contesting the designation.

IARA-2478

reasonable grounds to conclude that a person (entity in this case) is a threat to national security. Al Najjar v Reno, 97 F Supp 2d 1329 ( S.D. Fla. 2000 ), vacated by Al Najjar v Ashcroft, 273 F3d 1330 (CA 11, 2001), on other grounds (mootness).   Finally, in the event none of the documents are declassified and if the Court finds merit in relying on the classified information to resolve the dispute, Plaintiff recommends a certain approach to assess the classified documents.   Because Plaintiff cannot respond to the unknown and has to engage in guesswork to determine what possible evidence can be presented, it can be reasonably assumed that the information can be categorized in four types.   Plaintiff will identify the four types of information, and suggest an approach for the Court to consider in assessing the information.

The first type of information would be evidence strictly related to the Sudanese organization, Islamic African Relief Agency.   No weight should be given to that type of evidence as to specific wrongdoings attributed to Plaintiff.   The second type of information would relate to Plaintiff.   Of course, substantial weight should be attributed to Plaintiff's conduct and Plaintiff should be held accountable for its actions, both good and bad.   The third type of evidence, which we can reasonably assume the Court has in it is possession, is possible evidence suggesting that various NGOs, including IARA-USA, UNICEF and the Sudanese organization participated in humanitarian projects. It is respectfully suggested that the Court review the specific nature of IARA-USA's activity in humanitarian projects.   The fourth type of alleged evidence that could be in the Court's possession are government agent opinions (i.e., declarations of Robert Werner), alleging that IARA-USA was somehow involved in some wrongdoing.   Plaintiff would respectfully suggest that the Court inquire as to the basis supporting that agent's opinion other than mere hearsay or newspaper articles.

2

IARA-2479

## STANDARD TO APPLY

In assessing the classified and unclassified alleged evidence, the key test for this Court to decide is if "OFAC's actions were not arbitrary and capricious, and was based on **substantial evidence** that Plaintiff supported terrorism. Holy Land Foundation v Ashcroft, 333 F3d 156, 162 (CA D.C., 2003). Generally, the standard does not allow the Court to undertake its own fact finding mission, but to review the agency record to determine whether the decision was supported by a rational basis that Plaintiff supported terrorism. Id. at p 162. Contrary to what Defendants are attempting to assert, and as further discussed below, that test is not whether Plaintiff had any affiliation with the African group. If we take the government's test to its logical conclusion, that means every entity that dealt with the African group in some capacity would need to have its assets frozen, including, UNICEF and the United Nations (which as late as October 2004, had designated the African group as a "Special Consultative Status" - a prestigious qualification for NGOs), a clearly absurd result.

## UPDATED APPLICABLE FACTS

Plaintiff relies on the facts previously cited in its Motion for Preliminary Injunction, and Reply to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction. Further, since the last hearing date, Plaintiff has submitted a settlement proposal to alleviate the government's concerns and allow IARA-USA to reopen and continue to provide humanitarian relief. **Exhibit "A"** is a copy of the settlement proposal.

## ARGUMENT

### I.    Federal Law Mandates That Defendants Determine If The Alleged Evidence Can Be Declassified.

3

IARA-2480

28 CFR §17.17 states:

> §17.17 Judicial Proceedings.
>
> (a)(1)  Any department official or organization receiving an order or subpoena from a federal or state court to produce classified information, required to submit classified information for official department litigative purposes, or receiving classified information from another organization for production of such in litigation, shall immediately determine from the agency arranging the classified information whether the information can be declassified. . . .

In this case, there is no evidence to suggest that Defendants followed the procedures outlined in 28 CFR §17.17(a)(1).  This is significant.  If the information can be declassified, then established due process mandates that the unclassified information be turned over to opposing counsel for its review to adequately respond.  At this juncture, Plaintiff requests this Honorable Court to determine whether this procedure was followed.

## II.    This Matter Should Not Be Resolved By Usage Of Secret Evidence.

As stated before, Defendants' submission of unclassified documents was void of any evidence that Plaintiff supported terrorism.  This matter should not be decided by the use of secret evidence to determine if Plaintiff supported terrorism.  Absent any evidence of wrongdoing from the "unclassified" evidence, Defendants now "seek to use the secret information as a sword" to defeat IARA-USA's constitutional and statutory claims.  American-Arab Anti-Discrimination Committee v Reno, 70 F3d 1045, 1070 (CA 9, 1995).  Prohibiting Plaintiff access to the classified evidence that is to be used against them is simply wrong and in violation of due process.

The openness of judicial proceedings serve to preserve both the appearance and reality of fairness and adjudication of United States courts.  "Certain principles have remained relatively immutable in our jurisprudence.  One of these is that where governmental action seriously injures

4

IARA-2481

an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." States Marine Lines, Inc. v Federal Maritime Commission, 376 F2d 230, 238 (CA D.C., 1967) (same); see also, Haddam v Reno, 54 F Supp 2d 588, 598 (E.D. Va., 1999) ("The use of secret evidence against a party . . . is an obnoxious practice, so unfair that in any ordinary litigation context, its unconstitutionality is manifest.").

It is a firmly held rule that a court may not dispose of the merits of the case on the basis of ex parte, *in camera* submission." Abourezk v Reagan, 785 F3d 1043 (CA D.C., 1986). The District of Columbia has declared that "only in the most extraordinary circumstances" does our precedent countenance court reliance upon ex-part evidence to decide the merits of a dispute. Abourezk, supra, at p 1061. One possible circumstance is an action conducted pursuant to the International Emergency Economic Powers Act ("IEEPA"). But that Act is only invoked when there is "substantial evidence" that a foreign country or national had an "interest" in assets of Plaintiff which is non existent in this case. Holy Land Foundation for Relief and Development v Ashcroft, supra, 156, 159-60.

In Defendants' Supplement to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, they heavily rely on Holy Land Foundation for Relief and Development v Ashcroft, supra, to justify the use of classified evidence to be considered ex parte by the district court (page 2 of Brief.) The Holy Land Foundation ("HLF") case, which is strikingly different than this case, triggered the powers provided for under IEEPA. In HLF, the court found "substantial evidence" that a foreign country or national had an interest in the assets of HLF justifying the use of classified evidence under IEEPA. In HLF, the court found that:

5

IARA-2482

1.    HLF had financial connections of an already designated terrorist group, Hamas, which allegedly has been responsible for suicide bombings in Israel.

2.    HLF was actively involved in meetings with leaders of Hamas.

3.    HLF funded Hamas controlled organizations.

4.    HLF provided financial support to families of martyrs[2] and prisoners.

5.    HLF's Jerusalem office acted on behalf of Hamas.

6.    FBI informers reliably reported that HLF funded Hamas.

In this case, Defendants have not provided a single document to demonstrate (1) that Plaintiff had any financial connection to the Sudanese group, (2) that Plaintiff's leaders regularly met, (3) that Plaintiff funded any of the African group's organizations, or (4) that Plaintiff provided support to families of any martyrs or prisoners.  Simply put, there is no evidence that the African group had any "interest" in Plaintiff to justify the use of classified evidence on an ex–parte basis under IEEPA.  50 USC §17.02(a)(1)(B).

Moreover, mere alleged association, with nothing more, does not trigger reasonable grounds to engage in an action under the guise of national security.  Al Najjar, supra, 1360-61.

In following the basic principle that both parties must have access to the "evidence tendered in support of a requested court judgment", courts have repeatedly barred the government from using

---

2

Interestingly, the Defendants, for the first time, produced documents numbered IARA 1747, 1748, and 1749, and another document with a notation on top stating "OFACFTD . . . No. 736."  "They have references to the word "martyr or martyred."  All the documents involve three orphans whose fathers were of Afghan descent and who died from 1994 to 2002 in Afghanistan.  None of these documents suggest any wrongdoing to support terrorism.  In fact, in Afghanistan in the late 90's and early 2000, the Taliban ruled.  It is conceivable that the fathers could have been seeking their freedom from the Taliban when they died.  It appears that the Defendants are implying that the term "martyr" applies to a suicide bomber as that term is commonly known.  No Afghanis have been connected to suicide bombings in Israel.  The New Webster Dictionary defines martyr as "one tortured or killed because of his faith or beliefs" or "person suffering misery a long time".  In Arabic, a martyr is someone who dies as a witness to the truth.  Exhibit "B".  It is important also to mention that the word martyr is commonly used in the Arabic Culture as a cause of death.  For example, Exhibit "B" contains a reference that the former President of Egypt died as a martyr.

6

IARA-2483

secret evidence to take away important rights. See, e.g., <u>Ohio Bell Telephone Co.</u> v <u>Public Utilities</u> <u>Commission</u>, 301 U.S. 292, 300-05 (1937) (use of secret evidence in telephone rate proceeding violated due process), where the Court notes that, in light of the vast power afforded regulatory agencies, "[a]ll the more insistent the need, when power has been bestowed so freely, that the inexorable safeguard of a fair and open hearing be maintained in its integrity"); <u>United States</u> v <u>Atkins</u>, 323 F2d 733, 743 (CA 5, 1963) (holding that a county election board "could not deprive a person of the right to register to vote on the basis of secret evidence without affording notice and an opportunity for hearing"); <u>Kiareldeen</u> v <u>Reno</u>, 71 F Supp 2d 402, 413-14 (D.N.J. 1999) (use of secret evidence at alien's removal proceeding violated due process); <u>United States</u> v <u>Rafeedie</u>, 795 F Supp 13, 18-20 (D.D.C. 1992); (criticizing the use of secret evidence in exclusion proceeding against permanent resident alien); <u>United States</u> v <u>Taylor</u>, 403 F Supp 747, 751-53 (S.D.N.Y. 1975) (use of secret evidence at parole revocation proceeding violated due process); <u>Kinoy</u> v <u>Mitchell</u>, 67 F.R.D. 1, 15 (S.D.N.Y. 1975) (government's attempt to use secret evidence in support of summary judgment motion "wholly unacceptable"); <u>Alexiou</u> v <u>McGrath</u>, 101 F Supp 421, 424-25 (D.D.C. 1951) (government's use of secret evidence at suspension of removal proceeding violated due process).

This long line of authority counsels strongly against permitting the government to support its actions against IARA-USA on the basis of secret evidence. As the following argument demonstrates, such use of ex parte proceedings would violate IARA-USA's Fifth Amendment right to due process.

### III.    Under The *Mathews* v *Eldridge* Test, The Use Of Secret Evidence Would Violate IARA-USA's Right To Due Process.

To determine whether the government's proposed use of secret evidence would violate IARA-USA's right to due process, the Court must consider the three factors set forth in <u>Mathews</u>

7

IARA-2484

v Eldridge, 424 U.S. 319 (1976): (1) "the private interest that will be affected by the official action", (2) "the risk of an erroneous deprivation of such interest through the procedures used" and "the probable value, if any, of additional or substitute procedural safeguards", and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." Id. at p 335; see, e.g., American-Arab Anti-Discrimination Committee, 70 F3d 068-71 (CA 9, 1995) (applying Mathews test to determine whether use of secret evidence violates due process); Rafeedie v INS, 880 F2d 506, 524-25 (CA D.C., 1989) (Mathews balancing test governs process due alien in exclusion proceeding, including use of secret evidence). An application of the Mathews test confirms that permitting the government to use secret evidence would violate IARA-USA's right to due process.

