UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISLAMIC AMERICAN RELIEF AGENCY
(IARA-USA), a Missouri non-profit corporation,
201 East Cherry Street, Suite D
Columbia, MO 65203

Plaintiff

vs.

Case No. 1.04CV02264
Hon. Judge Reggie B. Walton

UNIDENTIFIED FBI AGENTS, PAUL SCHLUP, AND
OTHER UNIDENTIFIED DEPARTMENT OF TREASURY PERSONNEL,
in their individual and official capacities, JOHN SNOW, in his individual
and official capacity as Secretary of the Department of Treasury,
ALBERTO GONZALES, in his individual and official capacity as
Attorney General of the United States, and United States
Department of Justice,

Defendants

---

JOHN KENNETH ZWERLING (#147637)
Attorneys for Plaintiff
108 North Alfred Street
Alexandria, VA 22314
703) 684-8000

MICHAEL LEE HERTZBERG (#357319)
Attorneys for Plaintiff
740 Broadway, Fifth Floor
New York, NY 10003
(212) 982-9870

SHEREEF H. AKEEL (P54345)
Attorneys for Plaintiff
401 S. Old Woodward Avenue
Suite 430
Birmingham, MI 48009
(248) 594-9595

Carlton E. Greene
Andrea Gacki
Attorneys for Defendants
U. S. Department of Justice
Civil Division
20 Massachusetts Avenue, N.W.
Room 7308
P. O. Box 883
Washington, D. C. 20044

---

**PLAINTIFF'S ANSWER TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

For the reasons discussed in Plaintiff's accompanying Brief, Plaintiff requests that this Honorable Court deny Defendants' Motion to Dismiss and for Summary Judgment. Moreover, Plaintiff vehemently objects to the blank pages in Defendants' Brief for there is a concern that ex parte communications are being made to the Court without Plaintiff's knowledge. To the extent that there is any ex parte communication, Plaintiff is highly prejudiced and impeded to fairly and adequately reply. It is not even clear if any attempt was made to declassify the information presented as required under 28 CFR 17.17(a). Finally, pursuant to Rule 56(f), and the accompanying affidavit, Plaintiffs requests discovery to be conducted to support its claims.

Respectfully submitted,

AKEEL & VALENTINE, PLC

By/S/ Shereef Akeel

SHEREEF H. AKEEL (P54345)
Admitted Pro Hac Vice
Attorneys for Plaintiff
401 S. Old Woodward Avenue, Suite 430
Birmingham, MI 48009
(248) 594-9595

Dated: April 28, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISLAMIC AMERICAN RELIEF AGENCY
(IARA-USA), a Missouri non-profit corporation,
201 East Cherry Street, Suite D
Columbia, MO 65203

Plaintiff

vs.

Case No. 1.04CV02264
Hon. Judge Reggie B. Walton

UNIDENTIFIED FBI AGENTS, PAUL SCHLUP, AND
OTHER UNIDENTIFIED DEPARTMENT OF TREASURY PERSONNEL,
in their individual and official capacities, JOHN SNOW, in his individual
and official capacity as Secretary of the Department of Treasury,
ALBERTO GONZALES, in his individual and official capacity as
Attorney General of the United States, and United States
Department of Justice,

Defendants

---

JOHN KENNETH ZWERLING (#147637)
Attorneys for Plaintiff
108 North Alfred Street
Alexandria, VA 22314
703) 684-8000

MICHAEL LEE HERTZBERG (#357319)
Attorneys for Plaintiff
740 Broadway, Fifth Floor
New York, NY 10003
(212) 982-9870

SHEREEF H. AKEEL (P54345)
Attorneys for Plaintiff
401 S. Old Woodward Avenue
Suite 430
Birmingham, MI 48009
(248) 594-9595

Carlton E. Greene
Andrea Gacki
Attorneys for Defendants
U. S. Department of Justice
Civil Division
20 Massachusetts Avenue, N.W.
Room 7308
P. O. Box 883
Washington, D. C. 20044

---

**BRIEF IN SUPPORT OF PLAINTIFF'S ANSWER TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Plaintiff's Brief In Opposition To Defendants' Motion To Dismiss And For Summary Judgment . . . . . 1

I. Introduction . . . . . 1

II. Applicable Facts . . . . . 5
- A Islamic American Relief Agency . . . . . 5
- B How Plaintiff's Name Was Derived . . . . . 6
- C Internal Controls . . . . . 7
- D External Dealings With Other Entities . . . . . 9
- E Financing . . . . . 9
- F Events In 2004 Leading To Blocking Of IRA-USA's Assets . . . . . 10

III. Applicable Law And Argument . . . . . 13
- A Plaintiff Stated Sufficient Legal Claims And Alleged Sufficient Facts To Preclude Dismissal Or Summary Judgment . . . . . 14
- B OFAC's Blocking Of Plaintiff's Funds Was Not Rational Contrary To Existing Law, And Fails Under The Administration Procedure Act . . . . . 14
- C The Administrative Procedure Act - Standard Of Review . . . . . 15
  - 1. Defendants Actions To Shut Down Plaintiff Was Arbitrary And Capricious Under APA 2(A) . . . . . 18
  - 2. Defendants' Actions Were Not Supported By Substantial Evidence Violating APA 2(E) . . . . . 19
  - 3. Defendants Had No Rational Basis To Pierce The Corporate Veil To Assume That Plaintiff Is The Same As The Sudanese Organization Violating APA 2(A), 2(E) and 2(F) . . . . . 23
    - (a) Facts Do Not Justify Piercing The Corporate Veil Of IARA-USA . . . . . 23
    - (b) Plaintiff Was Not An Agent Nor Mere Instrumentality Of The Sudanese Organization . . . . . 29

IV. Defendants Violated Plaintiff's Constitutional Rights Under APA 2(B) . . . . . 31
- A Defendants Violated Plaintiff's Fifth Amendment Rights Under The Equal Protection Clause . . . . . 31
- B Fourth Amendment . . . . . 36
- C Plaintiff's Due Process Rights Were Violated . . . . . 38

D Plaintiff's First Amendment Freedom Of Speech And Association Rights Were Violated . . . . . . . . . . 40

1. Freedom Of Speech . . . . . . . . . . 40
2. Freedom Of Association . . . . . . . . . . 41

V. Defendants Violated The International Emergency Economic Powers Act . . . . . . . . . . 44

INDEX OF AUTHORITIES . . . . . . . . . . iii

## INDEX OF AUTHORITIES

**Case**: **Page(s)**

Application of Kingsley
614 F Supp 219, 223 (D. Mass. 1985), appeal dism'd, 802 F2d 571 (1st Cir. 1986) . . . . . . . . . .37

Atkins v Fischer
331 F3d 988 ; 356 U.S. App. D.C. 403 (2003)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 36

B.D.C. Corp. v U.S.
281 F. Supp 700 (N.D. Ill, 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Boim v Quranic Literacy Institute
127 F Supp 2d 1002, 1020 (N.D. Ill. 2001) . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

Borgo v Golden
204 F. 3d 251, 340 U.S. App D.C. 213 (CA DC 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Brandon v District of Columbia People of Parole
734 F2d 56 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Buckley v Valeo
424 US 1, 14 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . 40, 41, 42

Camacho v 1440 Rhode Island Ave. Corp.
620 A2d 242 (D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Campbell v Wells Fargo Bank
781 F2d 440, 442 (CA5, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Clark v U.S.
379 F. Supp 1399 (D.C. Iowa 1974) . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . .16, 21

Cleyburne v Cleyburne Living Center, Inc.
473 U.S. 432, 439 (1985) . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Country Club Estates, L.L.C. v Town of Loma Linda
213 F3d 1001 (CA 8, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Deleu v Scaife
775 F Supp 712, 716 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Detroit Free Press v Ashcroft
303 F3d 681 (CA 6, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Detroit Free Press v Ashcroft
195 F Supp 2d 937 (E.D. Mich. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Elfbrandt v Russell
384 US 11, 15-16 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Environmental Defense Center, Inc. v U.S.E.P.A.
344 F3d 832 (CA 9, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

Ex Parte Merryman
17 F. Cas 144 (C.C. Md. 1861) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ex Parte Milligan
71 U.S. 2 (U.S. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

FEC v Colorado Republican Federal Campaign Committee
533 US 431, 440 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

Florida v White
526 US 559 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

G.M. Leasing Corp v United States
429 U.S. 338, 353-59 (1977) . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

Haines v Kerner
404 US 519 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Hamdi v Rumsfeld
124 S. Ct. 2633 (U.S. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Healy v James
408 US 169, 185-86 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Hellstrom v United States Dept. Of Veteran Affairs
201 F3d 94 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Holy Land Foundation For Relief & Dev v Ashcroft
219 F Supp 2d 57, 84-85 (D.D.C. 2002) . .. . . . . .. . . . . .. .. . . . . . 4, 19, 20, 21, 22, 27, 35, 36, 39

Humana Inc. v Kissun
221 Ga. App 64, S.E.2d 514, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

Joint Anti-Fascist Refugee Committee v McGrath
341 US 123, 170-72 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

June Oil and Gas, Inc. v Andrus
506 F. Supp 1204 (D.C. Colo. 1981; aff'd 717 F2d 1323;
certiorari denied 104 S. Ct. 2169, 466 U.S. 958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Labadie Coal Co. v Black
217 U.S. App D.C. 239, 243-46, 672 F2d 92, 97-99 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Little v Barreme
6 US 170 (1804) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

McAuliffe v C&K Builders
142 A2d 605, 607 (D.C. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Mary Jo Ritter v Christian Health Systems
987 S.W. 2d 377 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31

NAACP v Alabama Ex Rel. Patterson
357 US 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

NAACP v Button
371 US 415, 429-38 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

NAACP v Claiborne Hardware Co.
458 US 886, 919 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43, 44

National Council of Resistance of Iran v Department of State
251 F3d 192, 205 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 39, 40

Nixon v Shrink Missouri Government PAC
528 US 377, 386-88 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Noto v United States
367 US 290, 299-300 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Olenhouse v Commodity Credit Corp.
42 F3d 1560 (CA 10, 1994); on remand 922 F Supp 489 . . . . . . . . . . . . . . . . . . . . . . 16, 21

Optimist Club of North Raleigh v Riley
563 F Supp 847, 849-50 (E.D.N.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

Phoenix Canada Oil Co., Ltd v Texaco, Inc.
842 F2d 1466 (C.A. 3, Del. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . .30, 31

