**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
ISLAMIC AMERICAN RELIEF AGENCY,)
                                                    )
    Plaintiff,              )
                                                    )
    v.                    )      Civil Action No. 04-2264 (RBW)
                                                    )
UNIDENTIFIED FBI AGENTS, et al., )
                                                    )
    Defendants.       )
_____)

## MEMORANDUM OPINION[1]

On December 30, 2004, the plaintiff commenced this action claiming violations by the

defendants of the First, Fourth and Fifth Amendment to the United States Constitution, the

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq. (2000), and

the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. (2003).   Complaint

("Compl.") ¶ 1.  On that same day, the plaintiff filed a motion for a preliminary injunction, which

this Court denied on February 18, 2005.  February 18, 2005 Order.  Currently before the Court is

(1) the Defendants' Motion to Dismiss and for Summary Judgment[2] and (2) Defendant Paul

Schlup's Motion to Dismiss.[3]   For the reasons set forth below, the Court grants both motions.[4]

---

[1]  The contents of this memorandum opinion contains only information that is already in the public domain, i.e., the plaintiff's complaint, the defendants' unclassified papers, and the unclassified administrative record.

[2]   The following papers have been submitted to the Court in connection with this motion:  (1) Memorandum in Support of Defendants' Motion to Dismiss and for Summary Judgment ("Defs.' Mem."); (2) Plaintiff's Answer to Defendants' Motion to Dismiss and for Summary Judgment ("Pl.'s Opp'n"); and (3) Reply in Support of Defendants' Motion to Dismiss and for Summary Judgment ("Defs.' Reply").

[3]  The following papers have been submitted to the Court in connection with this motion: (1) Memorandum of Points and Authorities in Support of Defendant Paul Schlup's Motion to Dismiss ("Schlup's Mem."); (2) the

(continued...)

1

# I.   Background

## (A)   Factual Background

The Islamic African Relief Agency, now the Islamic American Relief Agency ("IARA-USA"), based in Columbia, Missouri, was established in 1985 as a nonprofit humanitarian relief organization under section 501(c)(3) of the United States Internal Revenue Code.  Complaint ("Compl.") ¶ 8; Pl.'s Opp'n at 6.  Specifically, the IARA-USA has "provided charitable and humanitarian aid to refugees, orphans, victims of human and natural disasters, and other poor and needy persons and entities throughout the world, without regard to faith or political affiliation." Compl. ¶ 9.  At the time the IARA-USA was incorporated in the United States, an organization based in Sudan also existed under the name Islamic African Relief Agency ("IARA").[5]  Pl.'s Opp'n at 6.  The plaintiff posits that the two organizations are completely separate entities and are in no way related.  Compl. ¶¶ 12, 28.  In 2000, the IARA-USA began expanding and providing humanitarian relief to other countries outside of the African continent.  Pl.'s Opp'n at

---

[3](...continued)
Plaintiff's Answer to Defendant Paul Schlup's Motion to Dismiss ("Pl.'s Opp'n to Schlup's Mot."); and (3) Reply in Support of Defendant Paul Schlup's Motion to Dismiss ("Schlup's Reply").

[4]  Also before the Court is the Plaintiff's Motion for Reconsideration and to Amend Judgment.  This motion is directed at the Court's Order issued in response to the plaintiff's motion for a preliminary injunction.  Because this Court concludes that the defendants are entitled to summary judgment or dismissal of all the plaintiff's claims, the plaintiff's motion for reconsideration must be denied.  In addition, the plaintiff has filed a Motion to Compel Defendants to Pay Attorney Fees ("Pl.'s Mot.").  This motion challenges the decision of the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), denying the plaintiff access to blocked funds to pay its attorney's fees.  Pl.'s Mot. at 2-3.  The plaintiff's motion requires little discussion.  The plaintiff concedes that its complaint lacks any facts or claims to support this allegation as this decision to deny access to the blocked funds occurred following the filing of the present action.  Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion to Compel Payment of Attorney's Fees at 1.  As such, this claim is not properly before the Court and must be denied.  See Johnson v. DiMario, 14 F. Supp. 2d 107, 111 (D.D.C. 1998) (noting that a new claim must be asserted in an amended complaint pursuant to Federal Rule of Civil Procedure 15).

[5]  The Court will refer to the United States entity as "IARA-USA," and the Sudan-based organization as "IARA."

7.  Thus, to reflect its broader mission, the plaintiff changed its name to the Islamic American

Relief Agency ("IARA-USA").  Id.

On October 13, 2004, pursuant to Global Terrorism Executive Order No. 13,224, and the

IEEPA, the United States Department of the Treasury, Office of Foreign Assets Control

("OFAC"), designated the IARA, including the IARA-USA, as a Specially Designated Global

Terrorist ("SDGT"), and blocked the assets of the IARA, along with the assets of five of its

senior officials.[6]  Compl. ¶¶ 23-26; Compl., Ex. A; Pl.'s Opp'n at 11.  The designation was based

on evidence, both classified and unclassified, that purportedly demonstrated that the IARA

"assist[s] in, sponsor[s], or provide[s] financial, material, or technological support for, or

financial or other services to or in support of, such acts of terrorism  . . . ."  Exec. Order. 13,224,

§ 1(d)(i), 66 Fed. Reg. 49,079, at 49,080 (Sept. 23, 2001).  Based upon the blocking notice

against the IARA, the property of the IARA-USA was also blocked and its bank accounts frozen.

Compl. ¶ 29. The OFAC blocking notice stated that the IARA-USA could challenge the blocking

order by writing a letter to the Director of the OFAC.  Compl., Ex. A at 2.  In addition to the

blocking notice, the plaintiff posits that the defendants illegally obtained a sealed search warrant,

and seized and removed property from the IARA-USA office in Columbia, Missouri. Compl. ¶¶

31-32.

On December 30, 2004, the plaintiff filed this action challenging the OFAC's decision to

block its assets.  In particular, the plaintiff brings this action against John Snow, Secretary of the

---

[6]  Specifically, those officials were: Dr. Mohammed Ibrahim Sulaiman, Jaffar Ahmad, Abdullah Makki, Abdul Aziz Abba Karmuhamad, Khalid Ahmed Jumah Al-Sudani, and Abrahim Buisir.  Compl. ¶ 26 & Ex. B.

Treasury and Alberto Gonzales, Attorney General of the United States,[7] in their official

capacities, and various unidentified Federal Bureau of Investigation ("FBI") Agents, Paul Schlup,

a Special Agent with the Internal Revenue Service, and other unidentified Department of the

Treasury employees both in their individual and official capacities.  Compl. ¶¶ 13-21.  The

plaintiff's complaint asserts nine separate counts against the various defendants.  Specifically, the

plaintiff alleges violations of the APA, the First, Fourth and Fifth Amendments to the United

States Constitution, Civil Liability for False Affidavit, and violations of 42 U.S.C. § 1985(3).

Compl. ¶¶ 45-101.  Moreover, the plaintiff seeks monetary damages pursuant to <u>Bivens v. Six</u>

<u>Unknown Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971) against the individual

defendants.

**(B)      Statutory and Regulatory Background**

     (1)      <u>International Emergency Economic Powers Act ("IEEPA")</u>

     Through much of the Twentieth century, the United States utilized economic sanctions as

a tool of foreign policy pursuant to the Trading With the Enemy Act ("TWEA").  Passed in 1917,

and amended in 1933, the TWEA granted the President "broad authority" to "investigate,

regulate, . . . prevent or prohibit . . . transactions" in times of war or declared national

emergencies.  50 U.S.C. app. § 5(b).  In 1977, through the passage of the IEEPA, Congress

further amended the TWEA.  The IEEPA delineates "the President's authority to regulate

international economic transactions during wars or national emergencies."  S. Rep. No. 95-466 at

2.  The IEEPA limited the TWEA's application to periods of declared wars and to certain

---

[7] Pursuant to Fed. R. Civ. P. 25, the Court has substituted Alberto Gonzales, the current Attorney General, as the proper defendant, for John Ashcroft, who was the Attorney General when this action was filed.

existing TWEA programs, while the IEEPA was applicable during other times of declared

national emergencies.  See Regan v. Wald, 468 U.S. 222, 227-28 (1984).  Under the IEEPA, the

President can declare a national emergency "to deal with any unusual and extraordinary threat,

which has its source in whole or substantial part outside the United States, to the national

security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).   The IEEPA

authorizes the President to

> investigate, block during the pendency of an investigation, regulate, direct and compel,
> nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer,
> withdrawal, transportation, importation or exportation of, or dealing in, or exercising
> any right, power, or privilege with respect to, or transactions involving, any property in
> which any foreign country or a national thereof has any interest by any person, or with
> respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702(a)(1)(B).[8]  However, the IEEPA specifically prohibits the President from

regulating or prohibiting directly or indirectly "donations, by persons subject to the jurisdiction

of the United States, of articles such as food, clothing, and medicine . . . except to the extent that

the President determines that such donations . . .  would seriously impair his ability to deal with

any national emergency . . . ." 50 U.S.C. § 1702(b)(2).