## A.      The "Private Interest".

The "private interests" at stake here are extremely weighty. The treatment of IARA-USA as a terrorist organization effectively put the Foundation out of business. IARA-USA immediately had to cease its charitable works. Its employees lost their jobs, including benefits such as health insurance. The recipients of IARA-USA's charity-poor and needy persons and entities in Africa and elsewhere - - lost essential humanitarian aid. The designation of IARA-USA and the seizure of its assets substantially burdened the right of the Foundation and its donors to exercise their religion and their First Amendment rights of speech and association. These property and liberty interests carry great weight. See, e.g., United States v James Daniel Good Real Property, 510 U.S. 43, 54-55 (1993) (the private interests at stake in the seizure of real property "weigh heavily in the Mathews balance"); Wisconsin v Constantineau, 400 U.S. 433 (1971) (pre-deprivation hearing required because of seriousness of stigma associated with being publicly branded as having a drinking problem);

8

Goldberg v Kelly, 397 U.S. 254, 264 (1970) (termination of welfare benefits involves deprivation of important rights). [3]

In Bridges v Wixon, 326 U.S. 135 (1945), the Court recognized the importance of some of the interests at stake in this case. Bridges dealt with deportation. It noted that although deportation is not "criminal punishment" as such, "it may visit as great a hardship as the deprivation of the right to pursue a vocation or calling. As stated by Mr. Justice Brandeis speaking for the Court in Ng Fung Ho v White, 259 U.S. 276 (1922), deportation may result in the loss 'of all that makes life worth living'". In this case, the evidence establishes that the government's blocking order has prevented IARA-USA's former employees from making a living not just because they have lost their jobs, but because of the stigma the designation that it supports terrorists.

**B.     The Risk Of Erroneous Deprivation And The Value Of Additional Procedures.**

Turning to the second Mathews factor, the procedure that the government asks this Court to adopt - - the use of secret, ex parte, evidence that IARA-USA will have no opportunity to challenge - - carries a notoriously significant "risk of an erroneous deprivation" of the liberty and property interests at issue, and "additional . . . procedural safeguards" - - access to the secret evidence and an opportunity to challenge it - - carry substantial "probable value." Mathews, supra, at p 335. The Supreme Court has declared that "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity

---

[3]

The Court emphasized in Constantineau that due process protections are particularly important "where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him." 400 U.S. at 437. Here, the government has branded IARA-USA and, by implication, its staff as supporters of terrorism, a stigma far beyond the stigma found to be so weighty in Constantineau.

9

IARA-2486

to meet it.'" James Daniel Good, supra, at p 55 (quoting Joint Anti-Fascist Refugee Committee v

McGrath, 341 U.S. 123, 170-172 (1951) (Frankfurther, J., concurring)). As the Ninth Circuit

observed in a secret evidence case, "'One would be hard pressed to design a procedure more likely

to result in erroneous deprivations.' . . . [T]he very foundation of the adversary process assumes that

use of undisclosed information will violate due process because of the risk of error." American-Arab

Anti-Discrimination Committee, supra, at p 1069 (quoting district court); see, e.g., Id. at p 1070

(noting "enormous risk of error" in use of secret evidence).

The proceedings to date in this case demonstrate the value of adversarial - rather than ex-

parte - proceedings. As noted above, a review of the "unclassified" evidence that has been provided,

indicates that it is void of any proof that Plaintiff supported terrorism. The unclassified evidence is

void of "substantial evidence" - the burden of proof used in Holy Land- or even any record that a

foreign country or national has any interest in Plaintiff's assets to invoke IEEPA to enable Defendant

to use ex-part evidence. Also, it is void of any record that Plaintiff is a threat to national security

to use ex parte evidence.

Of equal significance, this Court has already seen how the alleged evidence can be used

erroneously. For example, if the Court recalls, one of the reasons Defendants blocked Plaintiff's

assets and are treating Plaintiff as a terrorist organization is based on Mr. Werner's statement in

paragraph 23 of his January 25, 2005 Declaration that Plaintiff made repeated License requests to

OFAC "to conduct humanitarian operations as a non-governmental organization in Sudan". Rather

than viewing this act as an organization following the letter of the law to obtain permission from our

government to combat the horrific famine problem in Sudan, Mr. Werner viewed this conduct as

Plaintiff's "connection to the Islamic African Relief headquartered in Sudan." These requests were

10

IARA-2487

made at a time when the African entity was not even designated as a terrorist organization and the United Nations was one of its regular partners.

Although we have no doubt that the Court would scrutinize the government's secret evidence rigorously, the Court lacks both counsel's familiarity with the underlying facts and the resources available to counsel to investigate the government's allegations. As stated in Alderman v United States, 394 US 165, 184 (1969):

> Adversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny that the Fourth Amendment exclusionary rule demands.

## C.    The Government's Interest.

Finally, the Court must consider the government's purported interest in using secret evidence. Predictably, the government asserts its interest in avoiding damage to "national security", without any effort to demonstrate either that exclusion of the specific evidence at issue here or the disclosure of that evidence would cause such damage. Courts have previously rejected such diffuse claims of national security. See, e.g., Arab-American Anti-Discrimination Committee, supra, p at 1070 ("We cannot in good conscience find that the President's broad generalization regarding a distant foreign policy concern and a related national security threat suffices to support a process that is inherently unfair because of the enormous risk of error and the substantial personal interests involved."); Kiareldeen, supra, at p 414 (same); Rafeedie, supra, at p 19 (same).

The government implies that the Court must take its word for the national security significance of the secret evidence. But the very D.C. Circuit decisions on which the government relies contemplate judicial inquiry into the government's purported national security interest. In

11

IARA-2488

Molerio v FBI, 749 F2d 815 (CA D.C., 1984), for example, the court noted that "[t]o some degree, at least, the validity of the government's assertion [of the state secrets privilege] must be judicially assessed." Id. at p 822; see also, e.g., United States v Reynolds, 345 U.S. 1, 8 (1953) ("The court itself must determine whether the circumstances are appropriate for the claim of privilege . . ."). In Molerio, the district court and the court of appeals examined the government's rationale for withholding the evidence at issue and concluded that the privilege had a sound basis. Molerio plainly recognizes a court's power, under appropriate circumstances, to reject the government's claim that disclosing or foregoing the use of certain evidence will damage national security. Similarly, in Abrourezk, the court acknowledged the possibility, in "extraordinary circumstances", of considering secret evidence, but only where (among other things) the government "demonstrate[es] . . . compelling national security concerns." 785 F2d at 1061.

The Court should require the "demonstration" that Abourezk contemplates before it assigns any weight to the government's interest for purposes of the Mathews analysis. In assessing the government's showing, the Court should consider the potential use of protective measures that will permit access to the secret evidence while reducing to a minimum the government's purported national security concerns. For example, if the Court is satisfied that national security will be harmed if the government discloses or foregoes the use of the secret evidence, it can consider permitting the government to redact particularly sensitive "sources and methods" information, and it can order disclosure only to defense counsel. Cf. Al Najjar v Reno, *supra*, 1358-59 [S.D. Fla., 2000] (proposing procedures for handling classified evidence in deportation context), vacated as moot, Abourezk. supra, p 1330.

12

We urge the Court to view the government's claimed need for secrecy - - and to evaluate the third Mathews factor - - in light of previous, similar claims that have proven exaggerated, if not outright false. To cite a few famous examples, the government argued in 1971 that disclosure of the Pentagon Papers would cause grave damage to national security. See, New York Times Co. v United States, 403 U.S. 713 (1971) (per curiam). The New York Times published the Papers, and there is no evidence that national security suffered in the slightest. In 1979, the government sought to suppress Howard Morland's article, The H-Bomb Secret, claiming that publication would cause immediate and irreparable harm to national security. See, United States v Progressive, Inc., 486 F Supp 5 (D. Wis.), dismissed as moot, 610 F2d 819 (CA 7, 1979). The Progressive published Moreland's article in November, 1979, and - - again - - there is no evidence of any harm to national security. In December, 1999, the government made strident national security claims to convince a federal court to detain Dr. Wen Ho Lee under extraordinarily strict conditions for nine months. *See,* United States v Lee, 79 F Supp 2d 1280 (D.N.M. 1999), aff'd mem., 308 F3d 228 (CA 10, 2000). One government witness even testified that the court faced a "you bet your country" decision in determining whether to release Dr. Lee. In September, 2000, following a plea bargain, Dr. Lee regained his freedom. There is no evidence that his release has caused any damage to the national security.

These examples share several common features. In each case, the government invoked national security to convince a court to depart from constitutional standards; in each case, courts initially acceded to the government's national security claims; and in each case, when the "doomsday" event actually occurred, the government's purported concerns proved to be unfounded. As the Fourth Circuit has observed in the First Amendment context:

13

> History teaches us how easily the spectre of a threat to "national security" may be used to justify a wide variety of repressive government actions. A blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a statement of reasons, would impermissibly compromise the independence of the judiciary and open the door to possible abuse.

In re: Washington Post Co., 807 F2d 383, 391-92 (CA 4, 1986).

Of equal significance, by not providing Plaintiff the fundamental tenets of due process of having an opportunity to reply or refute evidence to be used against it due to alleged secrecy of the evidence, national security is actually compromised. As stated in a Staff Report to the September 11 Commission (Exhibit X, p111 in Plaintiff's Motion for Preliminary Injunction) in assessing the public consequence in blocking the property of two other charities:

> The investigation of BIF and GRF reveals little compelling evidence that either of these charities actually provided financial support to al Qaeda, at least after al Qaeda was designated a foreign terrorist organization in 1999. Indeed, despite unprecedented access to the U.S. in foreign records of these organizations, one of the world's most experienced and best terrorist prosecutors has not been able to make any criminal case against GRF and resolve the investigation of BIF without a conviction for support of terrorism. **Although the OFAC action shut down BIF and GRF, the victory came at considerable cost of negative public opinion in the Muslim and Arab communities, who contend that the government's destruction of these charities reflects bias and injustice with no measurable gain to national security** (Exhibit X, p111).

This assessment is critical. Negative public opinion in the Arab and Muslim communities outweighs any measurable gain in national security when charities' funds are blocked in such a manner. In this day and age, we are engaging in every effort to spread democracy in the Middle East

14

IARA-2491

and rid the region of tyrannical regimes that afford no due process. Such action by Defendants increases the Middle East's skepticism about America's true intentions in applying democracy, and provides ammunition to terrorists that the United States does not practice what it preaches and essentially becomes a selling point to recruit other prospects.

In addition to national security, "the government, also, has an interest in the integrity and accuracy of administrative proceedings in which those interests are furthered." Al Najjar, supra, at 1357; and government has an interest in preserving fairness in judicial proceedings. Abourezk, supra, at p 1060.

Based on the foregoing, we ask the Court, when applying the third Mathews factor, to scrutinize with a skeptical eye the government's claim that disclosure (or foregoing the use) of the secret evidence will damage national security. Upon an objective and independent assessment of that claim, the Court should find that the first and second Mathews factors substantially outweigh the government's professed need to use its evidence ex parte.

## D.    Suggested Approach To Analyze The Classified Information.

If the Court is convinced that no "classified" evidence can be declassified, and that Defendants may use ex parte evidence, then Plaintiff can only suggest a certain approach for the Court to undertake in reviewing the alleged evidence.

Article III of the Constitution forbids courts from rubber stamping executive decisions. National Counsel of Resistance of Iran v Department of State, 251 F3d 192, 198 (D.C. Cir. 2001). Also, as already stated, this District has treaded these waters before. In its rulings in Holy Land Foundation, it laid out specific binding precedent in dealing with matters involving alleged terrorism. Specifically, in reviewing the established administrative record, whether there is "substantial

15

evidence" that Plaintiff supported terrorism, and a rational basis to lead to that conclusion. That test should be applied by the Court in viewing the classified material.

Certainly, it is impossible for Plaintiff to identify with certainty the alleged evidence, but Plaintiff can speculate on the type of material that would be presented. Essentially, they are 1) evidence related to Plaintiff; 2) evidence related to the African entity; 3) evidence related to Plaintiff's associations with other NGO's in humanitarian causes; and 4) declarations or affidavits by government officials. Plaintiff would suggests that the alleged evidence should be viewed in the following manner:

### 1. Evidence Related To Plaintiff - IARA-USA

In reviewing any alleged evidence specifically involving Plaintiff (not the African group), it is suggested, of course, that considerable weight should given in assessing and judging Plaintiff's actions. Plaintiff should only be held accountable for its own actions, good or bad.