Rasul v Bush
124 S. Ct. 2686 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Schattner v Girard, Inc.
215 U.S. App. D.C., 334, 668 F2d 1366, 1370 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . .24

Schweiker v Wilson
450 U.S. 221, 230 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Soldal v Cook County
506 U.S. 56, 63 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

Sparrow v United Air Lines, Inc.
216 F2d 1111 (D.C. Cir. 2000) . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 36

Steven v Roscoe Turner Aeronautical Corporation
324 F2d 157 (CA 7, 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Tarpon Transmission Co. v FERC
860 F2d 439, 442 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

U.S. v Moussaoui
382 F3d 453 (CA 4, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

United States v Daccarett
6 F3d 37, 49 (CA 2, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . .37, 38

United States v Jacobsen
466 U.S. 109, 113 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

United States v James Daniel Good Real Property
510 US 43, 55 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . .39

United States ex rel. Rahman v Oncology Associates
198 F3d 489, 500 (CA 4, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

United States v Robel
389 US 258, 265 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

Walter Boswell Mem'l Hospital v Heckler
749 F2d 788, 799 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . 16. 19

Yick Wo v Hopkins
118 U.S. 356, 373-74 (1881) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Ziegler v Jackson
638 F2d 776, 779 (CA 5, 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

**Authorities Cited**:

Administrative Procedure Act . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . .2, 14, 15, 16, 18, 23, 31, 44,45
Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . .2
Federal Rules of Civil Procedure/Rule 56(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
Federal Rules of Civil Procedure/Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
International Emergency Economic Powers Act (IEEPA) . . . . . . . . . . 11, 26, 32, 34, 37, 38, 44
TWEA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
US Const, Am I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
US Const, Am IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
US Const, Am V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32
8 USCA 1189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
15 USC 1701(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
15 USC 1702(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
42 USC 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**PLAINTIFFS' BRIEF IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

" *...We have not shown any funding from that organization (Plaintiff) to the main organization (IARA in Sudan) with the specific intent to fund terrorism* . . . (**Exhibit "A"**, Page 30 - Transcripts - Oral Arguments dated February 11, 2005)**.**

## I. INTRODUCTION

The above quote by Defendants, who are privy to secret classified and unclassified evidence, is the summary, theme and conclusion of this case. That is undisputed in Plaintiff's favor meriting a denial of Defendants' dispositive motions. Despite the thousands of papers assembled, including, newspapers articles, web pages and google searches, in addition to hundreds of pages of brief writing, to date, Defendants have not produced a single document to support the notion that Plaintiff supported or funded terrorism. Even more egregious, Defendants have recently produced a contract entered into between the Sudanese organization, IARA, and UNICEF dated December 8, 2004 providing for UNICEF to actually directly fund an alleged known designated terrorist organization, IARA in Sudan, in separate installment payments for an orphanage project. (**Exhibit W**). **That is approximately two months after IARA in Sudan and five of its officials were designated as alleged terrorists**. UNICEF has not had its assets frozen. But Plaintiff had its assets frozen despite the fact that Defendants even failed to demonstrate that there was any existing contract between Plaintiff and the African entity, IARA, or any evidence of funding to the Sudanese organization.[1]

[1]As the Court recalls, the closest Defendants have come is producing license requests made by Plaintiff to OFAC *seeking permission* to assist the impoverished in Sudan, which also includes a request by then Congressman David Bonior (**Exhibit Y**).

This clearly presents genuine issues of material fact meriting a denial of Defendants' Motion To Dismiss And For Summary Judgment. This is concrete proof of two not-for-profit charitable organizations in similar situations being treated differently in clear violation of the Equal Protection Clause and arbitrary and capricious conduct in violation of APA, as later discussed[2].

Further, with no justification, whatsoever, Defendants are attempting to completely ignore the corporate formalities of the two separate legal entities in a desperate effort to link Plaintiff with the Sudanese organization. Practically, Defendants are attempting to pierce the corporate veil of a reputable 20 year independently run organization, which undisputedly has its own separate board, employees and finance structure, contrary to existing binding precedence. In fact, **Exhibit B** contains the affidavits of the individuals that actually formed the organization, including the attorney that created the organization, Mr. Eric Vickers. Mr. Vickers undisputedly avers that from its inception, Plaintiff was independently set up and run and had no parent or affiliates. This is part of the administrative record, and its uncontroverted.

Defendants tout that Plaintiff's constitutional and statutory claims have been raised before in the context of asset blocking cases, and in two circuit courts they have been rejected. (Pg 15 of Defendants Motion) What Defendants have intentionally failed to mention was that these cases involved two entities (Holy Land and Global Relief) that were actually designated as terrorist organizations. In this case, the non party IARA based in Sudan and its officials were designated. The Sudanese organization, IARA, is not before this Court. And Plaintiff has been bootstrapped

---

[2]Because no discovery has yet been conducted, its not clear how many other US based organizations have had relationships with the Sudanese entity or other alleged known terrorists, and have not had their assets frozen; again, creating a genuine issue of material fact. Plaintiff renews its request to conduct discovery under the Federal Rules of Civil Procedures, including, Rule 56 (f) to further support its claims.

without regard, whatsoever, to its independence as a separate independent going concern.

Plaintiff has no intention to undermine the President's authority to combat terrorism. Plaintiff is in strong support of the President's efforts and the use of his powers. However, in this action, in carrying out the powers delegated by the President, Defendants have grossly abused the powers they are entrusted with and have engaged in a fishing expedition to create facts where none exist to support the allegation that Plaintiff has supported terrorism. Meanwhile, Plaintiff's counsel has received several letters from hunger-stricken children in Kenya pleading for help because their lifeline has been severed (**Exhibit F**).

Defendants unjustifiable heavy handedness in shutting down Plaintiff by using every opportunity to destroy it with no substantive basis that Plaintiff supported terrorism can be further demonstrated in its reconsideration process. Contrary to Defendants' assertion in their statement on page 34 of Defendants' Statement of Material Facts As to Which There is no Genuine Issue - citing Declaration of Werner, OFAC denied Plaintiff's repeated request for attorney fees in efforts to impede the organization from defending itself under US law **(Exhibit C**) . Not a penny has been paid, despite repeated requests. OFAC had even advised Plaintiff earlier that it can apply for fees. (**Exhibit H**, pg 2). Further, OFAC has completely ignored Plaintiff's request to settle the matter in which Plaintiff offered a number of solutions for OFAC to consider to address its concerns, including implementing reasonable monitoring measures, resignation of the board, and severing any ties with any projects that are of concern. (**Exhibit D**) And rather than actually engage in a reconsideration process, OFAC used this time to desperately seek some kind of evidence to support their conclusion that IARA-USA supports or funds terrorism, which again has proven to be nil. In fact, the same day OFAC denied Plaintiff's reconsideration request to unblock the property, was the

same day Defendants filed this in excess of 500 page brief with accompanying exhibits. The decision was long made to deny Plaintiff's request.

Further, contrary to Defendants' characterization that there is "adverse controlling legal precedent" (pg 2), Plaintiff maintains that the binding legal precedent runs in its favor. The standard test in judging the reasonableness of OFAC's actions has already been established by *Holy Land Foundation For Relief & Dev v Ashcroft*, 219 F.Supp.2d 57, 84-85 (D.D.C. 2002). Is there substantial evidence in the administrative record to support OFAC's conclusion that IARA-USA supported or funded terrorism? Id. Again, in this case, Defendants utterly fail the test.

Through their own admissions and recent submission of documents, Defendants have not produced any evidence, whatsoever, that a single penny from Plaintiff went to fund any wrongful act. Of equal significance, the record is totally absent and void of evidence that the African entity exerted any influence or control on this American charity.

Plaintiff strongly objects to the concealed information in Defendants' Brief. To present such a document, by hiding and concealing from Plaintiff communications being made to this Court is disturbing and clearly runs contrary to America's adversarial justice system. This is a clear attack on American jurisprudence, the very system we are trying to defend and sets a dangerous precedent in undermining our adversarial legal system

Finally, Defendants filing of a Rule 12 (b) (6) motion for failure to state a claim upon which relief can be granted is defective. If the factual allegations in Plaintiff's Complaint are accepted as true, which is required under this type of motion, Defendants' motion should be denied.[3]

---

[3]In their Motion, Defendants do not address all of Plaintiff's claims, which include Count VII, civil liability for false Affidavit; and, Count IV for violation of 42 USC 1985. Plaintiff presumes that these claims are not being challenged for dismissal. These claims are further discussed in Plaintiff's Answer to Defendant Schlup's Motion to Dismiss. Both claims involve

## II. APPLICABLE FACTS

### A. Islamic American Relief Agency (IARA-USA)

Plaintiff, IARA-USA, was established in 1985 as a 501(C)(3) non-profit organization, located at 201 E. Cherry Street, Suite D, Columbia, Missouri. Plaintiff does not operate under any other name and is not affiliated with any other organization. Plaintiff has no parent entities or subsidiaries. Plaintiff is an independent American Non-Governmental Organization (NGO) run by United States citizens[4]. See **Exhibit B**, the affidavits of the attorney that created the organization, and the affidavit of the original founding member of Plaintiff, both averring to the independence of Plaintiff[5]. This testimony is unrefuted. For nearly 20 years, Plaintiff dedicated its resources and efforts to provide immediate humanitarian relief to the poor without regard to race, religion, creed, color, disability, gender or nationality, while striving for long-term commitments to combat poverty and famine (see **Exhibit E**, By-Laws). For example, **Exhibit F** is a letter from a Christian aide worker, Anne Owltl, Director of a non-profit organization in Kenya, Kibera Community Self-Help Program Kenya (KICOSHEP), dated February 21, 2003, stating, in relevant part:

> IARA is an Islamic organization that has really come out to help humanity without any discrimination. The school has a Christian majority but that did not deter IARA from feeding these vulnerable children, they appreciate their situation and view them as children in need and not Christians. This is really commendable and a good example of religious tolerance. From our experience working with IARA, we have found them to be very sincere in their efforts to alleviate the suffering of mankind.

---

motive and intent, most suited for a trier of fact. *Borgo v Goldin* 204 F. 3d 251, 340 U.S. App D.C. 213 (CA DC 2000) *(motive for retaliatory discharge held proper for jury).*

[4]One board member has been a permanent resident alien for over 20 years.

[5]All of the attached exhibits are part of the Administrative record..