    (2)    Executive Order No. 13,224

Following the September 11, 2001 terrorist attacks on the United States, President Bush,

on September 23, 2001, issued Executive Order 13,224, declaring a national emergency with

respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further

---

[8] In October 2001, Congress passed the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), which amended the IEEPA.  These amendments added, among other things, authority to block assets pending an investigation, and provided that, in case of judicial review of an IEEPA blocking order, an agency record containing classified information "may be submitted to the reviewing court ex parte and in camera."  50 U.S.C. § 1702(c) (emphasis added).  Pursuant to this provision, this Court has reviewed the classified portions of the agency record in this case.

attacks on United States nationals or the United States."  Exec. Order. 13,224, 66 Fed. Reg.
49,079, at 49,079 (Sept. 23, 2001).  Through this Executive Order, President Bush invoked the
authority granted to him under the IEEPA, id. § 1, and blocked all property and interests in
property of twenty-seven foreign terrorist, terrorist organizations, and their supporters, each
which were designated as SDGTs, id., annex.

    The Executive Order authorizes the Secretary of the Treasury, in consultation with the
Secretary of State and the Attorney General, to designate additional SDGTs whose property or
interests in property should be blocked because they "act for or on behalf of" or are "owned or
controlled by" designated terrorists, or because they "assist in, sponsor, or provide . . . support
for," or are "otherwise associated" with them.  Id. § 1(c)-(d).  Moreover, the Executive Order
also authorizes the Secretary of Treasury to "employ all powers granted to the President by
IEEPA and [the United National Participation Act ("UNPA")]" and to promulgate rules and
regulations to carry out the purposes of the Order and to re-delegate such functions if he chose to
do so.  Id. § 7, 66 Fed. Reg. at 49,081.  Moreover, the Executive Order states:

> because of the ability to transfer funds or assets instantaneously, prior notice to such
> persons of measures to be taken pursuant to this order would render these measures
> ineffectual.  I therefore determine that for these measures to be effective in addressing the
> national emergency declared in this order, there need be no prior notice of a listing or
> determination made pursuant to this order.

Id. § 10.  In addition, section 4 of the Executive Order states that "the making of donations of the
type specified in section 203(b)(2) of IEEPA (50 U.S.C. § 1702(b)(2)) . . . would seriously impair
my ability to deal with the national emergency declared in this order . . . and [therefore the
President] . . . prohibit[s] such donations . . . ."  Id. § 4, 66 Fed. Reg. at 49,080.

(3)     Executive Order 13,372

On February 16, 2005, President Bush issued Executive Order 13,372.  This Executive

Order amended Executive Order 13,224 to make clear that the IEEPA's humanitarian aid

exception does not authorize entities blocked pursuant to Executive Order 13,324 to donate

humanitarian aid articles to anyone, even unblocked persons, without prior authorization from

the OFAC.  Exec. Order No. 13,372, 70 Fed. Reg. 8499 (Feb. 16, 2005).  Specifically, Executive

Order 13,372 states:

> I hereby determine that the making of donations of the type of articles specified in section
> 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)), by, to, or for the benefit of, any persons
> determined to be subject to this order would seriously impair my ability to deal with the
> national emergency declared in this order, and would endanger Armed Forces of the
> United States that are in a situation where imminent involvement in hostilities is clearly
> indicated by the circumstances, and I hereby prohibit such donations as provided by
> section 1 of this order.

Id. § 1

(4)     Regulations

The OFAC has, pursuant to a delegation of authority by the Secretary of the Treasury,

promulgated recordkeeping and procedural regulations applicable to their various sanctions

programs.  See, e.g., 50 C.F.R. pt. 500.  These regulations permit a designated or blocked

individual or entity to seek a license from the OFAC to engage in any transaction involving

blocked property.  31 C.F.R. § 501.801-802.  In addition, the regulations establish a procedure to

allow a person to "seek administrative reconsideration" of a designation or blocking if a party

believes an error has been made.  Id. § 501.806- 807.  Specifically, an applicant seeking

administrative reconsideration is permitted to submit materials to contest the designation, and the

OFAC may request additional materials from the applicant in assessing the request for

reconsideration.  Id.

## II.   The Defendants' Summary Judgment and Dismissal Motion

**(A)   Standards of Review**

On a motion to dismiss for failure to state a claim upon which relief can be granted

pursuant to Rule 12(b)(6), this Court must construe the allegations and facts in the complaint in

the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences

that can be derived from the facts alleged.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Barr v.

Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Communications Corp., 16

F.3d 1271, 1276 (D.C. Cir. 1994)).  However, the Court need not accept asserted inferences or

conclusory allegations that are unsupported by the facts set forth in the complaint.  Kowal, 16

F.3d at 1276.  In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only

consider the facts alleged in the complaint, documents attached as exhibits or incorporated by

reference into the complaint, and matters about which the Court may take judicial notice.  St.

Francis, 117 F.3d at 624-25.  The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the

defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief."  Conley, 355 U.S. at 45-46.

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings,

depositions, answers to interrogatories and admissions on file, together with the affidavits or

declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on

a motion for summary judgment, this Court must view the evidence in the light most favorable to

the non-moving party.  Bayer v. United States Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir.

1992).  However, the non-moving party cannot rely on "mere allegations or denials . . . , but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted).  Under Rule 56, "if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial" summary judgment is warranted.  Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  The party moving for summary judgment bears the burden of establishing the absence of evidence to support the non-moving party's case.  Id.  In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).[9]

**(B)      Legal Analysis**

The plaintiff's principal claim in this action is that the OFAC's designation of the IARA-USA as an SDGT and the blocking of its assets, amount to violations of the APA, namely, 5 U.S.C. § 706(2).  Pl.'s Opp'n at 18.  Under this provision of the APA, this Court may vacate a decision by an agency only if the decision is:

---

[9]  The vast majority of the plaintiff's claims will be dismissed pursuant to Rule 12(b)(6).  However, as discussed later in this opinion, the Court has looked beyond the complaint with regards to the plaintiff's First and Fifth Amendment claims, and accordingly, the Court will review those claims under the summary judgment standard.  See Fed. R. Civ. P. 12(b).  Although no discovery has taken place, it is appropriate for this Court to look beyond the complaint and resolve these claims under Rule 56(c), as the plaintiff has had ample opportunity to come forward with, and indeed has provided this Court with, a substantial number of exhibits and declarations to support its positions. Moreover, for several reasons, this Court must conclude that no further discovery is warranted.  First, the plaintiff's principal claim is an APA challenge to the OFAC decision.  As such, that challenge is limited to a review of the administrative record.  Camp v. Pitts, 411 U.S. 138, 142 (1973) (under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").  Moreover, based upon the papers and exhibits currently before the Court, discovery would not produce any evidence that could create a genuine factual dispute, which would be necessary to alter this Court's rulings.

| (A) | arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; |
| (B) | contrary to constitutional right, power, privilege, or immunity; [10] |
| (C) | in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; |
| (D) | without observance of procedure required by law; [11] |
| (E) | unsupported by substantial evidence . . . ; or |
| (F) | unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. |

5 U.S.C. § 706(2)(A).  The plaintiff claims that the defendants' actions should be vacated under each of the above provisions.  Pl.'s Opp'n at 18.  The Court will address each in turn.

(1)     Are the Defendants' Actions Arbitrary and Capricious, Supported by Substantial Evidence, and Warranted by the Facts?

Under the arbitrary and capricious standard, the Court does not undertake its own fact-finding, rather, the Court must review the administrative record as assembled by the agency. Camp v. Pitts, 411 U.S. 141, 142 (1973).  This review is highly deferential to the agency.  See Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 162 (D.C. Cir. 2003).  And "there is a presumption in favor of the validity of [the] administrative action."  Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 216 (D.D.C. 1996).   If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the [decision] is reasonable and must be upheld." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 521 (D.C. Cir. 1983)

---

[10]  In addition to claiming that the OFAC's actions violate various constitutional principals, and thus should be vacated pursuant to the APA, the plaintiff's complaint lists separately various alleged constitutional violations. Compl. ¶¶ 45-78.  However, the claims are identical.  Because this Court finds that the OFAC's actions do not contravene the Constitution, and thus are not violative of the APA, the constitutional claims, for the reasons stated herein, must fail as well.