Plaintiff should not be held accountable for activities committed by other entities over which Plaintiff has no control and could not have been reasonably expected to foresee. Fujrnair v Warden, Allenwood Federal Correctional Inst., 218 F3d 250, 255 (CA 3, 2000). This is especially true, even if there is any alleged evidence that Plaintiff was associated with the African group or any other NGO. Plaintiff is an American Citizen, entitling it constitution protections. Global Relief Foundation, Inc. v O'Neill, 207 F Supp 2d 779, 793 (ND. ILL. 2002). This, of course, includes the right of association under the First Amendment. As already stated in Plaintiff's Motion for Preliminary Injunction, " the government has the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims. Healy v James, 408 US 169, 186 (1972). Even in the case of a "membership" or affiliation,

16

IARA-2493

in determining specific intent, the Supreme Court has interpreted "membership to mean more than mere voluntary listing of a person's name (or of an organization's name on a web site as in this case). Scales v United States, 367 U.S. 203, 222 (1961). In fact, Al Najjar, supra, at p 1360 in observing another Supreme Court ruling stated:

> This interpretation (membership) recognized that "there is a great practical and legal difference between those who firmly attach themselves" to the beliefs of an organization "being aware of all of the aims and purposes attributed to it," and those who temporarily join an organization unaware "of its international relationship and believing it to be a group solely trying to remedy unsatisfactory social or economic conditions,...combat employment, or alleviate distress and poverty. Gastelum-Quinones v Kennedy, 374 U.S. 469, 472-73 (1963)

See also Elfrandt v Russell, 384 US 11 (1966). In that case, a public employee who was part of an organization that had one of its purposes to overthrow the government was punished for being part of that organization. The Supreme Court found that this violated the First Amendment protection for Freedom of Association because **there can be no exclusion of association by one who does not subscribe to an organization's unlawful ends**.

As such, if there is any alleged evidence that Plaintiff was associated with another entity, including just being on another entity's web site or a brochure, that is not enough. The evidence must demonstrate that Plaintiff possessed specific intent to engage or support terrorism. All Defendants have shown are web sites and brochures of other entities only promoting humanitarian causes. It is respectfully suggested that, in this instant action, when the Court is reviewing the "classified" evidence, it should use a standard to determine if there is any evidence that IARA-USA specifically subscribed to any unlawful end that would be allegedly perpetrated by the Sudanese group, which again based on the submission of the unclassified documents, it does not.

17

IARA-2494

## 2. Evidence Related To The African Entity - IARA

In reviewing any alleged evidence that specifically involves the African entity, it is suggested that no weight be given in assessing and judging Plaintiff's actions. This is especially true if no specific intent can be attributed to Plaintiff. Further, a key issue in this matter would be whether the African entity had any control or influence over Plaintiff or are they simply one and the same, or even aliases of one another. For reasons already discussed in Plaintiff's previously filed Motion for Preliminary Injunction, they are not. However, when the African group was designated as a terrorist organization, OFAC wrongfully claimed that Plaintiff is an AKA (also known as), or alias of the African group. (See Werner Declaration in Exhibit 2 of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction). This Court has treaded these waters before in determining if an entity is an alias of another, and has already set some binding precedent.

For example, in National Counsel of Resistance of Iran v Department of State, 373 F3d 152 (CA D.C., 2004)[4], the court dealt with the alias issues, and provided certain tests to establish if one entity is an alias of another. These include: 1) when one entity so dominates and controls another that they must be considered principal and agent, and it is appropriate, to look past separate juridical entities and to treat them as aliases with respect to their designation as foreign terrorist organizations; and 2) where there is substantial support in administrative records, including, the search of office space and discovery of documents of both organizations, which were co-mingled, and 3) that the two organizations shared an essentially unitarian leadership structure.

---

[4]

Although this case was decided under the Anti-Terrorism and Effective Death Penalty Act, the concept is, nevertheless, the same.

18

Now in applying the test for alias set out in <u>National Counsel of Resistance of Iran,</u> it is already clear, based on the unclassified documents, that Plaintiff is not an alias of the Sudan entity. No entity dominates the other. The records and financials have been separate and not commingled. Finally both entities have completely separate decisions makers and leaders. Simply put, Defendants have failed to meet any of the three part prong to claim that IARA-USA is an alias of the Sudanese entity. With respect to the alleged classified evidence, Plaintiff respectfully suggests that the Court apply the three part test laid out in <u>National Counsel of Resistance of Iran</u> to determine if Plaintiff is an alias of the African entity.

### 3. <u>Evidence Of Partnership Humanitarian Projects</u>

The third type of conceivable evidence is possibly information that shows that Plaintiff worked in partnership arrangements with other NGO's. Again, what is critical is the type of activity in which Plaintiff participated. This triggers the right of association principles espoused above. Wrongs committed by other entities should not be attributed to Plaintiff, unless there is alleged evidence of a specific intent on behalf of Plaintiff.

### 4. <u>Evidence Based On Declarations</u>

It is also conceivable that Defendants will submit more declarations from other government agents like that of Director Werner. It is probable that, like the declaration of Director Werner, there will be summary and conclusory statements. It is respectfully suggested that the Court determine the basis for these statements to determine if Plaintiff, in fact, (not the African group) supported terrorism. If this matter is conducted entirely in secret with no check as to it veracity, it is subject to extreme abuse. As eloquently stated by Justice Jackson, "the plea that evidence of guilt must be

19

secret is abhorrent to free men because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected." Arab-American Anti-Discrimination Committee, supra, 1069 .

## CONCLUSION

As stated, in assessing the classified and unclassified alleged evidence, the key test for this Court to decide is if "OFAC's actions were not arbitrary and capricious, and was based on **substantial evidence**" that Plaintiff supported terrorism. Holy Land Foundation v Ashcroft, supra, 156, 162. That is it. Contrary to what Defendants are attempting to assert, that test is not whether Plaintiff had any affiliation with the African group . With respect to the alleged Unclassified evidence, it is clear that Defendants failed to produce "substantial evidence" (even any evidence) that Plaintiff supported terrorism. With respect to classified evidence, Plaintiff respectfully suggests that the same test is to be applied on whether Defendants have "substantial evidence" that Plaintiff allegedly supported terrorism.

Finally, if the Court finds that there is alleged evidence that suggests that Plaintiff allegedly supported terrorism, which given the known information is inconceivable, Defendants should at a minimum provide Plaintiff "access to the decisive evidence to the fullest extent possible, without jeopardizing legitimately raised national security interests. Abourezk, supra, 1060. This could allow Plaintiff a fair and meaningful opportunity to reply and adequately respond.

AKEEL & VALENTINE, PLC

By: SHEREEF AKEEL (P53445)
Attorneys for Plaintiff

February 16, 2005
\\Secretary\C\MyFiles\G - L\iara-usa\04_cv_2264 Response to Defendants' Supplement.wpd

20

IARA-2497

# EXHIBIT "A"

IARA-2498

AKEEL & VALENTINE, PLC
ATTORNEYS AND COUNSELORS
401 S. OLD WOODWARD
SUITE 430
BIRMINGHAM, MICHIGAN 48009-6613

SHEREEF H. AKEEL, P.C.
GLENN L. VALENTINE, P.C.

TEL: 248-594-9595
FAX: 248-594-4477

February 7, 2005

Robert W. Werner, Director
Office of Foreign Assets Control
U. S. Department of Treasury
1500 Pennsylvania Avenue NW
Washington, D.C.  20220

Via facsimile and first class mail
(202) 622-1911

     RE:    Islamic American Relief Agency (IARA - USA)
               FAC No. SDG-237388

Dear Mr. Werner:

This letter serves as a follow-up request to unblock IARA-USA's property.  In the spirit of cooperation and to salvage the organization from the brink of extinction, while the matter is pending in Court, we offer an opportunity to resolve any of your concerns and have the matter resolved.

As you know, the organization has been sound for over 20 years, and we can all agree that there is no doubt that it has contributed to combating famine in the most devastated regions of the world. Members, employees, and personnel have come and gone, but the organization remained ever so vibrant to provide humanitarian relief and alleviate the suffering.

On January 10, 2005, you provided us, for review, certain material. This was the first time the organization learned of the suspicion surrounding the organization's purported affiliation with the Sudanese entity, Islamic African Relief Agency.

As you know, in early 2000, IARA-USA filed multiple pleas of inquiry as to the reasons why its USAID agreements were being terminated. At that time, and prior to the organization having its properties blocked on October 13, 2004, the organization never knew or had reason to know that the government had any concerns with the organization's purported affiliation with Islamic African Relief Agency.

In fact, as you know, license request after license request was filed, even with the assistance of then Congressman David Bonior, to provide relief in Sudan only to be denied. Again, no communication was received from the government that it had any concerns of any purported relationship.

IARA-2499

In your declaration dated January 25, 2005, you cite instances regarding brochures and web sites of other organizations to support you concerns that IARA-USA allegedly is one and the same with the Sudanese organization, and that IARA-USA is simply another name for the African agency. No other stronger words can be further provided in the negative but to say that the two entities have unequivocally been completely separate from one another. IARA-USA has no control over any other organization, nor does any other organization have any influence over it. This was constantly represented in the organization's tax returns since its inception. The fact that IARA-USA applied for one license after another for permission from our government to provide donations suggests that it continuously considered itself a separate entity from any other organization. Again, if the organization did not consider itself a separate and independent entity, it can be reasonably assumed that IARA-USA would not have attempted to seek a license to transfer monies from one of its pockets to the other.

We would ask for an opportunity to address any concern that the government has regarding any specific activities that IARA-USA has engaged in with any other organization. Based on the documents presented, we would respectfully submit to you that any activity IARA-USA has been involved in was solely dedicated and designed with the full intent to relieve human suffering.

When Holy Land Foundation was designated as a terrorist organization, part of the main reason was that it was believed that the Foundation still dealt with Hamas, an entity that was designated as a terrorist organization in the 1990's. This matter is strikingly different. It could be confidently stated that not a single charity or an NGO knew, or should have known that there was any suspicion surrounding the Sudanese organization in supporting terrorism. From UNICEF to even the United Nations, they all dealt with the Sudanese organization for the intent of relieving human suffering based on our research and findings of the brochures we incorporated in our recent court filings. We even learned that the United Nations had issued the Sudanese organization a "Special Consultative" status as an NGO. Not a single NGO, including, IARA-USA could possibly have known of any wrongdoing committed by the Sudanese entity.

Based on the documents presented in your letter dated January 10, 2005, and the documents presented by your attorneys in shedding light on the matters that have concerned the government, we suggest the following possible solutions.

In the event the organization's assets are unblocked, you, the government, and donors may rest assured that IARA-USA would implement the strictest measures to ensure that it does not participate, partake, or get involved, in any manner, in any humanitarian activity involving the Sudanese organization.

The organization would take an aggressive approach, including legal action, to remove any reference to the United States organization with any other organization deemed or found to support a terrorist organization. This would include, removing any reference in web sites or brochures.

The organization would be vigilant to ensure that all of its funds reach its intended humanitarian designation. This organization would even consider some sort of reasonable monitoring

program imposed by the government to ensure that donations reach its intended humanitarian destination. We would also consider any measures that the government may request the organization to implement, as part of IARA-USA's internal controls, to ensure that all monies collected reach its intended humanitarian designation.

Further, the organization is perpetual, ongoing, and greater than an individual. If requested, the organization would change its personnel.

If you have any evidence that directly supports the suspicion that IARA-USA allegedly funded terrorism, I would understand your position but would ask for the opportunity to explain any such purported evidence. Further, if your concerns are primarily based on past affiliated references, I would ask you to seriously consider the above suggested solutions.

Millions of people around the world are in dire need. With proper guidance and controls, this matter can be a win-win situation.

As you know, most of us are completely disconnected with the actual sufferings that take place around the world because of the great country we live in. However, we were personally contacted by orphans, Christians and Muslims, ages 11 to 15, from Nairobi, Kenya asking us personally to intervene on their behalf. This includes Rehma A. Sheikaha, age 11; Peter Mwangi Miugua, age 13; Adam Yusuf, age 15; Victor Stanley Mulindi, age 14; all of them pleading for "help", and asking me personally to assist them. (These letters can be found in Exhibit "C" of Plaintiff's Motion for Preliminary Injunction to Unblock Assets. We also received a direct plea from an orphan feeding program called Kicoshep School based in Kenya, which houses orphans afflicted by HIV-AIDS, and who are critically ill of HIV-related illnesses. They expressly advised us that they are "saddened to learn of the closure of IARA-USA", and that "This is going to affect the children adversely". Practically at this time, we are the only voice for children for you to hear.