Plaintiff's activities included setting up orphan sponsorship programs, elderly health care clinics, feeding centers, and schools in impoverished countries around the world, including Mali, Chad, Yemen, Somali, Bangladesh, Jordan, Kenya, Bosnia and Ethiopia. Plaintiff was also instrumental in setting up health and feeding centers in Africa, for orphans of AIDS victims in Nairobi, Kenya, and providing humanitarian relief for victims of earthquakes (**Exhibit G**). Plaintiff has also been involved in providing disaster relief funds and other relief to victims of terrorist attacks, including the recent Kenya bombing.

**B. How Plaintiff's Name Was Derived**

From 1985 to May of 2000, the organization was known as the Islamic African Relief Agency, the same name as another organization currently based in Sudan.[6] Both organizations had a similar acronym: IARA, but were completely independent of one another. Plaintiff 's original founding member, Mohammed El-Beshir, came to America from Sudan in the early 80's. While living in Indiana, he recognized that very few organizations provide assistance to Africa. When he moved to Missouri, he consulted an attorney to set up an organization. The attorney, Mr. Eric Vickers, created the organization and became a board member. Mr. Beshir heard of the IARA organization (since it was the biggest organization in his country of Sudan). The name IARA was adopted because it was fitting for the cause and intention of the organization. No contacts were ever made with the African entity in the formation of Plaintiff. And according to Mr. Vickers, there was every intention to be completely independent. That fact is undisputed. See **Exhibit B** for affidavits

[6]The Department of Treasury designated the Islamic African Relief Agency based in Sudan and five of its officials as terrorists (**Exhibit H**). That organization and the members are all based abroad, and none of those members listed by the Department of Treasury as alleged terrorists are members of IARA-USA based in Columbia, Missouri.

of the founding members, which is part of the administrative record.

Because Plaintiff expanded and began providing humanitarian relief in other continents besides Africa, especially after the Bosnian conflict in the year of 2000, Plaintiff changed its name to Islamic American Relief Agency by amending its charter through the Secretary of State of Missouri (**Exhibit I**). Throughout its years of operation, Plaintiff has been completely independent from any other organization, including the Islamic African Relief Agency based in Africa, and maintained its own sets of books and records. Plaintiff has its own American-based independent board, officers, directors and employees. The board members periodically met and documented their activities with minutes, like the ones attached as **Exhibit J**. The Minutes reflect the members who have been in attendance and the type of decisions rendered by the organization.

**C. <u>Internal Controls</u>**

Plaintiff exercised impeccable internal control. Routinely, Plaintiff filed its 990 tax returns with the Internal Revenue Service and had its statements audited annually. The returns provided an accurate and detailed accounting of Plaintiff's activities only. No other entity's activities, such as IARA in Sudan, were ever reflected. No consolidated tax returns were ever required or needed to be filed with another entity. That fact is undisputed. The revenues and expenses flowed in and out of Plaintiff only, and Plaintiff's books and records only pertained to Plaintiff, and no other entity. **Exhibit K** contains the Form 990 tax returns for 1999, 2000, 2001 and 2003. **Exhibit L** contains certified audited statements for 2000 through 2002. It is believed the Form 990 for 2002 and the audited statements for 1999 and 2003 were seized when Plaintiff's office was raided by OFAC and other governmental officials, including FBI agents.

In 1999, Plaintiff had undergone a specialized audit for non-profit organizations. The

auditor made the substantive finding that IARA-USA met all Government Auditing Standards issued by the Comptroller General of the United States (**Exhibit M**).

Plaintiff also underwent a recent vigorous audit by the Better Business Bureau, which found that Plaintiff met 22 of the 23 listed criteria for operating a successful non-profit entity (**Exhibit N**). To appreciate the importance of the BBB finding, important information needs to be stated regarding the nature of this audit. Of relevance:

> The BBB Wise Giving Alliance Standards for Charitable Accountability were developed to assist donors in making sound decisions and to foster public confidence in charitable organizations. The standards seek to encourage fair and honest solicitation practices, to promote ethical conduct by charitable organizations, and to advance support of philanthropy. ...**organizations that comply with these accountability standards have provided documentation that they meet basic standards: 1) in how they govern their organization; 2) in the way they spend their money; 3) in the <u>truthfulness</u> of their representation; and 4) in their willingness to disclose basic information to the public**.
>
> Finances
>
> This section of the standards seeks to ensure that the charity spends its funds honestly, prudently, and in accordance with statements made in fund raising appeals...

See **Exhibit N** for further information regarding BBB Wise Giving Alliance Standards for Charitable Accountability.

Plaintiff also had formerly adopted internal accounting control policies (**Exhibit O**). Plaintiff also had built-in controls with respect to its contractual agreements with other non-government organizations overseas. For example, **Exhibit P** is a sample contract between IARA-USA and an organization in Bosnia. It states, in pertinent part:

> Whereas, the Main Partner (IARA-USA) has agreed to provide financial support for the first phase of the construction, the other

> Partners have offered, on the basis of their experience and expertise, to provide supervision and assurance of adherence to standards - U.S. Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S. Based Charities and the Better Business Bureau Standards.

In the sample contract, there is also a termination clause allowing Plaintiff to terminate the contract, should its partner breach it.[7]

**D. <u>External Dealings With Other Entities</u>**

Plaintiff worked regularly with United Nations Relief and Work Agency (UNRWA) which systematically provided reports for the funds contributed by Plaintiff, the amount that was applied to the given project, and detailed reports indicating how the funds were allocated. **Exhibit Q** are examples of a report to Plaintiff from UNRWA, another progress report to Plaintiff detailing the progress and activities to support the Afghan refugees, and another report detailing the progress in Mali.

**E. <u>Financing</u>**

Financing for Plaintiff was obtained from public and private contributions. There were two cooperative agreements awarded by United States for International Development (USAID) to IARA-USA in 1998 supporting specific agency-approved human needs activities (water, community income, and child survival) in poor and remote areas of Mali.[8]

---

7

All the contracts similar to **Exhibit P** were seized or confiscated during the raid on October 13, 2004.

8

The two awards received by Plaintiff from USAID in 1998 are: (1) cooperative agreement #688-A-98-00131-00, June 18, 1998, which supports the community education water income generating activities program in Mali; and (2) Cooperative Agreement #FAO-A-00-98-00045-00, September 30, 1998, which supports the Timbuktu Child Survival Project in Mali.

Unfortunately, both agreements were unilaterally terminated based on instructions from the U.S. State Department (**Exhibit R**). The termination of those agreements was completely at odds with the Agency's actions prior to the intervention of the State Department. At that time, the Regional Agreement Officer for USAID, Annette E. Tuebner, having reviewed Plaintiff's detailed November 1999 submission addressing certain USAID concerns, determined that USAID had "no basis" for unilateral termination of the CEWIGAP award.[9] After this determination, Ms. Tuebner decided to continue funding the CEWIGAP program (**Exhibit S**). Nevertheless, no further funds have been distributed by USAID and to date, Plaintiff was never advised of any concern that the State Department may have had with their activities.

Defendants argue that the USAID's termination of the agreements is the reason why Plaintiff changed its name and not because it was expanding. This is simply meritless. There is no evidence that this is true – only speculation. To date, Plaintiff has no knowledge or information as to why funding from USAID was terminated. But there is evidence that Plaintiff was expanding, especially after the Bosnian War conflict, where genocide left many without means. More importantly, all along, Plaintiff remained entirely independent.

**<u>F. Events In 2004 Leading To Blocking Of IARA-USA'S Assets</u>**

In 2004, the IARA-USA Board of Directors formed a plan of action to help disadvantaged people by raising at least two million dollars from donors for local and international projects to engage in outreach programs involving Muslims and non-Muslims. See **Exhibit T**, plan of action. Part of the plan was to increase the number of orphan sponsorships by 1,000 and to continue sponsoring orphan projects in Afghanistan, Kenya, China and Iraq.

---

[9] CEWIGAP = Community Education Water Income Generating Activities Program in Mali.

On October 13, 2004, the United States Department of Treasury designated another entity in Sudan, called, "Islamic African Relief Agency (IARA)", along with five of its senior officials, as Special Designated Global Terrorists (SDGT) pursuant to Executive Order No. 13224 issued by President George W. Bush on September 23, and under the authority granted by the International Emergency Economic Power Act (IEEPA), 50 USC 1701-06. The senior officials included Dr. Mohammed Ibrahim Sulaiman, Jaffar Ahmad Abdullah Makki, Abdul Aziz Abba Karmuhamad, Khalid Ahmed Jumah Al-Sudani, and Abrahim Buisir. **None of those individuals were ever officers, directors or employees of Plaintiff, IARA-USA**. (**Exhibit H**).

On that same day, the Office of Foreign Assets Control (OFAC) issued a blocking notice against, non party, the Islamic African Relief Agency's assets. See **Exhibit U.** The OFAC blocking notice provides in part:

> FAC No. SDG 234338
> *Islamic African Relief Agency*
> *201 East Cherry Street, Ste. D*
> *Columbia, MS 65203*
> **...**
> Gentlemen:
>
> [A]ll real and personal property of IARA, including but not limited to all offices, furnishings, equipment and vehicles, as well as all funds and accounts in which IARA has any interest, that are owned or controlled by IARA and that are in or come within, the United States or that are in, come within, the possession or control of any U.S. person, are blocked...

The notice also advised Plaintiff of its right to apply for attorney fees and expenses "related to legal representation of the organization in this matter". See page 2 (**Exhibit V**). However, Defendants have denied every one of Plaintiff's requests for attorney fees (**Exhibit C**).

Subsequently, despite the blocking notice being directed to a completely unrelated Sudanese

entity in Africa, agents of the Department of the Treasury and the FBI raided and seized the Plaintiff's assets and another organization's assets[10] in Plaintiff's possession. The agents seized and removed from Plaintiff's offices in Columbia, Missouri, all documents, computers, furniture, blankets for the impoverished, and other items.

The government also froze Plaintiff's bank accounts. At that time, Plaintiff's accounts contained hundreds of thousands of dollars that Muslims throughout the United States had contributed for charitable purposes in the exercise of their religion.

Based upon the information presented by Defendants, Defendants willfully provided false information to the Magistrate that the African entity in Sudan is based in Missouri, to convince the local Magistrate that there was probable cause to obtain a sealed warrant against against Plaintiff to search and seize property on IARA-USA's premises by representing that it was the African relief agency, when, in fact, it is not.[11]

To date, Plaintiff has no knowledge whatsoever of why its assets were blocked. Plaintiff and its officers vehemently deny any involvement in terrorism. Plaintiff has publicly condemned any

---

[10] An IARA-USA employee is a member of a local Islamic center called Islamic Center of Columbia, Missouri (ICCM). At the time of the raid, he had in his possession at IARA-USA's premises approximately $3,000 and membership forms for the Islamic center.