[11]  Despite claiming that the defendants' actions were contrary to established procedures, Pl.'s Opp'n at 18, the plaintiff presents no such argument in his papers submitted to the Court.  Thus, this claims will not be addressed.

(citation omitted).  Thus, the Court "must consider whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment."

Citizen to Pres. Overton Park, 401 U.S. at 416.  Moreover, in reviewing agency decisions

regarding foreign relations, the Court is mindful that "[m]atters related 'to the conduct of foreign

relations . . . are so exclusively entrusted to the political branches of government as to be largely

immune from judicial inquiry or inference.'" Regan, 468 U.S. at 242 (quoting Harisiades v.

Shaughnessy, 342 U.S. 580, 589 (1952)).  Thus, "[a]s a general principal, . . . this Court should

avoid impairment of decisions made by the Congress or the President in matters involving

foreign affairs or national security."  Global Relief Found. v. O'Neil, 207 F. Supp. 2d 779, 788

(N.D. Ill. 2002) (citing Haig v. Agee, 453 U.S. 280, 292 (1981)).

      The plaintiff contends that the administrative record lacks any evidence demonstrating

that the plaintiff has funded terrorist activities or that the plaintiff knowingly interacted with a

known terrorist or terrorist organization prior to its designation by the IARA as an SDGT.  Pl.'s

Opp'n at 18-19.  Moreover, the plaintiff contends that the District of Columbia Circuit's decision

in Holy Land Found., 333 F.3d at 156, requires the conclusion that the OFAC's decision should

be vacated because it lacks substantial evidence in the record.  Pl.'s Opp'n at 20-21.  In

particular, the plaintiff relies heavily on their claim that the IARA and the IARA-USA are

completely separate entities that are in no way related, or controlled by the other.  Id. at 22-30.

      This Court recognizes that the plaintiff is at an inherent disadvantage as it is not able to

review and analyze the administrative record in its entirety, but rather is limited only to those

portions of the administrative record that are not classified.  This Court, however, has before it

both the classified and unclassified administrative record.  Although the Court cannot disclose

the evidence which the defendants contend support its decision to block the assets of the IARA-USA, upon careful review of the entire record before it, and affording the defendants the substantial deference they are due under the APA, this Court must conclude that the agency's decision to block the IARA-USA's assets was not arbitrary and capricious, but is in fact supported by substantial evidence in the record and warranted by the facts contained therein.[12]  In fact, contrary to the plaintiff's argument, this Court must conclude that there is substantial evidence in the record to support the defendants' conclusion that the IARA-USA is related and connected to the IARA.  Accordingly, the defendants are entitled to summary judgment on this portion of the plaintiff's APA claim.

      (2)    Did the Defendants' Actions Exceed their Statutory Authority?

     The power vested in the President pursuant to the IEEPA "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701.  Based on the authorization of this statutory provision, the plaintiff posits that the defendants' decision to block the IARA-USA's assets violated the APA because the OFAC exceeded its statutory authority.  Pl.'s Opp'n at 43-44.  Specifically, the plaintiff argues that there is no evidence of an

---

[12]  Because the Court relies heavily on portions of the classified administrative record, and viewed the administrative record as a whole in making its decision, the Court's analysis would be incomplete if it detailed only those portions of the unclassified administrative record that supports its decision.  Thus, this Court will not delineate the facts in the unclassified administrative record that supports this ruling, as doing so would provide an incomplete and fragmented view of this Court's reasoning.  See, e.g., Edmonds v. Dep't of Justice, 323 F. Supp. 2d 65, 68 n.3 (D.D.C. 2004), aff'd No. 04-5386 (D.C. Cir. July 5, 2005).  Moreover, because the Circuit Court will have to review this decision de novo if it is appealed, this Court's analysis of the administrative record will not be central to the resolution of any such appeal.  See Pharm. Research and Mfrs. Am. v. Thompson, 362 F.3d 817, (D.C. Cir. 2004) ("We review the district court's grant of summary judgment de novo pursuant to the [APA]").

"unusual and extraordinary threat" to the United States to warrant the blocking of the IARA-USA's assets, as there is no evidence that the plaintiff engaged in or supported terrorist activities. Id. at 44.

Contrary to the plaintiff's argument, however, 50 U.S.C. § 1701 does not form the basis for challenging an individual designation. Rather, this provision sets forth the requirement that the President declare a national emergency with respect to such "unusual and extraordinary threats" in order to invoke the provisions of the IEEPA. Once this finding has been made, then the provisions of the IEEPA can be invoked and the assets blocked of organizations designated as SDGTs. Thus, any challenge based on 50 U.S.C. § 1701 must be to the President's determination that an "unusual and extraordinary threat" exists, i.e., the legality of the Executive Order. No such challenge is made here, nor could it successfully be made. The President specifically found the existence of "grave acts of terrorism and threats of terrorism committed by foreign terrorists, . . . and the continuing and immediate threat of further attacks on United States nationals or the United States [that] constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States . . . ." Exec. Order. 13,224, 66 Fed. Reg. 49,079, at 49,079 (Sept. 23, 2001). Thus, by finding that an unusual and extraordinary threat exists, and by declaring a national emergency, the President employed 50 U.S.C. § 1701 to invoke the provisions of the IEEPA. And following the September 11, 2001 attacks, there was clearly a basis for the President's finding of an unusual and extraordinary threat, and this finding comports with the requirements of 50 U.S.C. § 1701. Accordingly, the President properly exercised the powers granted to him under the IEEPA.

Nonetheless, even if this Court could conclude that 50 U.S.C.§ 1701 provides a basis to

challenge an individual organization's designation, the plaintiff's claim would still have to be rejected.  First, Executive Order 13,224 clearly designates the procedures for designating organizations as SDGTs.  Exec. Order. 13,224 §§ 5-7, 66 Fed. Reg. 49,079, at 49,081 (Sept. 23, 2001).  Moreover, this Court has already concluded that the defendants had a reasonable basis for blocking the IARA-USA's assets.  Thus, there was a sufficient basis for the conclusion that the IARA-USA's actions posed an "unusual and extraordinary" threat to the United States.  Accordingly, there is simply no basis for the plaintiff's claim that the OFAC exceeded its statutory authority.[13]  Accordingly, this claim must be dismissed under Rule 12(b)(6), as the plaintiff has failed to state a claim upon which relief can be granted.

    (3)    <u>Were the Plaintiff's Constitutional Rights Violated?</u>

    (a)    <u>The Plaintiff's Fourth Amendment Claim</u>

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the

---

[13]   During the preliminary injunction hearing, the plaintiff also posited that the defendants exceeded their statutory authority by blocking its assets because the aid provided by the IARA-USA fell under the humanitarian aid exception of the IEEPA, 50 U.S.C. § 1702(b).  Defs.' Mem. at 31.  The defendants again argue that the plaintiff's position has no merit.  In the plaintiff's opposition, however, the plaintiff makes no argument to the contrary.  Accordingly, this Court will treat this argument as conceded by the plaintiff.  <u>FDIC v. Bender</u>, 127 F.3d 58, 67-68 (D.C. Cir. 1997); <u>Stephenson v. Cox</u>, 233 F. Supp. 2d 119, 121 (D.D.C. 2002).  However, even if such a claim was now being made, it is clear that the humanitarian aid exception would not apply in this case.  First, 50 U.S.C. § 1702(b) does not, on its face, apply to monetary contributions, but rather is limited to the donation of "articles such as food, clothing, and medicine."  50 U.S.C. § 1702(b)(2); <u>Holy Land Found. for Relief and Dev. v. Ashcroft.</u>, 219 F. Supp. 2d 57, 68 (D.D.C. 2002).  Moreover, the humanitarian aid exception has an exception itself.  Specifically, it states that the exception applies "except to the extent that the President determines that such donations . . .  would seriously impair his ability to deal with any national emergency declared under section 1701 of this title . . . ."  50 U.S.C. § 1702(b).  Section 4 of Executive Order 13,224 as originally enacted, and as amended by Executive Order 13,372, specifically invokes this exception to the humanitarian aid exception.  Exec. Order 13,224 § 4, 66 Fed. Reg. 49,079 (Sept. 23, 2001); <u>see also</u> Exec. Order 13,372 § 1, 70 Fed. Reg. 8499 (Feb. 16, 2005).  Accordingly, the humanitarian aid exception would not apply even if it was now being advanced by the plaintiff.

place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The plaintiff contends that the defendants searched its offices and seized its assets without a warrant or an exception to the warrant requirement in violation of the Fourth Amendment.  Compl. ¶¶ 52-57; Pl.'s Opp'n at 36-37.  The plaintiff specifically is challenging "the removal of its property at the time of the raid."  Pl.'s Opp'n at 35.  Moreover, the plaintiff alleges that the defendants obtained a search warrant under false pretenses.  Id.  It appears that the plaintiff is raising two distinct Fourth Amendment claims.  First, whether the criminal search warrant that was issued and executed was valid, and second, whether the OFAC properly blocked the IARA-USA's assets.