While the matter is pending in Court, and you engage in further efforts to explore OFAC's suspicion, young children are being directly harmed. We truly believe that if you would consider the above progressive measures to alleviate your concerns, IARA-USA can reopen and continue alleviating human suffering. As a result, we would be able to continue to collect donations to sustain the lives of those in need.

Members of the organization, are deeply disheartened that the organization is unable to assist many in need at this time, especially, in the wake of the Tsunami disaster. These members have dedicated a major part of their lives helping others. In an area where the majority of inhabitants subscribe to the Muslim faith, IARA-USAs could have served in a vital role in collecting funds in the United States, especially from American Muslim donors, to assist the victims of this disaster. Further, as you may know, many orphans in that region have been kidnaped and are in dire need for food and shelter. Protecting orphans is IARA-USA's specialty and has been a vital resource for the United States to lend a hand in establishing feeding centers and orphanages. In fact, IARA-USA has a history of assisting victims from natural or man-made disasters. IARA-USA assisted victims from the recent Iran earthquake to the horrific terrorist attack of the US Embassy in Kenya.

IARA-2501

By unblocking the assets, we would be combating terrorism. At this time, the poor and weak are vulnerable to terrorists. By providing them an alternative for food and shelter, the underprivileged are less susceptible to be lured into terrorist organizations.

It is not too late to salvage this 20 year old American organization and allow it to resume its efforts in alleviating human suffering around the world. Please reconsider unblocking our client's assets given the proposals outlined above.

If you have any questions, comments or suggestions, please feel free to call. Thank you, and we look forward to hearing from you.

Very truly yours,

Shereef H. Akeel

SHA/

cc:    Timothy Ott, Office of Chief Counsel
        Foreign Asset Control
        U.S. Department of Treasury
        1500 Pennsylvania Avenue, N.W. Annex
        Washington, D.C. 20220

        Ms. Andrea Gacki
        U.S. Department of Justice, Civil Division
        20 Massachusetts Avenue, N.W., Room 7308
        P.O. Box 883
        Washington, D.C. 2044

C:\MyFiles\G - L\iara-usa\February 4.werner.wpd

BCC:    Mubarak Hamed
         Abdel mouhaymen Alsbai

IARA-2502

## AKEEL & VALENTINE, PLC
401 S. Old Woodward, Suite 430
Birmingham, Michigan 48009-6613

Phone: (248) 594-9595                              Fax No.: (248) 594-4477

### FAX COVER/TRANSMITTAL SHEET

DATE: *02-07-05*                              TIME: _____

TO: *ROBERT W. WERNER*

FAX NUMBER: *(202) 622-1911*

FROM: *SHEREEF AKEEL*

RE: *IARA - USA*

NUMBER OF PAGES (INCLUDING COVER SHEET) *5*

Comments: _____

If there are any problems with the transmission of this fax please contact_____ at (248) 594-9595.

The documents and materials accompanying this transmission contain information from the law firm of Akeel & Valentine, PLC which is confidential and/or privileged. The information is intended only for the personal and confidential use of the recipient named above on this cover sheet. If you are not the intended recipient, please be advised that (1) you have received this transmission in error; and (2) any disclosure, duplication, distribution, or other use of this transmission and its information is strictly prohibited. If you have received this communication in error, you should notify us immediately by telephone so that we can arrange the return of this transmission to us at no cost to you.

IARA-2503

EXHIBIT "B"

IARA-2504



The New
WEBSTER'S
DICTIONARY

IARA-2505

mam·mal, *n.* vertebrate animal whose young feed on milk from the mother's breast.

mam·moth, *n.* large extinct elephant. *a.* huge; gigantic.

man, *n. pl.,* men. human being, esp. a male adult; the human race; game piece. *v.* furnish with men.

man·a·cle, *n. often pl.* shackles; handcuffs; restraints.

man·age, *v.* control; direct; manipulate; contrive; carry on. -a·ble, *a.* -ag·er, -age·ment, *n.*

man·date, *n.* command; policy direction; authorization dictated by electorate; territory controlled by another nation. -da·to·ry, *a.*

man·da·to·ry, *a.* obligatory.

mane, *n.* long neck hair of some animals, as the horse.

ma·nege, *n.* art of horsemanship.

ma·neu·ver, *n.* regulated movement; tactical exercise; clever action; scheme *v.* perform military exercises; handle skillfully; scheme; manipulate.

man·ga·nese, *n.* metallic element used as an alloy.

mange, *n.* skin disease.

man·ger, *n.* feedbox, trough for livestock fodder.

man·gle, *v.* destroy, slash, or badly damage. *n.* machine to press cloth using heated rollers.

man·go, *n.* edible tropical fruit.

man·gy, *a.,* -gi·er, -gi·est. having mange; squalid; shabby; seedy.

man·han·dle, *v.* handle roughly; move by men, not machines.

man·hole, *n.* circular hole for entering a sewer, drain, etc.

man·hood, *n.* state of being an adult male; manly qualities; men collectively.

ma·ni·a, *n.* great excitement or enthusiasm; craze. man·ic, *a.*

ma·ni·ac, *n.* raving lunatic; madman.

man·i·cure, *n.* care of the nails and hands. *v.* trim or care for.

man·i·fest, *a.* clearly evident; obvious. *v.* make clear; reveal; prove. *n.* itemized shipping document. -fes·ta·tion, *n.*

man·i·fes·to, *n.* public declaration of policy, views, etc.

man·i·fold, *a.* having many different parts, forms, etc. *n.* exhaust pipe or system.

ma·nip·u·late, *v.* work, control, handle, or use with skill; change or falsify. -la·tion, *n.* -la·tive, *a.*

man·kind, *n.* all human beings; the human race.

man·ly, *a.,* -li·er, -li·est. qualities appropriate to a man; brave; resolute. -li·ness, *n.*

man·na, *n.* food from heaven; thing needed and unexpectedly received.

man·ne·quin, *n.* life-sized figure of the human body; fashion model.

man·ner, *n.* way or method of doing something; customary behavior; *pl.* polite social behavior.

man·ner·ly, *a., adv.* polite.

man·or, *n.* landed estate; mansion.

man·pow·er, *n.* power by human strength; collective strength.

manse, *n.* clergyman's residence.

man·sion, *n.* large residence.

man·slaugh·ter, *n.* unlawful, unintended killing of a person.

man·tel, *n.* shelf above a fireplace; ornamental work surrounding it.

man·tle, *n.* loose, sleeveless cloak. *v.* cover; envelop.

man·u·al, *a.* made, done, worked, or used by the hands. *n.* book of instructions.

man·u·fac·ture, *n.* producing goods by manual labor or machinery. *v.* make by hand or machinery; make up excuses, etc.

ma·nure, *n.* animal waste used to fertilize soil.

man·u·script, *n.* handwritten or typewritten work.

man·y, *a.,* more, most. numerous; large. indefinite number. *n., pron.* a large number.

map, *n.* representation of the earth's surface. *v.* make a map; plan in detail.

ma·ple, *n.* genus of shade tree important for lumber, syrup.

ma·ra·ca, *n.* gourd-shaped rattle.

mar, *v.,* marred, mar·ring. injure; blemish; damage; spoil.

mar·a·schi·no, *n.* sweet liqueur; preserved cherries.

mar·a·thon, *n.* long-distance foot race (usu. 26 miles); endurance contest.

ma·raud, *v.* raid or roam for plunder. -er, *n.*

mar·ble, *n.* hard limestone; little glass, etc., ball used in a child's game. *a.* hard or veined like marble.

march, *v.* move with steady stride; proceed; advance. *n.* measured, uniform walk; progress; marching music; organized walk on a public issue.

mare, *n.* female horse.

mar·ga·rine, *n.* vegetable oil buttery spread or cooking fat.

mar·gin, *n.* border; edge; limit; difference between cost and selling price; amount more than what is needed; security money deposited against loss. -gi·nal, *a.*

ma·ri·a·chi, *n.* Mexican street band.

mar·i·gold, *n.* garden plant grown for showy flowers.

mar·i·jua·na, *n.* narcotic from dried leaves of hemp plant.

ma·rim·ba, *n.* kind of xylophone.

ma·ri·na, *n.* small boat basin where moorings, supplies, and services are available.

mar·i·nate, *v.* soak in seasoned pickling sauce before cooking.

ma·rine, *a.* of the sea; nautical; maritime. *n.* member of U.S. Marine Corps; country's naval shipping.

mar·i·ner, *n.* seaman; sailor.

mar·i·on·ette, *n.* jointed, stringed puppet or doll.

mar·i·tal, *a.* of marriage; conjugal.

mar·i·time, *a.* on or near the sea; of sea navigation, shipping.

mar·jo·ram, *n.* aromatic herb used for cooking.

mark, *n.* spot, scratch, stain; a symbol or sign, as a punctuation mark; brand or label to show ownership or maker; a grade or rating; object serving as a guide. *v.* make marks on; to characterize; grade or rate; take note; write, record. marked, *a.* mark·ed·ly, *adv.* mark·er, *n.*

mar·ket, *n.* trade in goods, services; store selling provisions; those buying. *v.* to buy or sell; to offer for sale; buy provisions. -a·ble, *a.*

mark·ing, *n. often pl.* characteristic arrangement of marks, as on fur, feathers.

mar·lin, *n.* oceanic sport fish.

mar·ma·lade, *n.* preserve made with oranges or other fruit.

ma·roon, *v.* abandon; leave isolated. *n.* dark red.

mar·quee, *n.* rooflike projection over an entrance.

mar·quis, *n.* British nobleman above an earl.

mar·riage, *n.* wedlock; wedding; any close union.

mar·row, *n.* tissue in bone cavities; essential or best part.

mar·ry, *v.,* -ried, -ry·ing. join as husband or wife; wed; join closely.

marsh, *n.* swamp; morass; bog.

mar·shal, *n.* high military officer; sheriff-like official; person in charge of ceremonies,

etc. *v.,* -shaled, -shal·ing. direct; arrange; lead.

marsh·mal·low, *n.* soft, spongy confection.

mar·su·pi·al, *n.* animal with a pouch for carrying young.

mar·tial, *a.* military; militaristic.

mar·tial art, *n.* Oriental self-defense technique; judo; karate.

mar·tyr, *n.* one tortured or killed because of his faith or beliefs; person suffering misery a long time. *v.* make a martyr of.

mar·vel, *n.* wonderful, astonishing thing; prodigy; miracle. *v.* be amazed, wonder.

mas·car·a, *n.* cosmetic for coloring eyelashes.

mas·cot, *n.* thing or animal thought to bring good luck.

mas·cu·line, *a.* of the male sex; having male qualities, vigor, strength, etc. -lin·i·ty, *n.*

mash, *n.* any soft, pulpy mass. *v.* reduce to a mash.

mask, *n.* face covering worn for disguise, protection. *v.* disguise; conceal.

mas·och·ism, *n.* pleasure, esp. sexual, from emotional or physical pain. -ist, *n.* -is·tic, *a.*

ma·son, *n.* person who works with stone, brick, etc.

ma·son·ry, *n.* stone or brick work.

mas·quer·ade, *n.* ball or party with costumed, masked guests; disguise; pretense. *v.* disguise oneself; act under a pretense.

mass, *n.* body of indefinite size or shape; large number or quantity; bulk; majority; *cap.* communion service. *a.* of a large number. *v.* form into a mass.

mas·sa·cre, *n.* slaughter; indiscriminate killing. *v.,* -cred, -cring.

mas·sage, *v.* rub, knead, tap a body for remedial or hygienic purposes. *n.*

mas·seur, *n.* man who gives massage. -seuse, *n. fem.*

mas·sive, *a.* bulky; heavy; large scale; imposing.

mass-pro·duce, *v.* quantity production, esp. by machine. mass pro·duc·tion, *n.*

mast, *n.* long upright pole (on a ship) used for support; derrick pole; any large, upright pole.

mas·ter, *n.* male teacher; college degree; ruler; employer; skilled craftsperson. *v.* overcome; become proficient. *a.* dominant; skilled; proficient; superlative. -y, *n.*

mas·ter·ful, *a.* authoritative; skillful; competent.

mas·ter·piece, *n.* supreme artistic achievement.