[11] It is important to point out that various NGO may work together on a project. This type of arrangement in the context of humanitarian relief is referred to as "partnership" arrangement. However, the entities remain independent of one another. For example, Stephanie Bunker, a spokesperson for the UN Office for the Coordination of Humanitarian Affairs, indicated that they were working with an organization called IARA and the United Nations World Food Program in Sudan, as recently as October of this year. (**Exhibit V**) Of course, this does not mean that the UN is supporting terrorism. Likewise, **Exhibit W** is a contract between IARA in Sudan and UNICEF entered into two months after IARA was designated as a terrorist organization for a children project in Iraq. Again, although unwise, this does not mean that UNICEF supported terrorism.

such acts and dedicated all of its efforts to providing humanitarian relief. **Exhibit X** contains affidavits of all the officers of Plaintiff attesting to such a position. Further, to date, Plaintiff, and even Defendants have no knowledge of any evidence whatsoever to support any allegation that Plaintiff supports any act of terrorism.

## III. APPLICABLE LAW AND ARGUMENT

In deciding a motion to dismiss under Rule 12 b (6), the district court must take the facts as alleged in the Complaint as true, and may not dismiss the Complaint unless it appears that the Plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Sparrow v United Air Lines, Inc*. 216 F3d 1111 (D.C. Cir. 2000). Consequently, the motion will not be granted unless it appears to a certainty that Plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. *Haines v Kerner*, 404 US 519 (1972).

Summary Judgment under Rule 56, is properly granted if there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Campbell* v *Wells Fargo Bank*, 781 F2d 440, 442 (CA5, 1982). And conversion of a Rule 12 motion to one for summary judgment, without notice requirement and opportunity for further discovery, is "serious error". *Country Club Estates, LLC v Town of Loma Linda*, 213 F3d 1001 (CA 8, 2000). Summary judgment should rarely be granted ... when the plaintiff has not had an opportunity to resort to discovery procedures." *Deleu v. Scaife,* 775 F.Supp. 712, 716 (S.D.N.Y.,1991). Granting Summary judgment before any discovery at all is generally improper. *Hellstrom v United States Dept. of Veteran Affairs,* 201 F3d 94 (2d Cir. 2000). Finally, Summary judgment is hardly appropriate when questions of intent are involved. *Atkins v. Fischer* 331 F.3d 988; 356 U.S. App. D.C., 403 (2003).

### A. Plaintiff Stated Sufficient Legal Claims And Alleged Sufficient Facts To Preclude Dismissal Or Summary Judgment

Plaintiff pled in its Complaint, among other things that IARA-USA has never supported or donated funds to any organization to support terrorism. (Comp. para.11). Plaintiff is run by United States citizens and has no affiliates, parents or subsidiaries, in any other organization outside of the United States. (Comp. para.12). Defendants, labeled Plaintiff as "evil" (Comp. para. 34), conspired to destroy the organization because of its affiliation with Islam. (Comp. para. 92-101), intentionally discriminated and treated non-Muslim non-governmental organizations more favorably by allowing them to contribute funds to and throughout the same or similar persons and entities without having their assets blocked (Comp. para 72-78), and made material misrepresentations to the Magistrate, to have a warrant issued against Plaintiff (Comp. para 80-85). If the court accepts Plaintiffs allegations as true, as it should under a Rule 12 (b) motion, *Sparrow,* supra, and considers Plaintiff's Counts in the Complaint, which include Counts I-VI (constitutional violations for the First, Fourth and Fifth Amendments, including the Equal Protection Clause), Counts VII (Obtaining false warrant), Count VIII (violation of APA), and Count IX (violation of 42 USC 1985 ( 3)), clearly Plaintiff has provided a well pled Complaint, precluding a ruling in favor of Defendants under Rule 12 (b). Further, a Rule 56 ruling would be out of the question, since there are genuine issues of material fact without even discovery ensuing, as later discussed.

**B. OFAC'S Blocking Of Plaintiff's Funds Was Not Rational Contrary To Existing Law, And Fails Under The Administrative Procedure Act**

Should the Court wish to proceed further, in reviewing Defendants' actions based on the administrative record assembled by OFAC, Defendants' motions should still be denied under the Administrative Procedure Act. In applying binding precedent, there is simply no rational basis to support Defendants' conclusion that Plaintiff funded or supported terrorism to justify Plaintiff's assets being blocked. Moreover, based on binding precedent, there is no rational basis to support

Defendants' attempted actions in piercing Plaintiff's corporate veil in efforts to treat Plaintiff and IARA in Sudan one and the same. Finally, Defendants' actions were arbitrary, capricious, and in violation of existing law, including Plaintiff's Constitutional rights.

**C. <u>The Administrative Procedure Act - Standard of Review</u>:**

The Administrative Procedure Act ("APA") was passed by Congress in 1966 and signed by the President into law. Both branches of government, Legislative and Executive provided the Judicial branch, under the APA, the power and authority to review Executive Branch decisions to ensure proper compliance with APA. The Judicial Branch is not to act as a rubberstamp for executive decisions. *Tarpon Transmission Co.* v *FERC*, 860 F2d 439, 442 (D.C. Cir. 1988) The APA, in relevant part, states:

> To the extent necessary to a decision and when presented, the reviewing Court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall–
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be–
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. (Emphasis added).

An agency decision is arbitrary and capricious if it fails to “articulate a rational connection between the facts found and the conclusion made. *Environmental Defense Center, Inc.* v *U.S. E.P.A.* 344 F3d 832 (CA 9, 2003). An agency acts arbitrarily and capriciously when it construes or applies regulations in an inconsistent manner. *Walter Boswell Mem’l Hospital v. Heckler*, 749 F.2d 788, 799 (D.C.Cir. 1984).

Although an agency can use its expertise to make a decision, substantial evidence must, nevertheless, exist to support that decision. *B. D. C. Corp. v. U.S.*, 281 F.Supp. 700 (*N.D.Ill.*1968). In reviewing an agency's decision, a court may not function to weigh conflicting evidence adduced at an administrative proceeding but, rather, to determine whether based upon the entire record there is substantial evidence to support the agency's determination. *June Oil and Gas, Inc. v. Andrus,* 506 F.Supp. 1204 (D.C. Colo 1981). "Substantial evidence" in support of an agency determination is such relevant evidence as a reasonable man might accept to support a conclusion; a trace of evidence is not sufficient. *Clark v. U. S.*, 379 F.Supp.1399 (N.D.Iowa 1974). Substantial evidence, for purpose of the Administrative Procedure Act (APA), is more than mere scintilla, and must be such relevant evidence as reasonable person might accept as adequate to support a conclusion; evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. *Olenhouse v. Comm. Credit Corp.*, 42 F.3d 1560 ( CA 10 , 1994), on remand 922 F.Supp. 489.

Further, that standard does not change, no matter what the circumstances are. Whether the United States is under the threat of terrorism or embroiled in a state of war. For example, as referenced in Plaintiff’s Motion for Reconsideration for the denial of its Motion for Preliminary

Injunction, the Judicial Branch has a long history, prior to September 11, in serving as a check in evaluating Executive Branch decisions even at times of war. For example, in *Ex parte Merryman* 17 F.Cas. 144 (C.C.Md. 1861), in ruling that President Abraham Lincoln had violated the Constitution's Due Process Clause, the Court stated that the President, under the Constitution of the United States, cannot suspend the privilege of the Writ of Habeas Corpus, nor authorize a military officer to do so. And in *Ex parte Milligan* 71 U.S. 2 (1866), in a Civil War case, the Supreme Court denied the President's authority to ignore the Constitution and try American civilians in military tribunals. Justice Davis reasoned:

> The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and **under all circumstances**. *Id*. at 121-21 (emphasis added)

And recently, withing the context of terrorism, the judicial branch has continued to serve as a check of executive branch decisions. For example, the Supreme Court's Justice O'Connor, held that due process required that a United States citizen being held as an enemy combatant be given meaningful opportunity to contest factual basis for his detention. *Hamdi v. Rumsfeld* 124 S.Ct. 2633 (U.S.,2004).

In *Detroit Free Press v. Ashcroft* 303 F.3d 681 (CA6,2002), members of the press and public brought actions against the Attorney General seeking declaration that the closure of an alien's removal proceeding to the public violated their First Amendment right of access. The United States District Court for the Eastern District of Michigan, 195 F.Supp.2d 937 (E.D. Mich. 2002), Nancy G. Edmunds, J., granted relief, and the government appealed. The Court of Appeals, Damon Keith, affirmed by stating "The Executive Branch seeks to uproot people's lives, outside the public eye, and behind a closed door. Democracies die behind closed doors."

In *Rasul v. Bush* 124 S.Ct. 2686 (2004), the Supreme Court ruled that the capture of aliens abroad in connection with hostilities arising from September 11, 2001, terrorist attacks within the United States, who were subject to executive detention at the U.S. Naval Base at Guantanamo Bay, Cuba, and were held in military custody, did not bar a federal district court from exercising jurisdiction over claims asserted by aliens under the Federal Question Statute and Alien Tort Statute.

In *U.S. v. Moussaoui* 382 F.3d 453 (CA4, 2004), the Court ruled that ordering production of enemy combatant witnesses who were foreign nationals in military custody outside United States in a prosecution for conspiring to commit international terrorism did not infringe on the Executive's war making authority, in violation of separation of powers principles.

In this case, Defendants grossly violated several provisions of APA, namely, 2(A) arbitrary, 2(B) contrary to Constitutional right, 2 (C) exceeded statutory authority, 2(D) failed to follow procedures, 2(E) unsupported by substantial evidence, and 2(F) unwarranted by the facts.

1. **Defendants Actions To Shut Down Plaintiff Were Arbitrary And Capricious Under APA 2(A)**

Defendants assert that the "the blocking action against IARA-USA was rationally related to the legitimate governmental interest in **shutting down those organizations that fund terrorism**" (P 51). Defendants' argument is rather disingenuous, as to Plaintiff and is arbitrary and capricious.