To the extent that the plaintiff's Fourth Amendment claim seeks to challenge the validity of the search warrant, this aspect of the claim must be dismissed.  The search warrant was issued by the United States District Court for the Western District of Missouri.  Federal Rule of Criminal Procedure 41(g) states that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return.  The motion must be filed in the district where the property was seized."  Fed. R. Crim. P. 41(g).  Consistent with the language of the rule, the District of Columbia Circuit has held such a challenge to the validity of a search warrant must be brought in the district in which the seizure took place.  See Smith v. Katzenbach, 351 F.2d 810, 814 (D.C Cir. 1965);[14] see also In re Grand Jury Proceedings, 115

_____

[14] Rule 41(g) was originally part of Rule 41(e), and that is how the rule was constructed when the Circuit Court issued its ruling in Smith.  Under that earlier version of the rule, a party could seek the return of property or suppression of its use as evidence in the district where the property was seized.  See Smith, 351 F.2d at 814.  The rule also provided that the suppression motion could be made in the district where the trial is to be held.  Id.  This rule was amended in 1972, 1989, and 2002, with one result being part of Rule 41(g) becoming Rule 41(h).  See Fed. R. Crim. P. 41, amend.  Under the current version of the Rule, a motion seeking return of property is only proper in the district where the property was seized.  Fed. R. Crim. P. 41(g).  On the other hand, Rule 41(h) provides that a motion

(continued...)

F.3d 1240, 1245 (5th Cir. 1997).  Accordingly, to the extent that the plaintiff challenges the validity of the search warrant, this claim must be brought in the district in which the property was seized—the Western District of Missouri.[15]  Accordingly, this claim must fail.

Moreover, to the extent the plaintiff is alleging that the OFAC's blocking of its assets violates the Fourth Amendment, this claim must fail as well.  As another member of this Court noted in Holy Land Found., "[t]he Government plainly had the authority to issue the blocking order pursuant to the IEEPA and the Executive Orders and the Court has determined that its actions were not arbitrary and capricious.  Further, the case law is clear that a blocking of this nature does not constitute a seizure."  Holy Land Found. for Relief and Dev. v. Ashcroft., 219 F. Supp. 2d 57, 78-79 (D.D.C. 2002) (citing Tran Qui Than v. Regan, 658 F.2d 1296, 1301 (9th Cir. 1981); D.C. Precision Inc. v. United States, 73 F. Supp. 2d 338, 343 n.1. (S.D.N.Y. 1999); Can v. United States, 820 F. Supp. 106, 109 (S.D.N.Y. 1993)).  Accordingly, this Court agrees that the OFAC's blocking of the IARA-USA's assets does not create a cognizable claim under the Fourth Amendment.  Thus, the defendants are entitled to dismissal of the plaintiff's Fourth Amendment claim.[16]

---

[14](...continued)
to suppress can be brought only in the district where the trial will occur.  Fed. R. Crim. P. 41(h).  In this case, the plaintiff is seeking the return of its property.

[15]  The defendants make this argument in their dismissal motion, but the plaintiff makes no attempt in its opposition to challenge this argument.  Accordingly, it appears that the plaintiff concedes that this Court is not the proper forum to challenge the legality of the search warrant.  FDIC, 127 F.3d at 67-68.  Moreover, count seven of the plaintiff's complaint, alleging that the search warrant was based upon a false affidavit, is also a challenge to the sufficiency of the search warrant and, for the reasons stated above, must also be brought in the Western District of Missouri.

[16]  Much of the plaintiff's Fourth Amendment argument is premised on the assumption that the IARA-USA is an organization that is completely separate from the IARA.  Thus, goes the argument, there was no probable cause that the IARA-USA was engaged in any wrongdoing.  Pl.'s Opp'n at 36-37.  As already noted, however, this Court

(continued...)

(b)      The Plaintiff's Fifth Amendment Due Process Claim

The Fifth Amendment provides that no person may "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. "The fundamental requirement of [procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey, 408 U.S. at 481. In resolving claims of procedural due process violations, three factors are considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335. Moreover, in applying this test, the Court is mindful that there are circumstances that "present[] an 'extraordinary' situation in which postponement of notice and hearing until after seizure d[oes] not deny due process." Calero-Toledo v. Pearson Yachu Leasing Co., 416 U.S. 663, 679-80 (1974). As the Court noted in Calero-Toledo, even immediate seizure of a property interest is appropriate if (1) "the seizure has been directly necessary to secure an important governmental or general public interest;" (2) "there has been a

---

[16](...continued)
has concluded that there is substantial evidence in the administrative record to support the OFAC's decision to block the IARA-USA's assets. Accordingly, because the underlying assumption of the plaintiff's argument is without merit, so to is the argument itself.

special need for very prompt action;" and (3) "the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." Id. at 679 (citation omitted).

Here, the plaintiff claims its due process rights were violated because it was not afforded notice and a hearing before its assets were blocked. Compl. ¶¶ 45-47; Pl.'s Opp'n at 38-39. In support of this argument, the plaintiff relies heavily on Nat'l Council of Resistance of Iran (NCRI) v. Dep't of State, 251 F.3d 192, 205 (D.C. Cir. 2001). However, NCRI is inapposite. In NCRI, the District of Columbia Circuit held that notice and an opportunity to be heard must be afforded prior to designating an entity as a "foreign terrorist organization" under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). NCRI, 251 F.3d at 205-208. However, as another member of this Court has found, NCRI does not control in cases where action was taken pursuant to the IEEPA, as actions under the IEEPA "flow[] from a Presidentially declared national emergency." Holy Land Found., 219 F. Supp. 2d at 76. Moreover, the Circuit Court in NCRI did "not foreclose the possibility that the [government], in an appropriate case, [could] demonstrat[e] the necessity of withholding all notice and all opportunity to present evidence until the designation [was] already made." NCRI, 251 F.3d at 208. This is just such a case. Thus, this Court agrees with its colleague in Holy Land Found., that the applicable test was enunciated in Calero-Toledo.

It cannot be reasonably argued that protecting the public from terrorist attacks is not an important governmental and public interest. Moreover, here,

18

prompt action by the Government was necessary to protect against the transfer of assets subject to the blocking order.  Money is fungible, and any delay or pre-blocking notice would afford a designated entity the opportunity to transfer, spend, or conceal its assets, thereby making the IEEPA sanctions program virtually meaningless.

Holy Land Found., 219 F. Supp. 2d at 77.  Finally, there is no dispute that the government, not private parties, initiated the blocking at issue here.  Based on these circumstances, the Court agrees with the defendants' position that the plaintiff were not entitled to pre-deprivation notice and a hearing.  Accordingly, the plaintiff's due process challenge must be dismissed, as it fails to state a claim as a matter of law.

(c)   The Plaintiff's Fifth Amendment Equal Protection Claim

The plaintiff also contends that the defendants have violated the equal protection guarantees embodied in the Fifth Amendment.[17]  Compl. ¶¶ 71-78; Pl.'s Opp'n at 31-35. Specifically, the plaintiff opines that the defendants have treated the IARA-USA differently than it has treated the United Nations Children's Fund ("UNICEF"), which has assisted, sponsored, and provided support to the IARA even after the organization was designated as a SDGT.  Pl.'s Opp'n at 33.

"The Equal Protection Clause of the [Fifth] Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)).  When assessing an equal protection challenge, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally

---

[17]  The equal protection component of the Fifth Amendment is derived from the Amendment's due process clause.  Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 616 (1991).

related to a legitimate state interest." Id. at 440.  However, "when a statute classifies by race,

alienage, or national origin," courts must apply a "strict scrutiny" standard of review.  Id.

Accordingly, this Court must first determine what level of review it must employ in this case.