Case 1:04-cv-02264-RBW Document 34-9 Filed 03/18/05 Page 93 of 124

IARA-2506

# A DICTIONARY AND GLOSSARY OF THE QURAN

## JOHN PENRICE

LIBRARY OF ISLAM

IARA-2507

Plur. شُهَدَآء (2nd declension) A witness; 50 v. 20, *vide* سَاق; One who bears witness to the truth by suffering martyrdom, a martyr, as at 4 v. 71 and 39 v. 69. شَهَادَةٌ n.a. of شَهِدَ To testify, the act of bearing witness, evidence, a taking of evidence, testimony; 24 v. 6, أَرْبَعُ شَهَادَاتٍ بِاللَّهِ "Evidence given by swearing four times by God;" عَالِمُ الْغَيْبِ 9 v. 95, وَالشَّهَادَةِ "He who knoweth that which ye keep secret, and that which ye make known." مَشْهَدٌ Time or place of being present, or of giving or hearing evidence; the word occurs at 19 v. 38, and is susceptible of any of the above meanings. مَشْهُودٌ part. pass. That which is witnessed; يَوْمٌ مَشْهُودٌ 11 v. 105, "A day on which evidence shall be given," or it may be "a day which shall be witnessed by all," or "of which testimony has been given;" إِنَّ قُرْآنَ الْفَجْرِ كَانَ مَشْهُودًا 17 v. 80, "Verily the prayer (or reading) at daybreak is borne witness to" (by the guardian angels).— أَشْهَدَ IV. To take as witness, call to witness (with acc. and عَلَى); to call upon any one to be present at or to witness (with acc. of pers. and thing); to cause evidence to be taken of or against (with عَلَى).—إِسْتَشْهَدَ X. To call as witness (with acc. and عَلَى).

شَهَرَ aor. a. *To publish abroad.* Plur. أَشْهُر and شُهُورٌ A month; originally *A moon, either new, or according to others, a full moon;* الْحَجُّ أَشْهُرٌ 2 v. 193, "The (time for the) pilgrimage is (the) known months," viz. Shawàl, Dhu'l Ka'da, and part of Dhu'l Hajja; The word وَقْتُهُ must here be understood; *Lit.* "The pilgrimage (its time) is," etc., الْحَجُّ being what the gram-marians call مُبْتَدَأٌ مَرْفُوعٌ بِالْاِبْتِدَآء, put in the nominative case as being an inchoative; see D. S. Gr. T. 2, p. 594.

شَهَقَ aor. a. and i. *To draw in the breath in sighing.* شَهِيقٌ properly, *The drawing in of the breath of an ass in braying,* A sigh, see زَفِيرٌ; at 67 v. 7 it is applied to the roaring of Hell-fire.

شَهَا aor. o. *To desire, long for.* شَهْوَةٌ n.a. Plur. شَهَوَاتٌ Lust, desire.—إِشْتَهَى VIII. same as شَهَا.

شَابَ aor. o. *To mingle.* شَوْبٌ n.a. A mixture; لَشَوْبًا مِنْ حَمِيمٍ 37 v. 65, "A mixture of boiling water and other delicacies," with which evil-doers are to be allowed to wash down the fruit of the infernal tree Ez-Zakkoom.

شَارَ aor. o. *To gather honey from the comb.* شُورَى (2nd declension) A consultation; وَأَمْرُهُمْ شُورَى بَيْنَهُمْ 42 v. 36, "And their business is (a matter of) consultation among them."—شَاوَرَ III. To consult.—أَشَارَ IV. To make signs (with إِلَى of pers.).—تَشَاوَرَ n.a. VI. f. Consultation with one another.

شُوَاظٌ Flame without smoke; no verbal root.

شَاكَ aor. o. *To prick.* شَوْكَةٌ *A single thorn,* weapons, arms.

شَوَى aor. يَشْوِى a doubly imperfect verb, To roast, scald. شَوَّى plur. of شَوَاةٌ The scalp.

شَآءَ for شَيِئَ or شَيَأَ, aor. يَشَآءُ To will, be willing, wish (with acc. or أَنْ of verb). شَيْءٌ n.a. Plur. أَشْيَآءُ (2nd declension, see D. S. Gr. T. 1, p. 364, *note*) A thing, matter, affair; شَيْئًا *adverbially,* In any way, at all.

شَابَ aor. i. *To be hoary (the head).* شَيْبٌ and شَيْبَةٌ ns.a. Hoariness. أَشْيَبُ plur. of شِيبٌ Hoary, grey-headed; this word may be re-

Case 1:04-cv-02264-RBW    Document 34-8    Filed 03/18/05    Page 96 of 124

IARA-2509



*New!* **The Orient** Rome Hellas Egypt Mesopotamia Celtic Germania Americas

# THE EGYPTIAN WORLD

AncientWorlds > Egypt > **The Egypt Board** > **Egyptomania** > Sadat martyred.

Register | Login   News 2,681 Egyptians 20 Groups 115 Articles 20,146 Board Msgs 31 People Online Chat Site Map

## The Egypt Board *(- threads, 7014 posts)*

### Egyptomania! *(400 posts)*

General Thread , Featured November 11 , 2004

Ancient Egyptian influence on modern day society - Movies, Music, Style, Collections, more ...
**68 Members** have made **294** Posts here to date.

 Add a Message!

Next: EGYPTIANS (and other citizenry)! LOOK TO THE SKIES!
Prev: What are the reasons?

---

 # Sadat martyred.

---

*Author: * **ArchivesIsis** Ramesses - **0** Posts on this thread out of **43** Posts sitewide.
Date: Aug 22, 2003 - 07:51*

'''Sadat is a martyr, may God bless him'

July 16 2003 at 11:54AM

By Nadia Abou El-Magd

Cairo, Egypt - A leader in the militant group that assassinated former Egyptian President Anwar Sadat called the president a martyr and said he regretted his role in the murder, in an interview published on Wednesday

Karam Zohdy, leader of Al-Gamaa al-Islamiyya, or Islamic Group, is serving a life sentence in a tight security prison for his role in the October 1981 assassination.

"Yes, Sadat is a martyr, may God bless him with his mercy," Zohdy, 51, told the London-based daily Asharq Al-Awsat in a rare interview.

'Their main concern became killing Americans, Christians and crusaders without discrimination'
Zohdy said he regrets his "wrong ijtihad", or religious opinion, and if he could turn back time: "I would interfere to prevent it."

Zohdy is among those who ordered the assassination, a plot that also involved the militant Jihad group.

Sadat had been condemned by radicals for standing in the way of establishing an Islamic state and for being the first Arab leader to sign a peace treaty with Israel, in 1979.

Al-Gamaa al-Islamiyya, once Egypt's largest Islamic militant group, attempted to overthrow the government during the 1990s in bloody campaign that killed more than a thousand people, mostly militants, tourists and police.

Zohdy said all those killed in that violence were martyrs.

According to Islam, martyrs are those who died in defence of their religion, honour, self, or were unjustly killed, and are believed to go directly to heaven.

Al-Gamaa al-Islamiyya renounced violence in 1997.

The following year, Jihad entered an alliance with Osama bin Laden, formally establishing al-Qaeda with the goal of fighting Americans and Jews around the world.

Zohdy said that strategy has no Islamic legal base, as "their main concern became killing Americans, Christians and crusaders without discrimination".

In May, the jailed leaders of Al-Gamaa al-Islamiyya issued a statement condemning al-Qaeda-linked suicicide explosions in Saudi Arabia and Morocco and urging Muslim youth not to participate in al-Qaeda terror attacks
- Sapa-AP"


http://iol.co.za/index.php?set_id=1&click_id=68&art_id=qw1058349240883B221

NEXT:        EGYPTIANS (and other citizenry)! LOOK TO THE SKIES!
PREV:        What are the reasons?

IARA-2510

Case 1:04-cv-02264-RBW   Document 34-8   Filed 03/18/05   Page 97 of 124

# ADMINISTRATIVE RECORD

# EXHIBIT 176

AKEEL & VALENTINE, PLC
ATTORNEYS AND COUNSELORS
401 S. OLD WOODWARD
SUITE 430
BIRMINGHAM, MICHIGAN 48009-6613

SHEREEF H. AKEEL, P.C.
GLENN L. VALENTINE, P.C.

February 22, 2005

TEL: 248-594-9595
FAX: 248-594-4477

Robert W. Werner, Director
Office of Foreign Assets Control
U. S. Department of Treasury
1500 Pennsylvania Avenue NW
Washington, D.C.  20220

Via Facsimile Transmission and
First Class Mail

RE:  Islamic American Relief Agency (IARA - USA)
FAC No. SDG-237388

Dear Mr. Werner:

As you know, we represent IARA-USA.  In the course of our dealings, you have provided us with various documents regarding IARA-USA.  Included in those documents were various newspaper articles that have been taken into consideration in blocking my client's funds.

Recently, there was a misleading Associated Press article misquoting me, personally.  We recently issued a press release specifying succinctly the inaccuracy and our response.  Attached is a copy of our press release for your consideration.

If you have any further questions, please feel free to call.  Thank you.

Very truly yours,

Shereef H. Akeel

SHA/
Enclosure

cc:  Timothy Ott, Office of Chief Counsel
     Foreign Asset Control
     U.S. Department of Treasury
     1500 Pennsylvania Avenue, N.W. Annex
     Washington, D.C. 20220

     Ms. Andrea Gacki
     U.S. Department of Justice, Civil Division
     20 Massachusetts Avenue, N.W., Room 7308
     P.O. Box 883
     Washington, D.C. 20244

C:\MyFiles\G - L\iara-usa\Werner 006.wpd

IARA-2511

# U.S. Newswire
Medialink Worldwide

**Reaction to Misleading AP Story About Hakeem Olajuwon & IARA-USA**

To: National Desk

Contact: Shereef Akeel, 248-594-9595, Web: http://www.akeelvalentine.com

BIRMINGHAM, Mich., Feb. 14 /U.S. Newswire/ -- The following statement was released today by Akeel & Valen
PLC, in reaction to the Associated Press story about Hakeem Olajuwon & IARA-USA:

Due to the misleading report recently published by Associated Press (AP) writer Matt Kelly about Hakeem Olaju
and IARA-USA, it is necessary to state the true facts of this matter for the public record.

In his article, Kelly makes completely inaccurate statements regarding two separate and completely unrelated
organizations. The first organization is an American based organization, operated by Americans, and is called Is
American Relief Agency (IARA-USA), while the second organization is based in the Sudan, Africa, and is called
Islamic African Relief Agency (IARA). These two organizations are totally independent of one another, and have
different employees and board members. Kelly was unequivocally advised of this fact and, still, used the names
entities interchangeably, misleading the readers.

In his article, Kelly states that certain contributions were made by the mosque founded by Olajuwon to the Africa
organization, when, in fact, the contributions by Olajuwon's mosque were made to the American organization, IA
USA.

On October 13, 2004, the Department of Treasury designated the African organization, the Islamic African Relie
Agency (IARA), and its officials as a Special Global Terrorist organization. None of those officials were employe
IARA-USA. The statement in Kelly's article regarding the destination of the contributions from the mosque is
completely false, and his further comments in the article regarding the American organization imply that the
organizations are one and the same, and that Olajuwon made contributions to a terrorist organization.

The American organization was created in 1984 and, for the first 15 years of its existence, had the same name a
African group. When it expanded its operations to include humanitarian relief to Asia and other parts of the worl
changed its name to its current name -- IARA-USA. Based in Columbia, Missouri for the past twenty years, the
American non-profit humanitarian relief organization, Islamic American Relief Agency (IARA-USA) has helped th
and destitute and is NOT connected to any African group. IARA-USA has been a member of a prominent non pr
group, InterAction, the largest alliance of U.S.-based international development and humanitarian nongovernme
organizations and has recently received an excellent score by the Better Business Bureau for Charitable Solicita
measuring proper operations and truthfulness of the organization's representations.