To avoid an agency action being deemed arbitrary or capricious, Defendants' decision must have a "rational connection between the facts found and conclusions made", *Environmental, supra*, and their actions must be applied consistently, *Heckler*, supra. In this case, Defendants have unequivocally admitted that they have no evidence that Plaintiff funded terrorism (**Exhibit A**, p. 30). Even adopting Defendants' argument that there was an affiliation between Plaintiff and IARA, still,

there is no evidence, whatsoever, that Plaintiff dealt with any *known* terrorist before October 13, 2004 when the Sudanese entity was designated; or that Plaintiff funded the Sudanese entity. At the same time, Plaintiff has concrete proof that, another charitable organization, UNICEF, continued to fund an alleged *known designated* terrorist, Islamic African Relief Agency, two months after it was designated as an SDGT. (**Exhibit W**) UNICEF has not been shut down. Why is UNICEF allowed to continue funding an alleged known terrorist organization, while Plaintiff remains shut down despite no evidence of funding terrorism. This is totally irrational and completely undermines Defendants' rational basis argument that it is "shutting down those organizations that fund terrorism" (p. 51), violating *Environmental*, supra , and, certainly, solid proof of an agency action not acting consistently, violating *Heckler*, supra. This also warrants further discovery to determine how many other organizations continue to operate while funding a known terrorist, further undermining Defendants' "rational" basis argument.

2. **Defendants' Actions Were Not Supported By Substantial Evidence Violating APA 2(E).**

In the context of terror, the seminal case is the *Holy Land Foundation For Relief and Development v Ashcroft*, 333 F.3d 156 (U.S. App. D.C. 2003), upon which Defendants have principally relied. The facts and evidence presented in that case to support the notion that Holy Land supported terrorism provide a complete contrast from the facts in this instant action, meriting a ruling in Plaintiff's favor. Simply, Defendants do not have "substantial evidence" that Plaintiff supported terrorism, violating APA 2(E).

In clear, specific terms in *Holy Land*, the appellate court affirmed the district court's ruling in upholding the Agency's designation of Holy Land as a SDGT, by making the following clear and

specific findings:

> the court then commenced a detailed review of the administrative record and reiterated the evidence on which the Treasury Department relied in making its determination to designate HLF as an SDGT..It found that the record contained "ample evidence that (1) HLF has had financial connections to Hamas since its creation in 1989; (2) HLF leaders have been actively involved in various meetings with Hamas leader; (3) HLF funds Hamas-controlled charitable organizations; (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners; (5) HLF's Jerusalem office acted on behalf of Hamas; and (6) FBI informants reliably reported that HLF funds Hamas. The court concluded, based on the substantial evidence in the record, Treasury's determination that HLF acts for or on behalf of Hamas was not arbitrary and capricious, and therefore, upheld the agency's reasonable determination. Id. at 161.

The appellate court then laid out the standard of review by stating:

> [T]he actions of the Treasury Department in designating HLF as a SDGT are governed by the judicial review provisions of the APA, 5 U.S.C. Sec. 706 (2) (A). Therefore, if the OFAC's actions were not arbitrary and capricious, and were based on **substantial evidence**, we must affirm. *Id.* at 162
>
> There was **ample** record evidence, in any case, that HLF continued beyond 1995 to maintain its ties with Hamas and continued to give money to entities controlled by and associated with Hamas. *Id* at 162.
>
> There was evidence demonstrating that HLF operated as a fundraiser for Hamas in the United States and that Hamas officials provided HLF with funds. Therefore, OFAC did not exceed its authority when it blocked the assets after the designation, because OFAC needed only to determine that Hamas had an interest in HLF's property, and the record provided **substantial evidence** to support that conclusion. *Id* at 163.

The binding standard set out in *Holy Land* is squarely and entirely applicable to this case. That matter dealt with national security in the context of APA. And the court found that there was "substantial evidence" that *Holy Land* supported terrorism by funding a known designated terrorist organization, Hamas.

In applying the above test to this instant action, it would be: Is there substantial evidence to support the agency's conclusion that Plaintiff, IARA-USA, funded or supported terrorism? That is the test for the Court to apply, as was done in *Holy Land*, supra. Further, mere conclusions are not enough to justify an agency's actions. *Olenhouse*, supra. Scintillas of evidence are not enough. *Id.* Even the trace of evidence is not sufficient. *Clark, supra.*

Again, in viewing the totality of the unclassified documents presented (over 1,000 pages), and hundreds of court documents, Defendants failed to meet the deferential standard provided for in the Administrative Procedure Act. Certainly, there is no "substantial evidence", whatsoever, or even the scintilla of evidence to support the agency's conclusion that Plaintiff, IARA-USA, supported terrorism to justify the Government's action in blocking its property.

There is no evidence that Plaintiff had financial connections to IARA, as was found between Holy Land and Hamas There is no evidence that Plaintiff dealt with a known designated terrorist before the Sudanese entity was designated, as was found between Holy Land and Hamas, where Hamas was previously designated. There is no evidence that Plaintiff dealt with the Sudanese entity after the designation. There is no evidence that Plaintiff's leaders were actively involved in various meetings with the Sudanese entity as was found between Holy Land and Hamas. There is no evidence that Plaintiff funded any of the Sudanese entity's controlled charitable organizations. There is no evidence that Plaintiff provided financial support to the orphans and families of terrorists. There is no evidence that Plaintiff acted on behalf of the Sudanese entity in supporting terrorism. Finally, there is not even one single document or affidavit showing that an FBI informant or any federal official reliably reported that Plaintiff funded the Sudanese entity as was found in *Holy Land* where FBI informants reliably reported that HLF funded Hamas . Simply put, in

applying *Holy Land* to this case, Defendants utterly fail to meet their burden under APA, and cannot possible justify their draconian actions.

Morever, as the Court may also recall, it asked a very specific point to the Defendants in the February 18, 2005 hearing, questioning: *Need there be, as Plaintiff suggests, evidence of a direct diversion of funds from his client to terrorist activities to support the Government action? (*(**Exhibit A**, p. 29*)*. This Court's question was clearly answered in *Holy Land*, where the court in that case found "substantial evidence" that Holy Land actually diverted funds to the already designated terrorist organization, Hamas. Again in this case, its strikingly different. There is no evidence of any funds whatsoever being directed to support terrorist activities. And, in answering this Court's query, Defendants admitted, " *...We have not shown any funding from that organization to the main organization with the specific intent to fund terrorism*. (**Exhibit A**, p. 30). There is simply no evidence, whatsoever, that Plaintiff supported or funded terrorism, meriting a denial of defendants dispositive motions.

3. **Defendants Had No Rational Basis To Pierce The Corporate Veil To Assume That Plaintiff Is The Sudanese Organization Violating APA 2(A), 2(E) and 2(F).**

As stated repeatedly, Plaintiff is a completely separate and independent entity from IARA in Sudan. Still, without regard to existing law, Defendants are trying to allege that Plaintiff is merely another name for the Sudanese organization. As the Court notes in **Exhibit H**, when the Department of Treasury made its designation, it labeled Plaintiff, Islamic American Relief Agency as an a/k/a with IARA. This cannot be further from the truth. Corporations are separate entities and can be treated as one only when the Court finds reason to pierce the corporate veil. Courts are very reluctant to pierce the corporate veil, and only do so in extreme circumstances involving facts very

different than the facts in this case. Defendants violated APA 2(A) by "abusing its discretion", and making a finding "not in accordance with law"; and APA 2(E) (no substantial evidence); and 2(F) "unwarranted by the facts".

The Plaintiff has already established its independence of Islamic African Relief Agency in Sudan by making an application for Tax Exemption under Section 501 ( c ) (3) of the Internal Revenue Code and has been existing for the last twenty years. The Defendants are now struggling to justify their arbitrary act of blocking the assets of a legitimate and legal organization, the Islamic American Relief Agency without any rational basis, while they have not been able to come forward with one instance where the Plaintiff had directly or indirectly assisted terrorism in any form within the country or outside the country.

**(a) The Facts Do Not Justify Piercing the Corporate Veil of Plaintiff**

Plaintiff firmly contends that it is not in any way related to the Sudanese entity, IARA, either as an affiliate, subsidiary, related entity, etc. This is further evidenced by the attached affidavits of the incorporators and the attorney that formed Plaintiff in 1985. (**Exhibit B**) Defendants are claiming that Plaintiff is simply an a/k/a of the Sudanese entity. Essentially, Defendants have pierced the corporate veil. There is simply no evidence to rationally justify Defendants' actions to pierce the corporate veil and treat Plaintiff and the Sudanese organization, IARA, as one and the same.

The D.C. Court of Appeals has held that in order to pierce a corporate veil, there must be a "unity of ownership and interest," that the separateness of the entities has ceased, and that "an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice." See *Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242 (D.C. 1993). See

also *McAuliffe v. C & K Builders,* 142 A2d 605, 607 (D.C. 1958).

Some of the factors to consider with respect to piercing the corporate veil are the nature of the ownership and control, whether corporate minutes and adequate corporate records were maintained, whether the corporate formalities necessary for issuance or subscription of stock, such as formal approval of the stock issue by an independent board of directors, were followed, whether funds and other assets of the corporation were mingled, whether corporate funds or assets were diverted to non-corporate uses, and whether the same office space was used by the corporation and its individual shareholders. See *Labadie Coal Co. v. Black,* 217 U.S.App.D.C. 239, 243-46, 672 F.2d 92, 97-99 (1982).

See also *Schattner v. Girard, Inc*., 215 U.S. App. D.C. 334, 668 F.2d 1366, 1370 (D.C. Cir.1981). ("Piercing the corporate veil is an extraordinary procedure that is not to be used lightly"). Additionally, the mere use of a common name or logo is not sufficient to pierce the corporate veil. See *Humana Inc. v Kissun* 221 Ga.App.64, S.E.2d 514, 1996 (**Exhibit CC**), where it was held that "common use of advertising and the use of same logo is not sufficient to piece the corporate veil."

The Defendants have to establish facts sufficient to pierce the corporate veil and to hold Islamic American Relief Agency to be vicariously liable for the acts committed by Islamic African Relief Agency, which simply have not. On the contrary, Plaintiff has shown that it never had any board of directors in common with the Sudanese organization, never diverted any of its funds or assets to Sudanese entity, and that it maintained all corporate formalities wholly independent of the Sudanese entity. Thus there is no factual evidence to support treating Plaintiff in the same light as the Sudanese entity.

Further, there is binding precedent for the use of alias names in the context of terrorism that

would find against Defendants' actions for asserting that Plaintiff is an alias of the Sudanese entity. *In National Council of Resistance of Iran v Department of State*, 373 F.3d (C.A.D.C 2004) (2001), two Iranian organizations petitioned for review of an order of the Secretary of State designating them as foreign terrorist organizations. Part of their claim was that they should not have been deemed as alias of one another. The court disagreed first ruling that when one entity so dominates and controls another that they must be considered principal and agent and to look past their separate juridical identities and to treat them as aliases with respect to their designation as foreign terrorist organizations[12]. In that case the court found substantial evidence in the record that the two organizations were aliases of one another. For example, during the search of the office space, it was discovered that documents of both organizations, including bank records and travel documents, were commingled and the organizations shared essentially a unitarian leadership structure. More convincing, the same leader headed both organizations.