In Massachusetts Board of Retirement v. Murgia, 427 U.S. 307 (1976), the Supreme

Court made clear that an "equal protection analysis requires strict scrutiny of a legislative

classification only when the classification impermissibly interferes with the exercise of a

fundamental right or operates to the peculiar disadvantage of a suspect class." Id. at 312.  The

only conceivable suspect class challenge that could be made here would be religious based,[18] but

there is no basis for such a claim, and the plaintiff does not argue, that the IEEPA and the

Executive Order intentionally discriminates on the basis of religion.  Pl.'s Opp'n at 34

(acknowledging that the IEEPA is "fair on its face").  Nor does the IEEPA or the Executive

Orders interfere with the exercise of a fundamental right.  Accordingly, any classification made

by the IEEPA or the Executive Orders need only be rationally related to a legitimate

governmental objective in order to survive a constitutional challenge.  See Mathews v. de Castro,

429 U.S. 181, 185 (1976).  Here, the IEEPA and the Executive Order are clearly rationally

related to the government's objective to protect the American public from terrorist attacks.

Moreover, the plaintiff has simply failed to even invoke the Equal Protection guarantees

of the Fifth Amendment.  As noted earlier, as a predicate to invoking the protections of the Equal

Protection Clause, the plaintiff must demonstrate that it was similarly situated to other nonprofit

organizations who support terrorist activities and who were treated differently.  See Plyer v. Doe,

---

[18]   The plaintiff does not attempt to argue, nor could it, that terrorists or terrorists organizations are a suspect class that warrant application of the "strict scrutiny" test.  See, e.g., Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003) ("there is no constitutional right to fund terrorism.").

457 U.S. 202 (1982); <u>Cook v. Babbitt</u>, 819 F. Supp. 1, 11 (D.D.C. 1993) (citing <u>City of Cleburne</u>,

473 U.S. at 439).   Here, the plaintiff contends that its treatment has been different than that of

UNICEF.   However, based on the evidence presented to this Court, there is simply no basis to

conclude that UNICEF has even remotely the same type and number of ties to the IARA, or any

other organization with terrorist ties, as does the plaintiff.   Thus, the underlying premise for the

plaintiff's equal protection argument fails as UNICEF and the IARA-USA are simply not

similarly situated.   As the Circuit Court stated, "there is no constitutional right to fund terrorism."

<u>Holy Land Found.</u>, 333 F.3d at 165 (citation omitted).   And the record evidence supports the

conclusion that the IARA-USA has done exactly that.   Accordingly, the defendants are entitled to

summary judgment on the plaintiff's equal protection claim.

(d)      The Plaintiff's Takings Clause Claim

The second count of the plaintiff's complaint alleges that the taking of its property and

the blocking of its assets violate the Takings Clause of the Fifth Amendment.   Compl. ¶¶ 48-51.

Under the Fifth Amendment,  no "private property [shall] be taken for public use, without just

compensation."   U.S. Const. amend V.   The defendants argue, and this Court agrees, that this

claim must be dismissed.[19]   First, it appears that this Court lacks subject matter jurisdiction over

the plaintiff's Fifth Amendment claim, as this is a claim properly brought before the United

States Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491. <u>See, e.g.</u>, 28

U.S.C. § 1491(a)(1) ("[t]he United States Court of Federal Claims shall have jurisdiction to

render judgment upon any claim against the United States founded either upon the Constitution,

---

[19]   The plaintiff has failed to advance any argument in opposition to the defendants' position regarding this claim.  Accordingly, they have conceded the issue and this claim could be dismissed without further discussion. <u>FDIC</u>, 127 F.3d at 67-68.

21

or any Act of Congress or any regulation of an executive department . . . ."); <u>Dames & Moore v.</u>

<u>Regan</u>, 453 U.S. 654, 688-89 (1981) (noting that the Court of Federal Claims is the proper forum

for claims alleging an unconstitutional taking).  Moreover, to the extent that the plaintiff seeks to

challenge the blocking of assets pursuant to an Executive Order, such an order is not, as a matter

of law, a takings within the meaning of the Fifth Amendment.  <u>Holy Land Found.</u>, 219 F. Supp.

2d at 78 (citing multiple cases for the proposition that the blocking of assets does not "as a matter

of law, constitute takings within the meaning of the Fifth Amendment.").[20]

(e)     <u>The Plaintiff's First Amendment Freedom of Speech Claim</u>

The fourth count of the plaintiff's complaint alleges that the defendants, by prohibiting

the plaintiff from making humanitarian contributions, has violated the free speech guarantees of

the First Amendment.  Compl. ¶¶ 58-63.  Under the First Amendment, "Congress shall make no

law . . . abridging the freedom of speech."  U.S. Const. amend I.  In analyzing claims under the

First Amendment, the Supreme Court has provided multiple analytical frameworks depending on

the type of speech at issue.  For example, if the speech is aimed at interfering with the expressive

component of conduct, the Court must apply the strict scrutiny standard of review. <u>See, e.g.</u>

<u>Texas v. Johnson</u>, 491 U.S. 397, 406 (1989) (applying strict scrutiny to law prohibiting only the

burning of flags which offended witnesses of the events).  However, the Court analyzes a claim

under intermediate scrutiny when the " regulation  . . . serves purposes unrelated to the content of

expression."  <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989); <u>see also</u> <u>United States v.</u>

<u>O'Brien</u>, 391 U.S. 367, 376 (1968) (applying intermediate scrutiny to regulation prohibiting the

---

[20]  In addition, as this Court has already noted, if this claim seeks the return of the plaintiff's property seized
pursuant to the search warrant, such a claim must be brought in the Western District of Missouri.

22

burning of a draft card).[21]  Here, the plaintiff premises its claim on the Supreme Court's decisions in Buckley v. Valeo, 424 U.S. 1 (1976) and Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377 (2000), and opines that this Court should employ the strict scrutiny analysis.  Specifically, the plaintiff posits that these cases stand for the proposition that the contribution of money is clearly the type of speech activity that warrants protection under the First Amendment.  Pl.'s Opp'n at 39-40.  Thus, because the Executive Order and the IEEPA prohibit the plaintiff from making financial contributions for humanitarian aid, the plaintiff contends that they violated the First Amendment.  Pl.'s Opp'n at 39-40.

The defendants do not argue, nor could they, that donation of money is not a form of speech protected by the First Amendment.  See, e.g., Buckley, 424 U.S. at 16; Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 636-37 (1980).  Rather, they posit that the Court should employ an intermediate scrutiny standard of review, Defs.' Mem. at 53-54, and this Court agrees.  Contrary to the plaintiff's contention, Buckley and its progeny simply do not set forth the proper framework for the analysis the Court must conduct in this case.  In Buckley, the Supreme Court was presented with a statute that placed restrictions on political contributions. Buckley, 424 U.S. at 1.  Noting that "[t]he First Amendment affords the broadest protection to such political expression," the Court applied the strict scrutiny standard in analyzing whether the restrictions passed constitutional scrutiny.  Id. at 14.  Here, however, there is no allegation that the IARA-USA uses its funds to make political contributions, rather, the IARA-USA uses its

---

[21]  The principal standards under which First Amendment claims are reviewed are strict scrutiny and intermediate scrutiny.  Am. Soc. of Ass'n Executives v. United States, 23 F. Supp. 2d 64, 68 (D.D.C. 1998).  However, the Supreme Court has employed "other standards for analyzing the restriction of speech depending on the particulars of the speech or the type of regulation at issue. In analyzing statutes involving taxation or the allocation of public funds the Supreme Court has applied a standard even more deferential than intermediate scrutiny."  Id.

funds for charitable and humanitarian aid.  As Judge Kessler noted in Holy Land Found., "[s]uch charitable contributions plainly do not involve political expression, and therefore do not warrant strict scrutiny under Buckley."  Holy Land Found., 219 F. Supp. 2d at 82 n.37.  Rather, First Amendment freedom of speech challenges to blocking decisions are analyzed under the intermediate scrutiny standard discussed in United States v. O'Brien, 391 U.S. 367, 376-77 (1968).  See Holy Land Found., 219 F. Supp. 2d at 81; see also Humanitarian Law Project v. Reno, 205 F.3d 1130, 1135-36 (9th Cir. 2000); Global Relief Found., Inc. v. O'Neil, 207 F. Supp. 2d 779, 806 (N.D. Ill. 2002).