2/20/2005

IARA-2512

Case 1:04-cv-02264-RBW Document 34-8 Filed 03/18/05 Page 101 of 124

On October 13, 2004, the assets of the American group were frozen. This has been challenged by IARA-USA in Federal Court and the case is currently pending in the District of Columbia. In fact as the court documents clearl show, and as IARA-USA has consistently maintained, it is totally independent of Sudanese group, and any othe organization.

The 20-year-old American organization, IARA-USA, has publicly condemned all acts of terrorism and, in the pas assisted victims of terrorism in Kenya during the bombing of the US Embassy.

Instead of reporting the truth and upholding the high standards followed by the Associated Press, Matt Kelly cho repeat old misleading claims about the American humanitarian group, while tarnishing the reputation of an Amer sports hero, Hakeem Olajuwon.

In trying to link Olajuwon to terrorism, in his February 9, 2005 article about Olajuwon, Kelly stated:

"Shereef Akeel, a lawyer for IARA-USA, acknowledged the U.S. group and the Sudanese group 'may be in a partnership together" and some people with links to IARA-USA have Terrorist associations"

Kelly simply misstated the truth. Akeel never made such a statement or any such acknowledgment, and not a sh evidence has been presented that IARA-USA is linked to "terrorism." Akeel never stated that IARA-USA and IAF may be in a partnership together. In fact, what Akeel stated, clearly and unequivocally to Kelly was that the Unite Nations and many humanitarian organizations like IARA-USA and UNICEF may be working in humanitarian ad-I partnership humanitarian causes such as setting up feeding centers or orphan programs. And, "partnerships" be various relief organizations are common and are created on a case-by-case basis and cover a specific humanita relief operation or function. All of this information was included in the previously filed court papers, and Kelly wa: specifically advised of that. Rather than correct this inaccuracy to clear Olajuwon's name and referring to the previously filed documents made by IARA-USA, Kelly in a subsequent report dated February 11, 2005, tries to c up this inaccuracy by stating that Akeel had "reversed" his statement of a partnership connection. This is truly disturbing and simply dishonest.

Finally, Kelly blatantly misstates that the African group renamed its name to the Islamic American Relief Agency According to public records, the African group never changed its name.

Kelly was also advised that, to date, IARA-USA's attorney has received several letters from African orphans and stricken children in Kenya, Christian and Muslim alike, pleading for IARA- USA, not the African group, to resume donations.

These misleading articles attempt to destroy the character of a great American, Hakeem Olajuwon, as well as th well- established American humanitarian group. Reporting the truth is one thing, but to distort it for personal or o reasons at the expense of innocent people is shameful.

To ascertain the accuracy of the above matters, or for further information on the lawsuit filed in U.S. Federal Cot please refer to the court documents, or call Attorney Shereef Akeel at the above number.

http://www.usnewswire.com/

-0-

/© 2005 U.S. Newswire 202-347-2770/

http://releases.usnewswire.com/GetRelease.asp?id=43105

IARA-2513

**MSNBC.com**

# Olajuwon mosque linked to terror funding
**Ex-NBA star says he didn't knowdonations went to groups deemedfronts for al-Qaida, Hamas**

The Associated Press
Updated: 2:31 p.m. ET Feb. 9, 2005

WASHINGTON - A mosque established and funded by basketball star Hakeem Olajuwon gave more than $80,000 to charities the government later determined to be fronts for the terror groups al-Qaida and Hamas, according to financial records obtained by The Associated Press.

Olajuwon told the AP he had not known of any links to terrorism when the donations were made, prior to the government's crackdown on the groups, and would not have given the money if he had known.

"There is no way you can go back in time," Olajuwon said in a telephone interview from Jordan, where he is studying Arabic. "After the fact, now they have the list of organizations that are banned by the government."

A Treasury Department spokeswoman, Molly Millerwise, declined to discuss Olajuwon's contributions but said, "In many cases donors are being unwittingly misled by the charities."

Federal law enforcement officials said they were not investigating Olajuwon, a 7-foot center born in Nigeria who played 17 seasons for the Houston Rockets of the National Basketball Association before retiring in 2002.

Olajuwon, who became a U.S. citizen in 1993, was known as "The Dream" and won the NBA's Most Valuable Player award in 1994, when he led the Rockets to the first of back-to-back championships.

The Olajuwon-founded Islamic Da'Wah Center gave more than $60,000 in 2000 and $20,000 in 2002 to the Islamic African Relief Agency, the center's tax records show.

The government shut down the relief agency in October, saying it gave money and other support to Osama bin Laden and al-Qaida.

But the agency and its possible ties to terrorism had been in news stories years earlier, before Olajuwon's contributions:

• The U.S. Agency for International Development cut off two government grants to the Islamic African Relief Agency in 1999, saying funding the group "would not be in the national interest of the United States."
• A former fund-raiser for the relief agency, Ziyad Khaleel, was named in a federal trial in 2001 as the man who bought a satellite telephone that bin Laden used to plan the 1998 bombings of U.S. embassies in Kenya and Tanzania.
• Numerous news organizations reported shortly after the 2001 terrorist attacks that the relief agency was among more than two dozen Islamic charities under scrutiny for possible terrorist ties.

Olajuwon also participated in a 1999 celebrity bowling tournament for the Holy Land Foundation for Relief and Development, which the U.S. government shut down in 2001, accusing it of sending money to Hamas. The Islamic Da'Wah Center gave more than $2,000 to the Texas-based Holy

IARA-2514

Land Foundation in 2000, according to its tax returns.

At the time, Olajuwon was vice president of the mosque — which was named after him — and provided more than three-quarters of its money. Olajuwon heads the separate foundation that now controls the Islamic Da'Wah Center.

All the donations came before the government designated the Holy Land Foundation and the Islamic African Relief Agency as terrorist fronts. Vipul Worah, an accountant for Olajuwon's charities, said U.S. authorities have never asked about the contributions.

Olajuwon, who is married with four daughters, became a Muslim during his professional career and was known for playing in key games while observing dawn-to-dusk fasting during the Islamic holy month of Ramadan.

Tax returns for Olajuwon's Islamic Da'Wah Center show it gave the Islamic African Relief Agency $61,250 in 2000 and $20,000 in 2002.

Those donations accounted for 2.2 percent of the $2.8 million the Islamic African Relief Agency received during 2000 and 1.4 percent of the $1.4 million it raised in 2002, records show.

Olajuwon said the donations came after fund-raisers from the Islamic African Relief Agency visited Houston. He said the group told him donations would help the needy in Africa.

"They came and approached us and everything was legitimate. I had no knowledge of their activity," Olajuwon said.

The Treasury Department alleged in October that several top officials of the group's branches overseas are al-Qaida members or associates and the group gave bin Laden hundreds of thousands of dollars in 1999.

The federal government says the Sudan-based Islamic African Relief Agency's U.S. branch is IARA-USA, based in Columbia, Mo. That group has challenged the terrorist designation in court, saying it is separate from the Sudanese group.

Shereef Akeel, a lawyer for IARA-USA, acknowledged the U.S. group and the Sudanese group "may be in a partnership together" and some people with links to IARA-USA have terrorist associations.

"Just because someone traveled in the same circles, just because one employee was at the same conference as someone who supported terrorism, doesn't mean the organization sponsors or condones acts of terrorism," Akeel said.

The Holy Land Foundation was shut down in December 2001. Federal authorities say it was the main U.S. fund-raiser for Hamas and sent $12.4 million to the Palestinian terrorist group from 1995 to 2001. Hamas has claimed responsibility for dozens of suicide bombings in Israel that have killed scores of people, including Americans.

The Holy Land Foundation and several leaders are awaiting trial on criminal charges of supporting terrorism — charges they deny. U.S. District Judge Gladys Kessler rejected the group's 2002 lawsuit challenging its terrorist designation, ruling federal officials had "ample evidence" of financial support for Hamas.

Attorney General John Ashcroft said in July that an indictment against several officers was "neither a reflection on the well-meaning people who may have donated funds to the foundation, nor is it a

IARA-2515

reflection on the Muslim faith and its adherents."

In 2000, the year after Olajuwon participated in the Dallas bowling tournament for the Holy Land Foundation, the Islamic Da'Wah Center gave the group $2,430, tax records show. That money was a tiny fraction of the $13 million the foundation raised that year.

Olajuwon said the bowling tournament was one of many charitable events he has attended.

"I get all sorts of requests from charitable organizations," Olajuwon said. "It was a bunch of kids and I gave them autographs."

© 2005 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

URL: http://www.msnbc.msn.com/id/6941247/

IARA-2516

# ADMINISTRATIVE RECORD

# EXHIBIT 177

AKEEL & VALENTINE, PLC
ATTORNEYS AND COUNSELORS
401 S. OLD WOODWARD
SUITE 430
BIRMINGHAM, MICHIGAN 48009-6613

SHEREEF H. AKEEL, P.C.                                                    TEL: 248-594-9595
GLENN L. VALENTINE, P.C.                                                  FAX: 248-594-4477

March 1, 2005

Chief Counsel's Office
Office of Foreign Assets Control
U.S. Department of Treasury
1500 Pennsylvanis Avenue, N.W.
Annex, Washington, D.C. 20220

> RE:   IARA - USA v Unidentified FBI Agents, et al
>        Case No.  **1:04CV02264**
>        Hon. Judge Reggie B. Walton

Dear Chief Counsel:

Pursuant to License No. SDG-435 issued to Akeel & Valentine, PLC, please find enclosed a copy of the Plaintiff's Motion for Reconsideration. Should you have any questions regarding this matter, please do not hesitate to contact the undersigned.

Very truly yours,

AKEEL & VALENTINE, PLC

Shereef H. Akeel

/lfm
Enclosures

C:\MyFiles\G - L\iara-usa\motion for reconsideration letter.wpd

IARA-2517

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISLAMIC AMERICAN RELIEF AGENCY
(IARA-USA),

       Plaintiff

vs.

UNIDENTIFIED FBI AGENTS, PAUL SCHLUP, AND
OTHER UNIDENTIFIED DEPARTMENT OF TREASURY PERSONNEL,
in their individual and official capacities, JOHN SNOW, in his individual
and official capacity as Secretary of the Department of Treasury,
JOHN ASHCROFT, in his individual and official capacity as
Attorney General of the United States, and United States
Department of Justice,

       Defendants

---

| | |
|---|---|
| JOHN KENNETH ZWERLING (#147637) | MICHAEL LEE HERTZBERG (#357319) |
| Attorneys for Plaintiff | Attorneys for Plaintiff |
| 108 North Alfred Street | 740 Broadway, Fifth Floor |
| Alexandria, VA 22314 | New York, NY 10003 |
| 703) 684-8000 | (212) 982-9870 |

AKEEL & VALENTINE, PLC
BY: SHEREEF AKEEL (P54345)
Attorneys for Plaintiff
401 S. Old Woodward Avenue
Suite 430
Birmingham, MI 48009
(248) 594-9595

---

**PLAINTIFF'S MOTION FOR RECONSIDERATION AND TO AMEND JUDGMENT**

---

IARA-2518

## TABLE OF CONTENTS

Index Of Authorities............................................................................................ ii

Statement Of Questions Presented....................................................................... 1

        Is The Court Required To Provide The Defendants Higher
        Deference Than What Is Already Provided In The Administrative
        Procedure Act In The Context Of National Security?