Clearly, the above discovered facts far differ in this instant action. There is no evidence, whatsoever that the entity in Sudan "so dominated" and controlled Plaintiff. There is no evidence that both entities commingled their records in any manner, let alone, even exchange documents. Most importantly, there is no evidence, whatsoever, that there was a unitarian leadership structure. In fact, Plaintiffs' American leaders are completely separate and independent from the leaders of the Sudanese entity, where its officials were, also, designated as alleged terrorist (**Exhibit H**).

Defendants are essentially asking this Court to disregard the separate corporate existence of Plaintiff and the Sudanese entity, without a shred of evidence that these two organizations acted in

---

[12] Although, this case was decided in the context of the Anti-Terrorism and Effective Death Penalty Act, the concept in finding whether an organization is an alias of another is essentially the same.

concert. Defendants have clearly failed to provide evidence of any acts done by the Plaintiff warranting the treatment meted out to them under IEEPA and hold them liable for acts of some other entity.

Defendants have even gone as far as attempting to simply use the names IARA and IARA-USA interchangeably to mislead the court to assuming they are just one and the same, with complete disregard to their separate independent corporate existence. For example, in footnote 6 on page 13, Defendants falsely stated that IARA-USA was designated as an SDGT. However, in page 15 of Defendants brief, they correctly point out that it was the Sudanese entity that was designated as an SDGT. As can be seen in **Exhibit H**, the Department of Treasury designated the Sudanese organization IARA, and its five officials (none of whom are employed by Plaintiff) as an SDGT and then stated that IARA-USA was an aka of IARA, which is simply untrue for reasons already discussed[13].

Further, Defendants own documents speak for themselves in showing that the two organizations were entirely separate and independent. On paper, there is not one document that states Plaintiff is an a/k/a of the African entity. In examining the course of conduct, based on the documents presented, there is not one correspondence, one financial transaction, or one activity exchanged between Plaintiff and the African entity. There are no common employees, directors or officers. There is not one report, tax return, financial document or bank record that would show any financial connection between Plaintiff and the African entity. Even assuming there was a connection, which has not been established, there is no evidence, whatsoever, that can be reasonably

[13]This is also another distinction between this case and *Holy Land*. In Holy Land, it was Holy Land that was designated as SDGT. In this case, it was the Sudanese organization, IARA.

construed to establish that Plaintiff supported terrorism.

Even considering Defendants' purported evidence, which include, Google searches, newspaper articles, documents showing the two entities names on common web sites for humanitarian aid purposes[14], 10 to 20 year old tax returns dating back to the 1980's referencing the word "affiliate", editorial response to a Washington times article by a Mubarek Hamed based on a personal belief (p. 21 of Defendants' Statement Of Material Facts As To Which There Is No Genuine Issue), common logos (which is insufficient to pierce the corporate veil, *Humana Inc.*supra) again, as of 2005, the administrative record is void of a single document that Plaintiff funded or supported terrorism. The record is totally void of any evidence that the Sudanese entity had any interest or influence over Plaintiff. And the record is void of any evidence that Plaintiff dealt with any known terrorist before October 13, 2004, when the African entity was designated.

Morever, on January 13, 2005, Defendants furnished several license requests previously made by Plaintiff (**Exhibit Y**), including one made by then Congressman, David E. Bonier, to allow Plaintiff to provide humanitarian aid to Sudan to combat the very worsening crisis of famine and displacement. Each request was denied, but strongly demonstrates Plaintiff's course of conduct in following the letter of the law in efforts to obtain permission to transact charitable activities in Sudan and provide humanitarian relief to that country. After all, if the entities were one and the same, why would Plaintiff have been requesting permission to furnish relief in efforts to assist the African entity

[14]With respect to plaintiff, it was listed as a member of InterAction, based in Washington DC, with various other well known NGOs members including CARE, United Way International , YMCA of the USA, and Project Hope. (**Exhibit AA**). Clearly, because Plaintiff is listed on a web site with other organizations, its does not mean that they are one and the same. Likewise, Plaintiff's, listing on a web pages of other organization, should not be held to a different standard.

in Sudan.

Defendants state on page 25 that "there is no evidence that Plaintiff IARA-USA has severed its ties with Islamic African Relief Agency." This statement is very misleading. For nearly 5 years, Plaintiff urged and pleaded with Defendants to have its USAID agreements resumed and to be allowed to provide humanitarian efforts to one of the poorest and famine stricken countries in African, Sudan. (**Exhibit Z** ) Never once did Defendants advise Plaintiff of any specific concerns, including alleged possible links to Islamic African Relief Agency.

Assuming we adopt Defendants' claim that Plaintiff had ties with the Sudanese entity, for at least 20 years before the African entity was declared a terrorist organization, no organization in the world that was working with Islamic African Relief Agency on a cooperative humanitarian project had any knowledge that would lead them to sever ties with Islamic African Relief Agency. This includes the United Nations, which provided the African Agency a prestigious Special Consultative Status with the Economic Social Counsel of the United Nations. (**Exhibit BB**). Defendants rationale to block Plaintiff's property because of alleged past ties, is further undermined since many of the other organizations that had past ties continue to operate with no adverse actions by Defendants. Discovery is clearly warranted to further prove Plaintiff's assertion that Defendants' "affiliation theory" is simply a disguise to mask their arbitrary conduct. This, also, bolsters Plaintiff's Equal Protection claim, as later discussed.

**(b) Plaintiff Was Not An Agent Nor Mere Instrumentality Of The Sudanese Organization**.

Related to the doctrine of piercing the corporate veil, courts may also look at whether one entity acted as an agent of another and thereby may be held vicariously liable for the actions of

another. In *Mary Jo Ritter v. Christian Health Systems*, 987 S.W.2d 377 (1999) **(Exhibit DD)**, the patient's estate sued hospital's parent corporation, hospital, clinic, and doctors for negligent medical care. The parent corporation was sued under the theory that the hospital was acting as the agent of the parent corporation. The Court of Appeals held, and the Supreme Court affirmed, that the corporate forms of hospital and parent corporation could not be disregarded to impose liability on the parent corporation for patient's allegedly negligent medical care while in hospital. Id. at 384. The Court held, that in order to establish a principal-agent relationship between two corporate entities, "**there must be such domination and control 'that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.**'". Id. at 385.

The Court reasoned that when no agency relationship existed between the parties, it was not right to pierce the corporate veil, especially when the corporation enjoyed a separate and individual corporate existence from the respondent. Id. The Court held that the parent corporation was not vicariously liable for the hospital's actions, to which it was affiliated, because it did not have control or the right to control the activities of the Hospital. Id at 385.

In *Steven v. Roscoe Turner Aeronautical Corporation,* 324 F.2d 15 (C.A.Ind. 1963) it has been held that:

> In determining whether the requisite degree of control is maintained by a parent corporation to find that a subsidiary is a mere instrumentality, the presence of many factors in the proper combination is controlling. Factors include: (a) parent corporation owns all or most of the subsidiary's capital stock; (b) parent and subsidiary corporations have common directors or officers; (c) parent corporation finances the subsidiary; (d) parent corporation subscribes to all the capital stock of the subsidiary or causes its incorporation; (e) subsidiary has grossly inadequate capital; (f) parent corporation

> pays the subsidiary's salaries and other expenses or losses; (g) subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (h) in the papers of the parent corporation or in statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own. (i) parent corporation uses the property of the subsidiary as its own; (j) directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest; (k) formal legal requirements of the subsidiary are not observed.

*Id.* at 161. See also *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc*. 842 F.2d 1466 (C.A.3, Del,1988), where the Court of Appeals held: "In determining whether two corporations are truly separate, significant factors to consider include adequacy of capitalization, overlapping directorates and officers, separate record keeping, payment of taxes and filing of consolidated returns, maintenance of separate bank accounts, level of parental financing and control over the subsidiary, and subsidiary authority over day-to-day operations". *Id.* at 1476, 1477.

Plaintiff and the Sudanese organization share no legal affiliation nor is either an agent of the other, rather they merely share the same acronym. Further, there simply is no evidence that Plaintiff was an agent of the Sudanese entity. No evidence of one entity domination matter exists. *Mary Jo Ritter*, *supra*. No evidence of overlapping directorates, and officers. *Texaco, Inc. supra*. No evidence of joint record keeping, or even filings of "consolidated returns". *Id*. No evidence of "parental financing". *Id*. The Defendants have not been able to establish any acts committed by the Plaintiff to encourage or promote terrorism within the United States or outside of it. Nor have Defendants advanced any evidence to prove that Plaintiff was legally affiliated with the Sudanese entity or that the former was a subsidiary of the latter. Even if Plaintiff was found to be a subsidiary or affiliate of IARA, there is no evidence to attribute the alleged acts of the Sudanese entity to

Plaintiff.

## IV. DEFENDANTS VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER APA 2(B).

Paragraph 2(B) of the APA prohibits an agency from violating the Constitution. In the instant action, there is clear evidence that Defendants violated Plaintiff's First, Fourth, and Fifth Amendment rights under the Constitution, creating a genuine issue of fact to preclude summary judgment.

### A. <u>Defendants Violated Plaintiff's Fifth Amendment Rights Under The Equal Protection Clause</u>

At a minimum, there is a genuine issue of material fact that Defendants violated Plaintiff's Fifth Amendment rights under the Equal Protection Clause, also a violation of 2(B) of the APA. Plaintiff has concrete proof, with no discovery even yet conducted, that Defendants have favored one organization over another, although similarly situated in almost ever aspect related to the Sudanese organization, IARA, to trigger a violation of the Equal Protection Clause. Plaintiff not only requests denial of Defendants' motion on that ground but also request discovery to further bolster its Equal Protection violation claim.

Under the Due Process Clause of the Fifth Amendment, equal protection principles essentially direct that all similarly situated persons should be treated alike. *Cleburne v Cleburne Living Center, Inc*. 473 U.S. 432, 439. (1985).