Under O'Brien, the government's restriction passes intermediate scrutiny if (1) "it is within the constitutional power of the Government;" (2) "it furthers an important governmental interest;" (3) "the governmental interest is unrelated to the suppression of free expression;" and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  391 U.S. at 377.  Here, the IEEPA and the Executive Order clearly survive constitutional scrutiny under this standard and the plaintiff makes absolutely no attempt to argue otherwise.  First, the President clearly had the power to issue Executive Order 13,224, and the OFAC had the authority to block the plaintiff's assets.  See Regan, 468 U.S. at 244; Teague v. Regional Comm'r of Customs, 404 F.2d 445-46 (2d Cir. 1968).  Second, Executive Order 13,224 and the OFAC's actions clearly further an important governmental interest — preventing terrorist attacks.  Third, the government's interest is completely unrelated to the suppression of free expression, rather, its interest is to prohibit the funding of terrorist activities.  As noted in Holy Land Found., "[m]oney is fungible, and the Government has no other, narrower, means of ensuring that even charitable contributions to a terrorist organization

24

are actually used for legitimate purposes." <u>Holy Land Found.</u>, 219 F. Supp. 2d at 82 (citing

<u>Humanitarian Law Project</u>, 205 F.3d at 1136). Moreover, nothing in the IEEPA or the Executive

Order prohibits the IARA-USA from expressing its views. Finally, the incidental restriction on

the First Amendment is no greater than necessary. Accordingly, this Court must conclude that

the restrictions created by the Executive Order and the OFAC's actions are "narrowly enough

tailored to only further its interest in stopping the flow" of funds to terrorist activities. <u>Id.</u>

(f)       The Plaintiff's First Amendment Freedom of Association Claim

The plaintiff also claims, relying on <u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. 886,

(1982), that because Executive Order 13,224 and the actions of the OFAC's completely prohibit

the plaintiff from making any contributions, which is a type of associational activity, the

Executive Order and the blocking order violate its right of association as protected by the First

Amendment. Pl.'s Opp'n at 41-43. Specifically, the plaintiff contends that the government

simply cannot meet its "burden of establishing knowing affiliation with an organization

possessing unlawful aims and goals, and a specific intent to further those illegal aims," which is

necessary to withstand constitutional scrutiny. Pl.'s Opp'n at 41-42 (quoting <u>Healy v. James</u>, 408

U.S. 169, 186 (1972)). The argument raised here is virtually identical to the argument raised and

rejected by the Court in <u>Holy Land Found.,</u> and this Court sees no reason to depart from the very

clear and persuasive logic in that case.

In <u>Claiborne Hardware Co.</u>, the Supreme Court reversed the judgment against the

NAACP and members of that organization who had participated in a seven-year boycott of white

merchants. The Supreme Court found that liability had been unconstitutionally imposed "by

reason of association alone." <u>Claiborne Hardware Co.</u>, 458 U.S. at 920. As the District Court in

25

Holy Land Found. noted, "this is simply not a case like Claiborne Hardware, because OFAC's action was not taken against [the IARA-USA] for 'reason of association alone.'" Holy Land Found., 219 F. Supp. 2d at 80 (citation omitted).   Rather, here, as in Holy Land Found.,

> the IEEPA, the two Executive Orders, and the blocking order do not prohibit membership in [the IARA-USA] or endorsement of its views, and therefore do[es] not implicate [the IARA-USA's] association rights.  Instead, they prohibit [IARA-USA] from providing financial support to [the IARA], "and there is no constitutional right to facilitate terrorist."

Holy Land Found., 219 F. Supp. 2d at 81 (quoting Humanitarian Law Project, 205 F.3d at 1133).

Thus, Claiborne Hardware Co. does not control this case and the defendants' actions, which do not prohibit association, are not unconstitutional.

Moreover, because the defendants have not acted based on guilt by association, the specific intent requirement discussed in Claiborne Hardware Co. is not applicable here. Nonetheless, "imposing a 'specific intent' requirement on the Government's authority to issue blocking orders would substantially undermine the purpose of the economic sanctions programs. Regardless of [its own] intent, [the IARA-USA] cannot effectively control whether support given to [the IARA] is used to promote that organizations's unlawful activities." Holy Land Found., 219 F. Supp. 2d at 81 (citing Humanitarian Law Project, 205 F.3d at 1133).   Accordingly, the defendants are entitled to dismissal of this claim, as the plaintiff has failed to state a claim upon which relief can be granted.

(g)     The Plaintiff's First Amendment Freedom of Religion Claim

The fifth count of the plaintiff's complaint alleges a violation of its First Amendment right of free exercise of religion.  Compl. ¶¶ 64-70.  Specifically, the plaintiff claims that the "IARA-USA and its Muslim donors and employees support and participate in the IARA-USA's

work because it fulfills their religious obligations as Muslims to engage in Zakat (humanitarian

charitable giving)."  Id. ¶ 65.  Thus, argues the plaintiff, by blocking its assets, the government

has substantially burdened its and its donors exercise of religion.  Id. ¶ 66.  The defendants posit,

however, that this claim must fail under the ruling in Farrakhan v. Regan, 669 F. Supp 506, 512,

aff'd 851 F.2d 1500 (1988), and also because the IARA-USA cannot invoke the religious rights

of its employees or past donors, nor does it have standing itself to state a valid free exercise

claim.  Defs.' Mem. at 58-59.  The plaintiff makes no attempt to counter the defendants'

argument, and this Court therefore must conclude that the plaintiff concedes that this claim has

no merit and must be dismissed.  FDIC, 127 F.3d at 67-68.  In any event, the Court notes that the

IARA-USA lacks standing to even make such a claim.  As the Supreme Court has recognized,

"[s]ince 'it is necessary in a free exercise cause for one to show the coercive effect of the

enactment as it operates against him in the practice of his religion,' the claim asserted here is one

that ordinarily requires individual participation."  Harris v. McRae, 448 U.S. 297, 321 (1980)

(citation omitted).  Thus, the Harris Court held that an organization did not have standing to raise

a free exercise claim, but rather, it must be brought by an individual.  Id.  Here, since the only

named plaintiff is the IARA-USA, an organization, the IARA-USA simply has no standing to

assert this challenge.  See Harris, 448 U.S. at 321;  Holy Land Found., 219 F. Supp. 2d at 83-84.

(h)     The Plaintiff's 42 U.S.C. § 1985(3) Claim

_____Although not specifically challenged by the defendants in their dismissal motion, the

plaintiff's § 1985 claim must fail as well.  This claim is predicated on the defendants' alleged

constitutional violations.  Compl. ¶¶ 92-101.  Since this Court has already concluded that the

plaintiff's constitutional challenges can not survive the defendants' motions, the legal predicate

underlying this claim is lacking and it too cannot survive.

**(C)      Conclusion**

Based on the foregoing analysis, the Court concludes that the plaintiff is unable to maintain any of the claims it has raised under the APA, the Constitution, and 42 U.S.C. § 1985. Accordingly, the Court must grant either the defendants' motion to dismiss or their motion for summary judgment.

## III.    Defendant Schlup's Dismissal Motion

In addition to the other defendants' motion for dismissal of the claims against them in their official capacities, which the Court has granted, defendant Schlup also seeks dismissal of the claims brought against him in his individual capacity.  The plaintiff alleges that Schlup violated its First, Fourth, and Fifth Amendment rights, by submitting a false affidavit to obtain a search warrant, and violated 42 U.S.C. § 1985(3).  Pl.'s Opp'n to Schlup Mot. at 1.  The claims are premised upon the invocation of the ruling enunciated in <u>Bivens</u>, 403 U.S. at 388.[22]  Compl. ¶¶ 47, 51, 57, 63, 70, 78, 85.  Schlup posits that he should be dismissed as a defendant in this case because this Court lacks personal jurisdiction over him.[23]  Schlup's Mem. at 3.  The plaintiff

---

[22]  In <u>Bivens</u>, the Supreme Court acknowledged the right of citizens to file claims for damages against federal law enforcement officials who violate their constitutional rights.  <u>Bivens</u>, 403 U.S. at 389.  There, petitioner Bivens alleged he had been subjected to an unlawful search and seizure by federal agents in violation of the Fourth Amendment.  <u>Id.</u>  In reversing the District Court and the Second Circuit's affirmance of the dismissal of Biven's complaint on the ground that he had failed to state a cause of action, the Supreme Court held that "damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials . . . ."  <u>Id.</u> at 395; <u>see also</u> <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 66 (2001) ("In Bivens . . . we recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.").