Introduction....................................................................................................... 1

Applicable Facts................................................................................................ 2

Applicable Law and Argument........................................................................... 4

I.     A Higher Deferential Standard Does Not Exist
       In The Context Of International Affairs......................................................... 5

       a.     The Administrative Procedure Act - Standard of Review................. 5

       b.     The Limit Of Deference For The Court To Apply
            Is Embodied In APA........................................................................ 7

       c.     Government Expertise In Matters Of National Security Is
            Not Enough To Give A Higher Deference....................................... 10

II     Relief Requested........................................................................................ 13

IARA-2519

## INDEX OF AUTHORITIES

<u>Cite</u>                                                                    <u>Page</u>

<u>Anyanwutaku</u> v <u>Moore</u>
    151 F3d 1053, 1057 (DC Cir 1998)..........................................................    5

<u>B.D.C. Corp</u>. v <u>U.S</u>.
    281 F. Supp. 700 ( N.D. Ill 1968)...........................................................    6, 10

<u>Clark</u> v <u>U.S.</u>
    379 F. Supp. 1399, N.D. Iowa 1974).....................................................    7, 8

<u>Detroit Free Press</u> v <u>Ashcroft</u>
    303 F3d 681 (C.A. 6, Mich 2002).........................................................    10

<u>Ex-Parte Merryman</u>
    17 F. Cas 144 (C.C. Md. 1861)..............................................................    12

<u>Ex-Parte Milligan</u>
    71 U.S. 2 (U.S. 1866)............................................................................    12

<u>Hamdi</u> v <u>Rumsfeld</u>
    124 S. Ct. 2633 (U.S. 2004)..................................................................    10

<u>Harvey</u> v <u>Dist. of Columbia</u>
    949 F. Supp. 878, 879 (D.D.C. 1996).....................................................    4

<u>Holy Land Foundation Relief and Development</u> v <u>Ashcroft</u>
    333 F3d 156 (U.S. App. D.C. 2003).......................................................    7, 8, 10, 13

<u>June Oil and Gas, Inc</u>. v <u>Andrus</u>
    506 F. Supp. 1204 (D.C. Colo. 1981; aff'd 717 F2d 1323,
    certiorari denied 104 S. Ct. 2169, 466 U.S. 958)....................................    6

<u>Niedermeier</u> v <u>Office of Baucus</u>
    153 F. Supp. 2d 23, 28 (D.D.C. 2001).....................................................    4

<u>Olenhouse</u> v <u>Commodity Credit Corp</u>.
    42 F3d 1560, C.A. 10, Kansas (1994)
    (n remand 922 F. Supp 489).....................................................................    7, 8

ii

<u>Rann</u> v <u>Chao</u>

IARA-2520

       209 F. Supp. 2d 75, 78 (D.D.C. 2002)........................................................ 4


Rasul v Bush
       124 S. Ct. 2686 (U.S. 2004)................................................................ 11

U.S. v Moussaoui
       382 F3d 453 (CA 4 Va 2004)................................................................. 11

Authorities

5 U.S.C. 701(2)(E)........................................................................ 2

5 U.S.C.  706(2)(A)....................................................................... 7

18 U.S.C.A. §2339B........................................................................ 9

FRCP 59.................................................................... 1, 4, 5, 10, 13

iii


**Statement of Questions Presented**

IARA-2521

**Is The Court Required To Provide The Defendants Higher Deference Than What Is Already Provided In The Administrative Procedure Act In the Context Of National Security?**

Plaintiff Answers:                                      No

## Introduction

The Court entered its order denying Plaintiff's Motion for Preliminary Injunction on February 18, 2005. This is Plaintiff's Motion for Reconsideration pursuant to Rule 59 (e) of FRCP.

The Court asked some very pointed questions in oral arguments on February 18, 2005, in determining whether Plaintiff's property should remain blocked. Essentially, the Court was inquiring as to whether it should provide the Executive Branch *additional* deference than what is already provided for in the Administrative Procedure Act in the context of national security. The Court then did apply a higher deferential standard, without regard to whether there was "substantial evidence" (as required under APA and binding precedent as discussed below) that Plaintiff supported terrorist activities. Essentially, this Honorable Court carved out a new higher deference standard in the context of national security contrary to existing law. The law of the land dictates that the Court should *not* provide the Executive Branch additional deference than what is already provided for in the APA in the context of national security. As such, if there is not substantial evidence in the record that Plaintiff funded or supported terrorism, Plaintiff's property should be immediately unblocked.

1

IARA-2522

## Applicable Facts

The Court asked the following series of questions:

- *What, if any, impact does the degree of deference I am required to give to the decision, because it does deal with the Executive Branch and it's responsibility for international affairs, have on the standard or quantum of evidence that I have to conclude as present in order to justify the Government's action?* (Page 40 of hearing of February 18, 2005).

Plaintiff's Response:

Your Honor, The A.P.A. - specifically 5 U.S.C. 701(2)(E) provides the Court guidance on the quantum of evidence required. There is the arbitrary and capricious standard, but within that statute, it defines what does that mean. Well, within that, one of the factors is is there substantive evidence to demonstrate that IARA-USA funds terrorism or supports terrorism.

- *Is that, in any way, affected by the level of deference I am required to give in this context (terrorism)* (Page 41).

Plaintiff's Response:

Your Honor, the Court - -

- *Does that test (Administrative Procedure Act substantive evidence test) remain constant regardless of what level of deference I am required to give? If that's true, then it seems to me saying that a higher level of deference has to be given in this context really is meaningless.* (Exhibit "A", Page 41).

Plaintiff's Response:

Well, there is a high deference given to the Executive Branch, but it is kept in check, and it is limited. And it is limited by A.P.A. and it sets the Court guidance on what are those types of limitations. One of those limitations is the substantive evidence standard. Is there substantive evidence to demonstrate that the Government has a rational basis to conclude that IARA-USA supports or funds terrorism?

- *I guess what I am asking is this higher degree of deference I am required to give - what, if any, impact does that have on that APA test?* (Exhibit "A", Page 41).

Plaintiff's Response:

> Well, how high is the deference? How high should the Court give deferential treatment to the Executive Branch? A.P.A. provides the Court some guidance on that. There is a high deference standard, but A.P.A. - -

2

IARA-2523

- *Does that impact on that standard under the APA that I have to apply? I mean, is it in someway lessened because of the degree of deference I am required to give?* (Exhibit "A", Pages 41-42)

Plaintiff's Response:

I believe you are required to give high deference to the Executive Branch, but not blind deference.

- *. . . What I am asking is that that level of substantive evidence in some way affected by level of deference I am required to give in this context.* (Exhibit "A", Page 42).

Plaintiff's Response:

Your Honor, with respect to the high-deference standard, I think in any agency action where a reviewing court has to examine an agency's action, there is the default position that you give that agency action high deference. However, the substantive evidence - - if it is not there, it trumps the high deference.

The Court then denied Plaintiff's Motion for Injunctive Relief. In denying Plaintiff's

Motion, the Court ruled as follows:

- *Because of the nature of the relief that is being requested, there is a high bar that the Plaintiff has to meet in order to be entitled to that relief.* (Exhibit "A", Page 43)

- *I don't think I have to, and I won't make a determination as to whether the unclassified information justifies the action taken by the Government, but it does seem to me, collectively considering everything that has been presented to me, that **considering the degree of deference I am required to give to the determination made by the Executive Branch in the area of international affairs, and particularly national security,** I can't conclude on the record it has been submitted to me that the Government has not made a showing sufficient to justify the action it has taken.* (Exhibit "A", Page 45)

The Court further stated:

> *In the context of these types of issues - and I'm trying to think back in another case I had where clearly there is an appellate authority that says, when you're talking about the issues of national security, there is a mosaic out there that the Court may not be totally aware of all the pieces that make up that puzzle that, obviously, the Executive Branch is in a better position to know about, and it becomes, obviously, very difficult for the Court to make a call as to whether in an individual circumstance, the circumstances are such that the Government should be rebuffed in the position it takes because,*

3

*obviously, a mistake made by the Court in that regard could have drastic impact on the security of the nation and the lives of the American public. And here the Government, in my view, collectively has presented sufficient evidence that shows that the action that it took is, in fact, justified and, accordingly, considering the high standard that I have to apply at this point, I cannot conclude that it has been shown by a preponderance of the evidence by the Plaintiff that there is a substantial likelihood that the Plaintiff will succeed on the merits on any of the claims that have been presented set forth ultimately in this case. So, I would have to deny the Motion for Injunctive Relief. (Page 46)*

Based on the series of questions presented, it is clear that the Court was inquiring on, in matters of national security, whether it needs to apply a higher deferential standard to the Executive Branch decisions beyond what is provided for in the Administrative Procedure Act. Further, based on the above opinion, it is clear that the Court applied a higher deferential standard than what is provided for in the Administrative Procedure Act to deny Plaintiff's Motion for Injunctive Relief.

Plaintiff maintains that, in denying its motion for Preliminary Injunction, the Court's application of a higher differential standard than what is already provided for in APA is not supported by existing law and runs contrary to the law of the land. For the reasons discussed below, Plaintiff's Motion for Reconsideration pursuant to Rule 59 (e) of FRCP should be granted .

## Applicable Law and Argument

Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment pursuant to Federal Rules of Civil Procedure Rule 59.

"The district court has considerable discretion in ruling on a Rule 59(e) motion." *Rann v. Chao*, 209 F.Supp.2d 75, 78 (D.D.C.2002). "[A] motion pursuant to Fed.R.Civ.P. 59(e) to alter or amend judgment after its entry is not routinely granted." *Harvey v. Dist. of Columbia*, 949 F.Supp. 878, 879 (D.D.C.1996). "Motions under Fed.R.Civ.P. 59(e) are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances." *Niedermeier v. Office of Baucus*, 153 F.Supp.2d 23, 28 (D.D.C.2001). Rule 59(e) motions can be granted if the

4

IARA-2525

district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice. *Anyanwutaku v. Moore,* 151 F.3d 1053, 1057 (D.C.Cir.1998).

## I   A Higher Deferential Standard Does Not Exist In The Context Of International Affairs.

Plaintiff maintains that a Court should not provide the Executive Branch deference higher than what is already provided for in the Administrative Procedure Act in the context of national security. A clear error was committed under Rule 59 (e) warranting this Honorable Court to amend its judgement to all Plaintiff access to its property. Manifest injustice will continue to occur if the property remains blocked.

As the Court recalls, Plaintiff maintains that based on the unclassified documents presented by the Defendants, Plaintiff, by the preponderance of the evidence, has the substantial likelihood to succeed for the reason that the Defendants have failed to meet the substantial evidence test that Plaintiff supported or funded terrorism. Plaintiff would respectfully suggest that the Court should apply the same substantial evidence test to the classified material without regard to any higher deferential consideration even in the context of national security.

### a.   The Administrative Procedure Act - Standard of Review

The Administrative Procedures Act ("APA") was passed by Congress in 1966 and signed by the President into law. Both the branches of government, Legislative and Executive provided the Judicial branch, under the APA, the power and authority to review Executive Branch decisions to ensure proper compliance with Due Process. The Administrative Procedures Act, in relevant part, states:

To the extent necessary to a decision and when presented, the

5

reviewing Court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall–

(1)      compel agency action unlawfully withheld or unreasonably delayed; and

(2)      hold unlawful and set aside agency action, findings, and conclusions found to be–

(A)      arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)      contrary to constitutional right, power, privilege, or immunity;

(C)      in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)      without observance of procedure required by law;

(E)      unsupported by *substantial evidence* in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)      unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. (Emphasis added).

Although an agency can use its expertise to make a decision, substantial evidence must, nevertheless, exist to support that decision. *B. D. C. Corp. v. U.S., N.D.Ill.* 1968, 281 F.Supp. 700. Further, in reviewing an agency's decision, a court may not function to weigh conflicting evidence adduced at an administrative proceeding but, rather, to determine whether based upon the entire record there is substantial evidence to support the agency's determination. *June Oil and Gas, Inc. v. Andrus, D.C.Colo.* 1981, 506 F.Supp. 1204, affirmed 717 F.2d 1323, certiorari denied 104 S.Ct. 2169, 466 U.S. 958. "Substantial evidence" in support of an agency determination is such relevant evidence as a reasonable man might accept to support a conclusion; a trace of evidence is not sufficient. *Clark v. U. S.,* N.D.Iowa 1974, 379 F.Supp. 1399. Also, substantial evidence, for purpose

6

of the Administrative Procedure Act (APA), is more than mere scintilla, and must be such relevant evidence as reasonable person might accept as adequate to support a conclusion; evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. *Olenhouse v. Commodity Credit Corp.*, C.A.10 (Kan.) 1994, 42 F.3d 1560, on remand 922 F.Supp. 489.

b.     **The Limit Of Deference For The Court To Apply Is Embodied In APA**

As the Court notes above, the deferential standard provided for in the Executive Branch is already embodied in the APA. Rather than the Court making a finding of a clear and convincing standard or by preponderance of the evidence, the APA provides that the Court needs to simply establish that there was "substantial evidence" to justify an agency's action. In specifically addressing the Court's inquiry on how much deference to provide the Executive Branch in the context of natural security and the application of the APA, the seminal case is the *Holy Land Foundation Relief and Development v Ashcroft*, 333 F.3d 156 (U.S.App.D.C. 2003), upon which defendants have principally relied. In clear, specific terms, the Court laid out the standard of review by stating:

> [T]he actions of the Treasury Department in designating HLF as a SDGT are governed    by the judicial review provisions of the APA, 5 U.S.C. Sec. 706 (2) (A). Therefore, if the OFAC's actions were not arbitrary and capricious, and were based on substantial evidence, we must affirm[1].