Defendants in their brief artfully describe the powers of Executive Order 13,224 and its related blocking powers under IEEPA by stating:

> There Order further authorized the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to designate "persons" (defined as individuals or entities) *whose property or interests in property should be blocked because they "assist in, sponsor, or provide...support," or are "otherwise associated" with them*. (Pg 10)

> ...the immediate blocking of fungible assets such as money-which an organization could easily dissipate with prior *notice-and the corresponding disruption of all transactions and* ***future*** *services* to the designated entity remain the fundamental goal of the actions undertaken under IEEPA and the blocking of IARA-USA's assets. (Pg 49)

> *Because the blocking action against IARA-USA was rationally related to the legitimate governmental interest in shutting down those organizations that fund terrorism, Plaintiff's Equal Protection claim must be dismissed*. (Pg 51)

In this case, there is ample proof that Defendants violated the tenants of the Equal Protection clause espoused in *Cleyburne*. For example, the United Nations Office for the Coordination of Human Affairs (UNCHA) had been working with the Sudanese organization, IARA, as recently as October 2004, the same month as when US Dept of Treasury designated IARA a SDGT. **Exhibit V**. Even more compelling, there is concrete solid evidence that UNICEF actually signed a contract with the African entity, IARA, to ***fund*** IARA two months **after** IARA was designated a SDGT. **Exhibit W** is a contract between UNICEF and IARA dated December 8, 2004 (IARA was designated on October, 13, 2004), requiring UNICEF to fund IARA, for a total amount of approximately $168,000.00 payable in two (2) separate installments[15]. There is no such existing

15

Interestingly, OFAC inadvertently produced that documents in efforts to prove another faulty point, perhaps, without recognizing the devastating consequences that document had to its Equal Protection defenses, that the contract included a representation that IARA in Sudan has offices all over the world. (**Exhibit W**, ANNEX A page 2) The representation lists an organization structure

contract between Plaintiff and the Sudanese organization. Still, Plaintiff had its assets blocked. UNICEF has not. Both are humanitarian relief not-for-profit organizations. Both assist the poor and impoverished children. If shutting down Plaintiff "was rationally related to the legitimate governmental interest in shutting down those organizations that fund terrorism", and to disrupt "future services to the designated entity", how can Defendants justify allowing UNICEF to continue to fund the designated African entity? Clearly, there are issues of material fact that different treatments are visited upon Plaintiff and UNICEF, a clear violation of *Cleyburne*, where "all similarly situated persons should be treated alike"

How can Defendants possibly survive Equal Protection claim scrutiny by shutting down Plaintiff's 20 year-old organization, where to date, there is no evidence, whatsoever, of direct funding to the Sudanese organization, and only the appearance of an alleged "affiliation". While there is clear proof that UNICEF "assist[ed] in, sponsor[ed], or provide[d]...support[ed]," or are "otherwise associated with them" (Islamic African Relief Agency)" two months ***after*** the Sudanese organization in Sudan was designated by continuing to directly fund the African. It cannot. There is simply no excuse to shut down one organization under the guise that there is an alleged "possible" relation to a terrorist organization (which was not known to be one before the designation) , while allowing another (UNICEF) to continue directly funding a known terrorist organization. How many other organizations have been treated differently? Again, clearly there are genuine issues of fact, and discovery is warranted to further bolster Plaintiff's equal protection claim.

---

with a box titled "director US Branch". That is it. No reference is made to Plaintiff or its actual director, Mubarek Hamed. There maybe many more such contracts or partnership agreement documents in OFAC's possession further bolstering Plaintiff's Equal Protection claim that can only be obtained through discovery.

Even for the sake of argument if Plaintiff may have had coordination of relief efforts in Africa in the past (such "partnership" arrangements being commonplace among humanitarian relief organizations), Defendants still have failed to produce a single document that Plaintiff dealt with any known terrorist organization. More significantly, Defendants have failed to produce any evidence of monies being transferred from Plaintiff to the African entity.

Morever, the unequal application of a law, fair on its face, may act as denial of equal protection. *Yick Wo v Hopkins*, 118 U.S. 356, 373-74 (1881); *Ziegler v Jackson*, 638 F.2d 776, 779 (CA 5, 1981). The Sudanese entity, IARA was designated a SDGT pursuant to Executive Order No. 13224 issued by President Bush under authority granted by the International Emergency Economic Power Act (IEEPA), 50 USC 1701-06. The IEEPA is "fair on its face," granting the President much needed authority to deal with extraordinary threats to "national security, foreign policy, or economy of the US if the President declares a national emergency with respect to such threat." (50 USC 1701) However, the unequal application of this law has resulted in a denial of equal protection for IARA-USA. Although UNICEF continued to do business with IARA after its designation as a SDGT, there was no application of this law to sanction it for its behavior. Still, Plaintiff is faced extreme sanctions of being shut down, while UNICEF continues to thrive. There is no question that there is a genuine issue of fact that Defendants have not applied the law equally, violating the Equal Protection clause. Defendants contend that the *Holy Land* court considered and rejected a similar equal protection argument made by a Muslim organization. (p. 50). However, *Holy Land* is distinguishable from the case at hand because there was no similarly situated organization, as UNICEF is in this case Further, it was Holy Land that was actually designated. In this case, the Sudanese entity and its officials were, and Plaintiff has been wrongly treated as an a/k/a. It is clearly

"arbitrary and capricious" for the government to suggest that since the Equal Protection argument for one Muslim charity (Holy Land) was defeated, the argument must fail for a similar Muslim organization, Plaintiff, even though there are facts present which distinguish the two situations.

The government may avoid violating equal protection principles if it can demonstrate that its reasons for treating an individual differently bear some rational relationship to a legitimate state purpose. *Brandon* v *District of Columbia People of Parole*, 734 F2d 56 (1984) (citing *Schweiker* v *Wilson*, 450 U.S. 221, 230 (1981). Again, in this case, it cannot. As Defendants stated, *"the blocking action against IARA-USA was rationally related to the legitimate governmental interest in shutting down those organizations that fund terrorism"* (p. 51). If that is the case then why was Plaintiff shut down, where, undisputedly, there is no evidence that Plaintiff funded terrorism, while there is solid uncontroverted evidence that UNICEF funded a terrorist organization.

**B. Fourth Amendment**

First of all, Defendants attempt to mislead the court by stating, somehow, that Plaintiff contests the removal of its property after it issued a letter to OFAC to have it removed, (p. 40). Plaintiff is not contesting that at all. What Plaintiff is contesting is the removal of its property at the time of the raid on October 13, 2004. Defendants, assert, that all OFAC do was change the locks and nothing more on that day. Plaintiff cannot confirm that without further discovery.

Also, this is a Rule 12 (b) motion. As such, this Honorable Court should rely on the allegations pled in Plaintiff's Complaint. *Sparrow*, supra. Plaintiff has alleged that the government's search of Plaintiff's offices and seizure of its assets was without probable cause, and violated its rights under the Fourth Amendment. Plaintiff has, also, alleged Defendants obtained a sealed search warrant under false pretenses, by intentionally misrepresenting that Plaintiff is the

same as the Islamic African Relief Agency, a completely separate, unrelated entity[16] and that it supports and funds terrorism, knowing this is false. Summary judgment is hardly appropriate when questions of intent are involved. *Atkins, supra*. Again, discovery is warranted for Plaintiff to prove the intent issue.

Defendant's argument that this Constitutional claim was raised before in *Holy Land* is meritless. Again, in *Holy Land*, it was *Holy Land* that was designated. Here, it was the Sudanese entity and its officials (**Exhibit H**). Plaintiff was bootstrapped as an a/k/a in violation of existing law as already discussed. Now, assuming that Plaintiff is a completely separate entity from the Sudanese entity, clearly, the physical entries into Plaintiff's offices in Columbia, Missouri, constituted "searches" that implicate the protections of the Fourth Amendment.[17] Similarly, the removal of Plaintiff's records, computers, and equipment and the blocking of Plaintiff's bank accounts and changing of the locks constituted "meaningful interference with Plaintiff's possessory interests in that property" and therefore amounted to "seizures" under the Fourth Amendment.[18]

The searches of Plaintiff's offices and the seizures of their contents plainly required either a warrant based on probable cause or an exception to the warrant requirement.[19] There was no probable cause that Plaintiff did anything wrong. The government acted solely under the authority

---

16

In its Complaint, Plaintiff also alleged civil liability for presenting false affidavit to the Magistrate to make a finding of probable cause to raid and seize assets of Plaintiff.

[17]*G.M. Leasing Corp. v United States,* 429 U.S. 338, 353-59 (1977).

18

*Soldal v Cook County*, 506 U.S. 56, 63 (1992) (quoting *United States v Jacobsen*, 466 U.S. 109, 113 (1984); *United States v Daccarett*, 6 F3d 37, 49 (2d Cir. 1993)

[19]*G.M. Leasing*, 429 US at 353-59.

of the OFAC blocking notice directed to the Sudanese entity. Again, assuming that Plaintiff is a completely separate entity from the Sudanese entity, clearly, and the Defendants knew that, or should have known, Defendants could not lawfully seize Plaintiff's bank accounts without either a warrant based on probable cause, or an exception to the warrant requirement.[20] Plaintiff needs discovery to establish this fact. Although the Supreme Court has held that the government may seize contraband in a public location without a warrant[21], the funds at issue are not contraband and were not located in a public place.

Plaintiff is not questioning the President's powers under IEEPA or TWEA to regulate financial transactions in the foreign policy and national security arena. Plaintiff rather questions the application of these powers by Defendants. Again, the evidence is void and lacking, based on the documents presented by Defendants, to merit any blocking of Plaintiffs assets pursuant to IEEPA and TWEA. Simply put, the powers bestowed by IEEPA and TWEA were misapplied. Defendants' actions were arbitrary and capricious for the reasons already stated above implicating the Fourth Amendment. In instances where IEEPA is not triggered, restraint of fund transfers have been held to constitute seizure. *United States v Daccarett*, 6 F3d 37, 49 (2d Cir. 1993) (restraint of electronic funds pending forfeiture trial constitutes Fourth Amendment seizure) *United States ex rel. Rahman v.Oncology Associates*, 198 F3d 489, 500 (4th Cir. 1999) (court analogizes seizure under Fed. R. Civ. P. 64 to Fourth Amendment and holds that court order "direct[ing] that assets be frozen pending further order" constitutes a seizure.

---

20

*Daccarett, supra*, 6 F3d at 49; *Application of Kingsley*, 614 F Supp 219, 223 (D. Mass. 1985), appeal dism'd, 802 F2d 571 (1st Cir. 1986).

21 *Florida v White*, 526 US 559 (1999).