[23]  In addition, defendant Schlup opines that he is entitled to dismissal of the claims raised against him because (1) this Court is not the proper venue for the plaintiff to assert its claims; (2) he was not properly served with the summons and complaint; (3) the plaintiff cannot state a cognizable Fourth Amendment claim against him because it cannot assert Fourth Amendment protections on behalf of its employees or donors; and (4) he is entitled to qualified immunity.  Because this Court concludes that it lacks personal jurisdiction over defendant Schlup, it need

(continued...)

contends, however, that this Court has personal jurisdiction over Schlup under two distinct theories. First, the plaintiff opines that Schlup has "transacted business" within the meaning of the District of Columbia's long-arm statute, D.C. Code § 13-423. Pl.'s Opp'n to Schlup's Mot. at 4. And second, the plaintiff posits that this Court has personal jurisdiction over Schlup because he is a member of a civil conspiracy with members subject to personal jurisdiction in this Court. Pl.'s Opp'n to Schlup's Mot. at 6. Neither argument, however, provides a sufficient basis for this Court to exercise personal jurisdiction over Schlup.[24]

**(A)      The District of Columbia Long-Arm Statute**

"Because <u>Bivens</u> suits are suits against government officials in their individual, rather than their official, capacities, personal jurisdiction over the individual defendants is necessary to maintain a <u>Bivens</u> claim." <u>Robertson v. Merola</u>, 895 F. Supp. 1, 3 (D.D.C. 1995) (citing <u>Delgado v. Bureau of Prisons</u>, 727 F. Supp. 24 (D.D.C. 1989); <u>Lawrence v. Acree</u>, 79 F.R.D. 669, 670 (D.D.C. 1978)). On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing personal jurisdiction over each defendant. <u>Crane v. New York Zoological</u>

---

[23](...continued)
not address these alternative positions.

[24]  Throughout the IARA-USA's opposition, it opines that discovery will provide further support for its contention that this Court has personal jurisdiction over defendant Schlup. Pl.'s Opp'n to Schlup's Mot. at 4-5. Motions for discovery concerning personal jurisdiction are liberally granted whenever a party has "a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." <u>Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC</u>, 148 F.3d 1080, 1090 (D.C. Cir. 1998). Moreover, "[a] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum." <u>El-Fadl v. Cent. Bank of Jordan</u>, 75 F.3d 668, 676 (D.C. Cir. 1996). But the plaintiff here is not entitled to discovery. First, the IARA-USA merely mentions that discovery would further support its arguments, however, it has not filed a motion seeking such discovery, or represented what information discovery would disclose which would elucidate any of the issues, including the jurisdictional issue. Moreover, even if this Court could conclude that such a request has been made, in the absence of any proffer concerning "allege[d] . . . facts remotely suggesting that [Schlup] had any connection to the District of Columbia[,]" the Court concludes that jurisdictional discovery would not shed light on whether it can exercise personal jurisdiction over defendant Schlup. <u>Caribbean Broad. Sys.</u>, 148 F.3d at 1090.

Soc., 894 F.2d 454, 456 (D.C. Cir. 1990) (explaining that the plaintiff bears the burden of

establishing a factual basis for a court's exercise of personal jurisdiction over a defendant).   In

order to satisfy this burden, the plaintiff cannot rely on conclusory allegations; rather, it must

allege specific facts on which personal jurisdiction is based.   First Chicago Int'l v. United

Exchange Co., 836 F.2d 1375, 1378 (D.C. Cir. 1988) (noting that conclusory allegations

regarding a defendant's business practices are insufficient to establish personal jurisdiction).

Moreover, a court need not treat the plaintiff's allegations as true; rather, the court may consider

and weigh affidavits and other relevant matter in making the jurisdictional determination.   Id.

Nonetheless, "[i]n determining whether such a basis exists, factual discrepancies appearing in the

record must be resolved in favor of the plaintiff."   Crane, 894 F.2d at 456 (D.C. Cir. 1990).

     Under District of Columbia law, personal jurisdiction can be satisfied either by

demonstrating that the court has general jurisdiction pursuant to D.C. Code § 13-422, or that the

court has personal jurisdiction pursuant to the District of Columbia long-arm statute, D.C. Code

§ 13-423.   It is clear, and the plaintiff does not contend otherwise, that the Court does not have

general jurisdiction over defendant Schlup, as he is not domiciled in the District of Columbia nor

does he maintain his principal place of business here.   See D.C. Code § 13-422.   Rather, Schlup

is a resident of Missouri and works in Missouri.   Schlup's Mot., Declaration of Paul R. Schlup

("Schlup Dec.") ¶ 2.   Thus, the question for this Court to resolve is whether it can exercise

personal jurisdiction over Schlup pursuant to the District of Columbia's long-arm statute.

     The plaintiff contends that it has satisfied the requirements of showing that this Court can

exercise personal jurisdiction over Schlup pursuant to D.C. Code § 13-423 (a)(1).  Pl.'s Opp'n to

Schlup's Mot. at 2.  This provisions provides: "(a) A District of Columbia court may exercise

personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief

arising from the person's — (1) transacting business in the District of Columbia." D.C. Code

§ 13-423.  D.C. § 13-423(a)(1) is "'co-extensive with the Constitution's due process limit.'"

Dickson v. United States, 831 F. Supp. 893, 897 (D.D.C. 1993) (quoting First Chicago Int'l v.

United Exch. Co., Ltd., 836 F.2d 1375, 1377 (D.C. Cir. 1988); see also Envtl. Research Int'l, Inc.

v. Lockwood Greene Engineers, Inc., 355 A.2d 808 (D.C. 1976) (stating that Congress intended

the District of Columbia's long-arm statute to be co-extensive with due process.).  As a result of

this congruence, courts in this jurisdiction have consistently held that "[t]he only nexus required

by . . . [§ 13-423](a)(1) . . . between the District of Columbia and the nonresident defendant is

'some affirmative act by which the defendant brings itself within the jurisdiction and establishes

minimum contacts.'"[25]  Berwyn Fuel, Inc. v. Hogan, 399 A.2d 79, 80 (D.C. 1979) (quoting

Cohane v. Arpeja-California, Inc. 385 A.2d 153, 158 (D.C. 1978)).  Therefore, the plaintiff must

demonstrate that exercising jurisdiction over the defendants would not "offend the traditional

notions of fair play and substantial justice."  Int'l Shoe Co. v. State of Washington, 326 U.S. 310,

316 (1945); see also Hasenfus v. Corporate Air Services, 700 F. Supp. 58, 61 (D.D.C. 1988)

(quoting Int'l Shoe, 326 U.S. at 316) (internal quotation marks omitted).  "Under the 'minimum

contacts' standard, courts must insure that 'the defendant's conduct and connection with the

forum State are such that he should reasonably anticipate being haled into court [here].'"  GTE

---

[25]   D.C. Code § 13-423(b) acts as a limitation on § 13-423(a) and "bars. . . claims unrelated to the acts forming the basis for personal jurisdiction."  See Dickson, 831 F. Supp. at 897 n. 5; Pollack v. Meese, 737 F. Supp. 663, 666 (D.D.C. 1990) (citing Willis v. Willis, 655 F.2d 1333, 1336 (D.C. Cir. 1981)).  The limitation in § 13-423(b) is "meant to prevent 'the assertion of claims in the forum state that do not bear some relationship to the acts in the forum state relied upon to confer jurisdiction.'"  Cohane, 385 A.2d at 158 (quoting Malinow v. Eberly, 322 F. Supp 594, 599 (D. Md. 1971)).  Therefore, if a claim is related to the defendants' acts in the District of Columbia, the requirement of § 13-423(b) is satisfied.  Dickson, 831 F. Supp. at 897.

New Media Services Inc. v. BellSouth Corp., 199 F.3d 1343, 1347 (D.C. Cir. 2000) (quoting

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).[26]

Here, the plaintiff opines that because Schlup is a special agent with the Internal Revenue

Service ("IRS"), and the IRS is a component of the United States Department of the Treasury,

which has its headquarters in the District of Columbia, he has transacted business within the

District of Columbia pursuant to the D.C. Code § 13-423(a)(1).  Pl.'s Opp'n to Schlup's Mot. at

4.  The plaintiff's argument is wholly without merit.  First, as already indicated, in order for the

plaintiff to precede on its constitutional claims pursuant to Bivens, it must first establish that this

Court has personal jurisdiction over Schlup in his individual capacity.  Robertson, 895 F. Supp.

at 3.  Moreover, it is well-settled that this Court cannot assert jurisdiction over an individual

defendant based on his actions taken pursuant to his employment.  See, e.g., Ali v. District of

Columbia, 278 F.3d 1, 7 (D.C. Cir. 2002) (district court did not have personal jurisdiction over

government employee because all contacts with the District of Columbia were taken in his

official capacity); Ibrahim v. District of Columbia, 357 F. Supp. 2d 187, 193 (D.D.C. 2004)

(dismissing claims against government employees because all actions connecting these

defendants to the forum were taken in their official capacities).  Rather, personal jurisdiction over

employees of an agency must be based on their individual contacts with the forum, and cannot be

based on the agency's contacts with the forum.  See Ali, 278 F.3d at 7; accord Wiggins v.