The standard set out in *Holy Land* is squarely and entirely applicable to this case. That matter dealt with national security in the context of APA. There was no reference to any additional deference provided to the Executive Branch. And the court found that there was "substantial evidence" that *Holy land* supported terrorism by funding a know designated terrorist organization,

---

[1] As the Court recalls, in the Holy Land, the court found substantial evidence that Holy Land supported terrorism to have its property blocked which included, among other things, 1) funding an already designated terrorist organization, Hamas, 2) regularly meeting with Hamas leaders, 3) acting as a fundraiser for Hamas, and 4) acting on behalf of Hamas in Jerusalem. In the instant action, there is not a shred of evidence that Plaintiff diverted any funds to any terrorist organization, or even did anything wrong to have its property blocked.

7

IARA-2528

Hamas. In applying the above test to this instant action, is there substantial evidence to support the agency's conclusion that Plaintiff, IARA-USA, funded or supported terrorism? That is the test for the Court to apply, as was done in *Holy Land*, supra. Again, no higher deferential standard was applied in the *Holy Land* matter. It strictly enforced the Administrative Procedure Act standard.

Further, mere conclusions are not enough to justify an agency's actions. *Olenhouse*, supra. Scintillas of evidence are not enough. *Id.* Even the trace of evidence is not sufficient. *Clark, supra.* With no additional deference to be provided to the Executive Branch in the context of national security, there must be substantial evidence to support an agency's actions. In this case, there is not.

Again, in viewing the totality of the unclassified documents presented (over 1,000 pages), Defendants failed to even meet the deferential standard provided for in the Administrative Procedure Act. Certainly, there is no "substantial evidence", whatsoever, or even the scintilla of evidence to support the agency's conclusion that Plaintiff, IARA-USA, supported terrorism to justify the Government's action in blocking its property. Further, Plaintiff would respectfully request the Court, in its viewing of the classified materials, to apply the same test as provided for in *Holy Land* and the APA. Simply, is there substantial evidence to justify the agency's conclusion that IARA-USA supports terrorism? Plaintiff respectfully suggests "no".

As the Court may recall, it asked a very specific point to the Defendants in its questioning:

- *Need there be, as Plaintiff suggests, evidence of a direct diversion of funds from his client to terrorist activities to support the Government action? (Page 29).*

This Court's question was clearly answered in Holy Land, where the court in that case found "substantial evidence" that Holy Land actually diverted funds to the already designated terrorist organization, Hamas. Again in this case, its strikingly different. There is no evidence of any funds whatsoever being directed to support terrorist activities. And, in answering this Court's query,

8

IARA-2529

Defendants' admitted, " *...We have not shown any funding from that organization to the main organization with the specific intent to fund terrorism . . .* (Exhibit "A", Page 30)

Defendants, further, argued at the hearing that specific intent was not required. (Page 30) This is contrary to existing law and even the statute that governs criminal liability for terrorism. The criminal statute for holding persons liable for terrorism specifically provides for an intent element:

> **(1) Unlawful conduct.**--Whoever, within the United States or subject to the jurisdiction of the United States, *knowingly* provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. 18 U.S.C.A. § 2339B (**Exhibit C**)

That statute was recently amended by the "Intelligence Reform and Terrorism Prevention Act of 2004", which states"

> To violate this paragraph, *a person must have knowledge* that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)." PL 108-458, 2004 S 2845 (**Exhibit C**)

There is no question that an element of intent or knowledge is required. And, again, in this case, based on the evidence presented, there is none. Consequently, since the Government has access to the classified documents, and the classified documents are totally absent of any specific wrongdoing by Plaintiff, IARA-USA in funding terrorism, there is no question that as a matter of law, Plaintiff would have a substantial likelihood to prevail on its claim that Defendants wrongfully blocked its property, warranting a ruling to have its property unblocked. Certainly, manifest injustice would occur if the Court does not allow the property to be unblocked based on the absence of evidence of *any* wrongdoing. And under, Rule 59 (e) the Court's ruling should be corrected to

9

reflect the law of the land, APA, and the binding precedent, *Holy Land*, that no additional deference is to be provided in this case.

c.    **Government Expertise In Matters Of National Security Is Not Enough To Give A Higher Deference**

In restating part of the Court's opinion:

> *The Executive Branch is in a better position to know about, and it becomes, obviously, very difficult for the Court to make a call as to whether in an individual circumstance, the circumstances are such that the Government should be rebuffed in the position it takes because, obviously, a mistake made by the Court in that regard could have drastic impact on the security of the nation and the lives of the American public.*

The Court was very deferential to the Executive Branch because it is in a "better position" to make a judgment. That degree of deference, based on an agency's expertise, is not supported by law. In fact, as stated in *B. D. C. Corp. v. U.S.*, supra, although an agency had used its expertise to make a decision, substantial evidence must nevertheless exist to support that decision.

Further, the prior courts, in post-September 11 rulings, and even at times of war before September 11, have had several occasions to uphold the law and override an Executive Branch decision, taking into consideration the security of the nation and lives of the American public. For example, the Supreme Court's Justice O'Connor, held that due process required that a United States citizen being held as an enemy combatant be given meaningful opportunity to contest factual basis for his detention. *Hamdi v. Rumsfeld* 124 S.Ct. 2633 (U.S.,2004).

In *Detroit Free Press v. Ashcroft* 303 F.3d 681 (CA6,2002), members of the press and public brought actions against the Attorney General seeking declaration that the closure of an alien's removal proceeding to the press and public violated their First Amendment right of access. The United States District Court for the Eastern District of Michigan, 195 F.Supp.2d 937, Nancy G. Edmunds, J., granted relief, and the government appealed. The Court of Appeals, Keith, Circuit

10

IARA-2531

Judge, held that: (1) The Constitution meaningfully limits non-substantive immigration laws and does not require special deference to the Government; (2) there is a First Amendment right of access to deportation proceedings; and (3) a directive requiring closure of "special interest" deportation cases impermissibly infringed on the newspapers' First Amendment right of access to deportation proceedings.

In *Rasul v. Bush* 124 S.Ct. 2686 (2004), the Supreme Court ruled that the capture of aliens abroad in connection with hostilities arising from September 11, 2001, terrorist attacks within the United States, who were subject to executive detention at the U.S. Naval Base at Guantanamo Bay, Cuba, and were held in military custody, did not bar a federal district court from exercising jurisdiction over claims asserted by aliens under the Federal Question Statute and Alien Tort Statute.

In *U.S. v. Moussaoui* 382 F.3d 453 (CA4, 2004), the court ruled that ordering production of enemy combatant witnesses who were foreign nationals in military custody outside United States in a prosecution for conspiring to commit international terrorism did not infringe on the Executive's war making authority, in violation of separation of powers principles.

Defendants have also developed a track record of wrongfully destroying individuals reputations since September 11, all in the name of terror, only to have their conduct rebuked by the courts for lack of evidence. Grand stage press conferences would be made, under the direction of Defendant, Ashcroft, alleging the capture of terrorists, only to be followed by dismissal for failing to meet court scrutiny. For example, a reputable Muslim Portland, Oregon attorney, Brandon Mayfield, was alleged by the government to have linkage to the Madrid bombing. Those charges were later dropped for lack of evidence. (**Exhibit B**)  A Muslim Chaplin and Army Captain James Yee was accused of espionage for the terrorists at Guantanamo Bay. Those charges were later dropped for lack of evidence while his reputation was obliterated. (**Exhibit B**) Four Muslim males were charged in Detroit for supporting terrorism. Again, the charges were dismissed for lack of

11

evidence for failing to withstand court scrutiny. (**Exhibit B**)[2] .

In each case above, the Judicial Branch served as a check governing Executive Branch actions in the context of international affairs and national security. In each instance, the courts performed their Article III function by not rubber-stamping executive decisions and holding the Executive Branch accountable for its actions. The same exact method of the destruction of a reputation is taking place in the instant action. There is simply no evidence, based on the document presented to Plaintiff, supporting the notion that the 20 year old humanitarian organization has funded terrorist activities. Clearly, immediate court intervention is warranted by unblocking the property.

To further answer the Court's query on the amount of deference to provide, the Judicial Branch has a long history, prior to September 11, in serving as a check in evaluating Executive Branch decisions even in times of war. For example, in *Ex parte Merryman* 17 F.Cas. 144 (C.C.Md. 1861), in ruling that President Abraham Lincoln had violated the Constitution's Due Process Clause, the Court stated that the President, under the Constitution of the United States, cannot suspend the privilege of the Writ of Habeas Corpus, nor authorize a military officer to do so. And in *Ex parte Milligan* 71 U.S. 2 (U.S.1866), in a Civil War case, the Supreme Court denied the President's authority to ignore the Constitution and try American civilians in military tribunals. Justice Davis reasoned:

> The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and **under all**

---

[2]Also, as the court is reminded, based on the September 11 Commission staff member report, since September 11, there has been no terrorism related convictions levied on any other American charity organization that had its property blocked and based on its access of classified and unclassified documents, there is "minuscule" evidence, if any, that terrorism funding have come from the United States. (Page 24 of Exhibit X of Plaintiff's Motion for Preliminary Injunction)

12

IARA-2533

**circumstances**. *Id*. at 121-21 (emphasis added)

As such, since post-September 11, and even prior thereto, the Judicial Branch has developed a rich track record of serving as a check to Executive Branch decisions made in the context of national security. And, in many instances, Executive Branch decisions were rebuffed or struck down, even in times of war, or in the context of national security because of violations of law. The APA serves as the mechanism for judicial review of Executive decisions in this case. The deference is already embodied in the APA by requiring this Court to make a finding based only on "substantial evidence" that OFAC's action was justified in its conclusion that Plaintiff funded terrorism. Finally, there is no question that Defendants' action in blocking Plaintiff's property was in violation of the APA, since the evidence presented clearly indicates that there is no substantial evidence that Plaintiff funded or supported terrorist activities,

## II    Relief Requested

In light of the forgoing, Plaintiff respectfully requests this Honorable Court to amend its Order and order Plaintiff's property to be unblocked. Pursuant to Rule 59 (e), manifest injustice will continue to occur to Plaintiff if the property remains unblocked. Clearly, an error in law has been committed by this Honorable Court applying a higher deferential standard to the decision of the Executive Branch, where none exits, and beyond what is provided in the APA, in denying Plaintiff's Motion for Preliminary Injunction.    Essentially, this Honorable Court carved out a new higher deferential standard over existing law, in the context of national security. Perhaps this was unintended and the Court is simply proceeding with caution. But, there is no question that based on binding precedent in *Holy land*, no substantial evidence exists, not even a trace, that Plaintiff supported or funded terrorism.

Respectfully submitted,

AKEEL & VALENTINE, PLC

13

IARA-2534

By:    Shereef H. Akeel
Attorneys for Plaintiff
401 S. Old Woodward Avenue, Ste. 430
Birmingham, MI 48009
(248) 594-9595

\\Secretary\c\MyFiles\G - L\iara-usa\04_cv_2264 Motion for Reconsideration.wpd

14

IARA-2535