## C. Plaintiff's Due Process Rights were Violated

Plaintiff is not the African entity, IARA. The Sudanese entity, or its officials are not before this Court to challenge their designation as an SDGT. Defendants' confiscation of Plaintiff's property without notice or an opportunity to be heard violated Plaintiff's Fifth Amendment right to due process.

"[T]he fundamental norm of due process clause jurisprudence requires that before the government can constitutionally deprive a person of the protected liberty or property interest, it must afford him notice and hearing".[22] No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."[23]

Defendants reliance on *Holy Land* and *Global Relief* with respect to their pre-deprivation notice arguments are totally inapplicable. Their premise is totally faulty. Both those cases involved the entities themselves being designated and those entities challenged such designation before a US court. In this case, we have a non-party that was designated, Islamic African Relief Agency in Sudan, which is NOT before this Court. In fact, if the African entity had challenged its designation, then Defendants reliance on those cases would be valid but it is not. The cases relied on by

---

22 *National Council of Resistance of Iran v Department of State*, 251 F3d 192, 205 (D.C. Cir. 2001). See also *Holyland Foundation for Relief and Development v Ashcroft*, 333 F3d 156, 163-164 (D.C. Cir. 2003), applying this to OFAC designations the same as at issue here.

23 *United States v James Daniel Good Real Property*, 510 US 43, 55 (1993), quoting *Joint Anti-Fascist Refugee Committee v McGrath*, 341 US 123, 170-72 (1951)(Frankfurter, Jr., concurring).

Defendants to support their Due Process arguments involve designated terrorist organizations. In this case, Defendants admitted they have no evidence that Plaintiff supported or funded terrorism.

Rather, here, we have Plaintiff being treated as an a/k/a, with no evidence whatsoever in the administrative record to (1) pierce its corporate veil under binding US law, as already discussed above to treat Plaintiff as one and the same as the Sudanese entity (2) that it was controlled or was influenced by the African entity (3) that it acted on behalf or directed the African entity or (4) that it funded or supported terrorism. Still, Plaintiff, a US Citizen, had its property confiscated, its liberty stripped and forced to closed down. Clearly, in this context, Plaintiff's due process rights were violated when it was not afforded notice and a hearing **before** it was deprived of its "protected liberty or property interest" *Department of State*, supra, precluding a ruling in favor of Defendants. At a minimum, there are genuine issues of fact that Defendants violated Plaintiff's Due Process rights by confiscating Plaintiff's property under the false pretense that Plaintiff was the African entity.

## D. <u>Plaintiff's First Amendment Freedom of Speech And Association Rights Were Violated</u>

### 1. Freedom Of Speech

By shutting down Plaintiff, and prohibiting it from making humanitarian contributions, Plaintiff's First Amendment rights to freedom of speech were implicated[24]. The Supreme Court has

---

[24] See *Optimist Club of North Raleigh v Riley*, 563 F Supp 847, 849-50 (E.D.N.C. 1982) (total ban on charitable solicitations by telephone violates First Amendment less restrictive means available to further state's interest in preventing fraud).

repeatedly held that contributions of money "fall within the First Amendment's protection of speech".[25] The symbolic act of contributing is a First amendment right."[26]

Because E.O. 13224 and the OFAC blocking order completely prohibit Plaintiff from making contributions, those actions entirely suppress the "symbolic act of contributing" and thus require a more compelling and narrowly drawn justification than the contribution limits at issue in *Buckley* and *Shrink Missouri*.[27] As the Supreme Court has observed, "[P]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms".[28] Such "precision" is utterly lacking here; E.O. 13224 and the OFAC blocking order "cast [their] net across a broad range of associational activities, indiscriminately trapping [contributions] which can be constitutionally punished and [contributions] which cannot be so proscribed." *Id.* at 265-66. Again, for the reasons discussed above, at a minimum, there are genuine issues of fact on the disparate treatment of Plaintiff and other organizations in restricting their First Amendment rights.

**2. Freedom Of Association**.

---

25

*FEC v Colorado Republican Federal Campaign Committee*, 533 US 431, 440 (2001); *see e.g., Buckley v Valeo*, 424 US 1, 14 (1976)(per curium)(noting that restrictions on political contributions and expenditures "operate in an area of the most fundamental First Amendment activities").

26

424 US at 21; *Nixon v Shrink Missouri Government PAC*, 528 US 377, 386-88 (2000).

[27]Defendants attempt to differentiate between political contribution and donations. This is a distinction without a difference for the principle that prohibiting the "symbolic act of contributing" is alone a First Amendment violation.

[28] *United States v Robel*, 389 US 258, 265 (1967)(quotation omitted).

The Supreme Court has held that "[t]he First Amendment protects political association as well as political expression."[29] "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly."[30] "Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associates is subject to the closest scrutiny."[31]

The Court has recognized that contributions of money may represent protected associational activity: "Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals."[32]

E.O. 13224 and the OFAC blocking order completely prohibit Plaintiff from making contributions, and thus bar Plaintiff from engaging in a critical form of associational activity. The Supreme Court has repeatedly "disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization."[33] In such a case, "[t]he government has the burden of establishing a knowing

---

[29]*Buckley,* 424 US at 15.

[30]*NAACP v Alabama ex rel. Patterson,* 357 US 449, 460 (1958); see *NAACP v Button,* 371 US 415, 429-38 (1963).

[31]*Alabama,* 357 US at 460-61.

[32]*Buckley,* 424 US at 22.

[33]*Healy v James,* 408 US 169, 185-86 (1972).

affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims."[34] The Court has explained that "this intent must be judged 'according to the strictest law,' for 'otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.'"[35]

*Claiborne Hardware* illustrates this principle. In that case, business owners in Mississippi sued the NAACP and its members for business losses allegedly suffered during an NAACP-led boycott. The boycott involved protected activities - including, for example, picketing, demonstrating, and marching.[36] But the boycott also involved acts of violence, which, the Court made clear, the First Amendment does not protect. [37] Although the Court acknowledged that NAACP members who "engaged in violence or threats of violence" could be held liable for "the injuries that they caused"[38], it refused to extend liability to members who did not perpetrate the violence absent proof of "a specific intent to further an unlawful aim embraced by that group".[39]

---

[34]*Id.* at 186 (emphasis added); *Elfbrandt v Russell*, 384 US 11, 15-16 (1966) (striking down Arizona statute that punished knowing association with organization which had as one of its purposes the violent overthrow of the government, without requiring proof that the defendant specifically intended to further the unlawful goals of the organization).

[35]*NAACP v Claiborne Hardware Co.*, 458 US 886, 919 (1982) (quoting *Noto v United States*, 367 US 290, 299-300 (1961).

[36]*Id.* at 903, 907-10.

[37]*Id.* at 916.

[38]*Id.* at 926.

[39]*Id.* at 925.

The United States District Court for the Northern District of Illinois applied the principles of *Claiborne Hardware* to a civil suit brought against Holy Land Foundation and other American organizations that allegedly contributed funds to Hamas.[40] The suit sought damages for Hamas' killing of an American. In support of a motion to dismiss, an amicus argued that the complaint did not adequately allege that the defendants specifically intended to carry out Hamas' unlawful (as opposed to its lawful) purposes. The court agreed with the legal principle on which amicus relied: "As the Coalition points out, the Supreme Court has held that neither civil nor criminal liability may be imposed when support is provided to a political organization, such as Hamas, that is engaged in a wide range of both lawful and unlawful activities, in the absence of a showing of specific intent to further the organization's unlawful ends."[41] The Court found, however, that Plaintiffs had sufficiently alleged such an intent in their complaint, and denied the motion to dismiss.

Under *Claiborne Hardware, Boim* and the other cases cited above, seizure of Plaintiff's assets violate its First Amendment right to freedom of association. At a minimum, as discussed above, there are genuine issues of fact on the disparate treatment of Plaintiff's rights to association in comparison to other organizations.

## V. DEFENDANTS VIOLATED IEEPA

Paragraph 2(C) of the APA prohibits an agency of exceeding its statutory authority. Plaintiff maintains that the Department of State exceeded its authority when it blocked its property. Under the International Emergency Economic Powers Act (IEEPA),the President may:

---

[40]*Boim v Quranic Literacy Institute*, 127 F Supp 2d 1002, 1020 (N.D. Ill. 2001).

[41]*Id.* (emphasis in original) (citing *Claiborne Hardware*, 458 US at 920).

> investigate blocks during the pendency of an investigation...any property in which any foreign country or national thereof has any interest by any person, or with any respect to any property subject to the jurisdiction of the United States. 15 USC 1702(a)(1)(B).

15 USC 1701(a) states:

> Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its sources in whole or substantial part outside the United States, to the national security...

Executive actions that go beyond statutory authority are invalid.[42]

In this instance, and for the reasons stated above, there is no evidence whatsoever that Plaintiff engaged in any act which could possibly be deemed as an "unusual and extraordinary threat" to the United States. There is no evidence that Plaintiff supported or funded terrorism. Further, there is no that any entity had any influence on Plaintiff. Defendants exceeded their authority by blocking Plaintiff's funds when it is not in any manner a threat to the United States. In fact, since its inception in 1985, Plaintiff has been a partner with the United States to combat famine in impoverished nations. Plaintiff, as an American organization, was consistently demonstrating America's generosity to combat famine and provide humanitarian relief to the impoverished. This drastic step is against public policy and national security interests, as it stifles Plaintiff's ability to combat a horrific famine problem. Now the real terrorist can prey on the poor, who have no other means for survival. Please see **Exhibit F** which includes several letters sent by hunger-stricken children in Kenya to Plaintiff's counsel pleading for intervention to open up Plaintiff and resume the life line supply to these children, and were now they are left to scavenge for food.

---

[42] *Little v Barreme*, 6 US 170 (1804).

Wherefore for the reasons discussed above, Plaintiff request this Honorable Court deny Defendants' Motion to Dismiss and Motion for Summary Judgment. Plaintiff has adequately stated a cause of action in its pleadings sufficient to preclude a dismissal of this case. Also, there are genuine issues of material fact, without even any discovery being conducted, to precluded summary judgment. Plaintiff further requests discovery to further bolster its claim of Defendants' violation of 2(A), 2(B), 2(C), 2(E) and 2(F) of the Administrative Procedure Act.

Respectfully submitted,

AKEEL & VALENTINE, PLC

By: /S/ Shereef H. Akeel
Admitted Pro Hac Vice
Attorneys for Plaintiff
401 S. Old Woodward Avenue, Ste. 430
Birmingham, MI 48009
(248) 594-9595

G:\G - L\iara-usa\Pleadings\04_cv_02264 Answer To Defendants Motion To Dismiss.wpd