---

[26] The burden imposed on the non-resident defendant from being haled into a foreign court will "in an appropriate case be considered in light of other relevant factors, including the interest of the forum state in adjudicating disputes. . .; the plaintiff's interest in obtaining convenient and effective relief. . .; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interests of the several [s]tates in furthering fundamental substantive social policies."  World-Wide Volkswagen, 444 U.S. at 292 (internal citations omitted).

Equifax, Inc., 853 F. Supp. 500, 503 (D.D.C. 1994) ("[p]ersonal jurisdiction over the employees

or officers of a corporation in their individual capacities must be based on their personal contacts

with the form and not their acts and contacts carried out solely in a corporate capacity."); Keeton

v. Hustler Mag., Inc., 465 U.S. 770, 781 n.13 (1984) ("jurisdiction over an employee does not

automatically follow from jurisdiction over the corporation which employs him"); Richard v.

Bell Atlantic Corp., 976 F. Supp 40, 49 (D.D.C. 1997).  Thus, the agency's contact with the

District of Columbia are insufficient to confer jurisdiction on this Court over defendant Schlup.

Here, the plaintiff believes that this Court can exert personal jurisdiction over Schlup because he

is employed and paid by the Department of the Treasury, provides services to the Department of

the Treasury at its direction, and is supervised directly or indirectly by officials at the Department

of the Treasury.  Pl.'s Opp'n to Schlup's Mot. at 3.  These allegations are simply insufficient, as

each action is based solely on actions allegedly taken by Schlup in his official capacity as an

employee of the IRS.  The plaintiff's claim that employment by a federal agency provides a basis

for this Court to exercise personal jurisdiction over a plaintiff who works and resides in Missouri

under D.C. Code § 13-423(a)(1) is clearly contrary to existing precedent.

Moreover, hailing Schlup into Court in this jurisdiction would clearly offend the Due

Process Clause.  In the seminal case in this area, International Shoe, the Supreme Court found

that a Delaware corporation that employed salesmen who resided in the State of Washington,

regularly sold shoes in permanent display rooms in Washington, resulting in large volumes of

business in Washington, had sufficient contact with the State of Washington to be hailed into

court there without violating due process.  Int'l Shoe Co., 326 U.S. at 320.  By contrast, here,

Schlup does not live in the District of Columbia, does not own property in the District of

Columbia, never owned or operated a business in the District of Columbia, and never supplied services in the District of Columbia.  Schlup's Mot., Schlup Dec. ¶¶ 1-11.  The simple fact that Schlup is employed by the IRS, which is a component of the Department of the Treasury and is headquartered in the District of Columbia, is simply no basis for this Court to exercise personal jurisdiction over Schlup.  See, e.g., American Ass'n of Cruise Passengers v. Cunard Line Ltd.,691 F. Supp. 379, 380 (D.D.C. 1987) (concluding that personal jurisdiction could not be asserted over an out-of-state defendant because of his membership in a District of Columbia trade association);  Investment Co. Institute v. United States, 550 F. Supp 1213, 1217 n.6 (D.D.C. 1982) (noting that "it would surely come as a surprise to the members of the many trade associations having offices [in the District of Columbia] that their memberships counted as intrastate business for jurisdictional purposes.").

**(B)   Conspiracy Theory of Jurisdiction**

Alternatively, the plaintiff posits that this Court has personal jurisdiction over Schlup because he is a member of a civil conspiracy with members subject to personal jurisdiction in this Court.  Pl.'s Opp'n to Schlup's Mot. at 6.   Courts in this Circuit have "held that acts within the forum of one co-conspirator, in furtherance of an alleged conspiracy, subject a nonresident co-conspirator to personal jurisdiction."  Dooley v. United Technologies Corp., 786 F. Supp 65, 78 (D.D.C. 1992) (citing Mandelkorn v. Patrick, 359 F. Supp. 692 (D.D.C. 1973)).  However, a plaintiff seeking to meet its burden of demonstrating that a court may exercise jurisdiction over a defendant under a conspiracy theory must present a "particularized pleading of the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy."  DSMC, Inc. v. Convera Corp., 273 F. Supp. 2d 14, 20 (D.D.C. 2002). "[M]ere speculation that the nonresident

defendants' are co-conspirators [is] insufficient to meet plaintiff's <u>prima facie</u> burden." <u>Dooley</u>,

786 F. Supp. at 78.  Thus, conclusory allegations are simply insufficient to establish a court's

jurisdiction under the conspiracy theory.

Here, the plaintiff alleges a conspiracy under 42 U.S.C. § 1985(3).  Compl. ¶¶ 92-101.

To establish a conspiracy under § 1985(3), the plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws, or of privileges and immunities under the law; (3) motivated by some class based, invidiously discriminatory animus exists; (4) whereby a person is either injured in his person or property, or is deprived of any right or privilege of a citizen of the United States.

<u>Graves v. United States</u>, 961 F. Supp. 314, 320 (D.D.C. 1997) (citing <u>Griffin v. Breckenridge</u>,

403 U.S. 88, 102-03 (1971); <u>Hobson v. Wilson</u>, 737 F.2d 1, 14 (D.C. Cir. 1984)).   Viewing the

plaintiff's complaint in the light most favorable to the plaintiff, this Court simply cannot

conclude that the plaintiff has sufficiently pled a claim for conspiracy.

> A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in that damage.'"

<u>Graves</u>, 961 F. Supp at 320 (quoting <u>Lenard v. Argento</u>, 699 F.2d 874, 882 (7th Cir. 1983)

(citation omitted)).  Here, the plaintiff has simply failed to allege facts with particularity that

support the existence of a conspiracy.  First, the plaintiff's conspiracy claim simply alleges a

"government-wide conspiracy" to deprive the plaintiff of various constitutional rights.  Compl.

¶¶ 93-94.  This is hardly pleading a conspiracy with particularity.  Moreover, the plaintiff's

complaint fails to identify which defendants were allegedly part of the conspiracy, and in fact, the

few factual allegations detailing actions allegedly committed by Schlup do not even assert that

they were performed as part of, or to advance an alleged conspiracy.  See Compl. ¶¶ 33-34.  In

addition, there is simply no allegation in the complaint that any of the defendants conferred with

each other or acted in complicity with each other for the purpose of conspiring to deprive the

plaintiff of its constitutional rights.  Accordingly, there is simply no basis for this Court to

conclude that the plaintiff has pled with particularity the facts necessary to support a conspiracy

claim.  As such, the plaintiff cannot rely upon an alleged conspiracy as a means for this Court to

exercise personal jurisdiction over Schlup.

**(C)      Conclusion**

For the reasons set forth above, this Court concludes that it does not have personal

jurisdiction over defendant Schlup.  Accordingly, the claims brought against Schlup in his

individual capacity must be dismissed.[27]

**SO ORDERED** this day of 15th day of September, 2005.[28]


                                        REGGIE B. WALTON
                                        United States District Judge

---

[27] As already indicated, the claims against John Snow, Secretary of the Treasury, and Alberto Gonzales, Attorney General of the United States, in their official capacities are dismissed.  In addition, the claims against the various unidentified FBI Agents, Paul Schlup, and other unidentified Department of the Treasury employees are dismissed as they relate to actions taken in their official capacities.  Moreover, this Court lacks personal jurisdiction over Paul Schlup, thus the claims against him individually must be dismissed.  Accordingly, this Court will dismiss this action.  However, the Court recognizes that the claims against the various unidentified FBI agents and unidentified Department of the Treasury employees in their individual capacities might still be cognizable. Specifically, the plaintiff might be able to pursue, for example, Bivens claims against these individual defendants once their identities are known.  It is likely, however, that this Court would lack personal jurisdiction over any such defendant, just as it lacks jurisdiction over defendant Schlup, as they are likely residents of Missouri and also work there.  However, the Court will provide the plaintiff 30 days in which to request reinstatement of this action if it is able to identify these defendants and can demonstrate that this Court can exercise personal jurisdiction over them.

[28] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.